United States District Court

For the Northern District of California

1

2 UNITED STATES DISTRICT COURT

3 NORTHERN DISTRICT OF CALIFORNIA

4

5
STATE OF CALIFORNIA, et al.,
6
              Plaintiffs,                    No. C 06-4333 PJH
7
      v.                       **ORDER GRANTING IN PART**
8                                   **AND DENYING IN PART DEFENDANTS'**
INFINEON TECHNOLOGIES AG,      **MOTION TO DISMISS**
9 et al.,

10               Defendants.

11 _____/

12      Defendants' motion to dismiss plaintiffs' complaint came on for hearing before this

13 court on February 7, 2007.  Plaintiffs, forty individual states acting through their Attorneys

14 General, and certain named government entities (collectively "plaintiffs" or "plaintiff States"),

15 appeared through their respective counsel.[1]  Defendants appeared through their counsel,

16 Julian Brew, Ronald C. Redcay, Joel S. Sanders,  Peter Nemerovski,  Kenneth R.

17 O'Rourke, Harrison J. Frahn, Gary L. Halling, and Robert B. Pringle.  Having read all the

18 papers submitted and carefully considered the relevant legal authority, the court hereby

19 GRANTS defendants' motion to dismiss in part and DENIES the motion to dismiss in part,

20 for the reasons stated at the hearing, and as follows.

21                               **BACKGROUND**

22      The instant case is closely related to a separate antitrust MDL action that is currently

23 pending before the court, In re Dynamic Random Access Memory Antitrust Litigation, M 02-

24 _____

25        [1]       For the sake of brevity, the court declines to list herein all plaintiff States and
entities represented by way of this action.  Plaintiffs' representatives who were present at the
26 hearing, however, included the following:  Brad Phelps (AR); Nancy Bonnell (AZ); Kathleen
Foote (CA); Emilio Varanini (CA); Michael Undorf (DE); Emilian Bucataru (FL); Rod Kimura
27 (HI); Blake Harrop (IL); Maryellen Mynear (KY); Jane Johnson (LA); John Tennis (MD);
Bridgette Williams (MS); Todd Sattler (ND); Deyonna Young (NM); Brian Armstrong (NV);
28 James Roberts (OH); Tim Nord (OR); Alexis Barbieri (PA); Sonny Jones (SC); Jay Smith (SC);
Elizabeth Martin (TN); Mark Levy (TX); Ron Ockey (UT); Sarah Allen (VA); Brady Johnson
(WA); Gwendolyn Cooley (WI); and Doug Davis (WV).

United States District Court

For the Northern District of California

1486 PJH.  Both actions generally allege a horizontal price-fixing conspiracy in the U.S.

market for dynamic random access memory ("DRAM"), carried out by numerous

manufacturer defendants.  Whereas the MDL case, however, is comprised of numerous

private actions brought by individuals and entities seeking relief against defendants, the

present action has been brought by forty individual plaintiff States, acting through their

respective Attorneys General, as well as certain government entities located within the forty

states.

A.    Background Allegations

DRAM is a semiconductor high-speed memory chip that is used to store electronic

data in a wide variety of electronic products, including personal computers and servers.

See First Amended Complaint ("FAC"), ¶ 9.  DRAM is sold worldwide, with the United

States DRAM market accounting for a significant share of global DRAM sales – more than

$5 billion annually.  See id. at ¶ 31.

The complaint alleges that over a four year period beginning in 1998, the

defendants[2] – various manufacturers of DRAM who collectively control the majority of U.S.

DRAM sales – conspired together to unlawfully fix, raise, and maintain the price for DRAM

in the U.S. market.  See id. at ¶ 34.  Defendants' conspiracy was allegedly effectuated

through coordinated participation in meetings, frequent price communications, and

coordinated supply reductions.  See, e.g., id. at ¶¶ 35-36, 39, 42, 60, 69, 79.  Plaintiffs

allege that, as a result of defendants' unlawful activity, DRAM prices were artificially inflated

during the conspiracy period, forcing consumers and businesses who purchased DRAM

during the period to pay more for DRAM than they would have in a free and competitive

market.  See id. at ¶¶ 89-91.

Plaintiffs define the victims of defendants' illegal price fixing cartel to include:  (1) the

_____

[2]      The named defendants are:  Infineon Technologies AG; Infineon Technologies North America Corp.; Hynix Semiconductor, Inc.; Hynix Semiconductor America, Inc.; Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Mosel Vitelic, Inc.; Mosel Vitelic Corp.; Nanya Technology Corporation; Nanya Technology Corporation USA, Inc.; Elpida Memory, Inc.; Elpida Memory (USA), Inc.; and NEC Electronics America, Inc. (collectively "defendants").

United States District Court

For the Northern District of California

plaintiff States themselves, since they were and are "purchasers of electronic products;" and (2) the "end user consumers" in the various plaintiff States, since they, too, are purchasers of electronic products. See FAC at ¶ 4. To that end, plaintiff States, acting through their various Attorneys General, proceed against defendants in various representative capacities – i.e., "on their own behalf, and on behalf of state agencies, political subdivisions, natural persons and/or businesses as warranted by federal and state laws." Id. In addition, certain state agencies and/or political subdivisions located within the plaintiff States also proceed as named plaintiffs, and are pursuing the instant action in a representative capacity on behalf of similarly situated entities. See generally FAC (named plaintiffs include, for example, City and County of San Francisco, County of Santa Clara, and the Los Angeles Unified School District "on behalf of all other political subdivisions similarly situated"); see also id. at ¶ 12.

All plaintiffs seek to recover "as damages, restitution, and/or disgorgement of the illegal overcharges that consumers paid as a result of the DRAM manufacturers' price fixing." See id.

B.    Plaintiffs' Claims

The instant complaint sweeps broadly. Although it is presented as stating only three "claims for relief," those claims for relief are further divided into several "counts," which collectively state numerous federal and state law claims alleged by varying combinations of different plaintiff groups. See generally FAC. Regardless whether styled as a claim for relief or a specific count, each of plaintiffs' grounds for relief is based on the allegations that defendants engaged in an unlawful conspiracy to restrain trade in the DRAM market:

1.    First Claim for Relief (Sherman Act)

Plaintiffs' first claim for relief alleges that defendants violated section 1 of the Sherman Act, and is further broken down into three separate counts. See FAC at ¶¶ 98-113. Count one alleges a claim by all forty plaintiff States against all defendants, and seeks injunctive relief against them to prevent and restrain the antitrust violations alleged

United States District Court

For the Northern District of California

by plaintiffs.  Plaintiffs further allege that included among all plaintiff States are both direct and indirect purchasers of DRAM.  See id. at ¶¶ 101(c), 102.

Count two alleges a claim for damages under section 1 of the Sherman Act, brought by only seven plaintiff States.  See FAC at ¶¶ 105-108.  These seven plaintiff States allege that they are entitled to damages against defendants as direct purchasers of DRAM, by virtue of certain assignment clauses contained in contracts that were entered into between the seven plaintiff States and certain Original Equipment Manufacturers ("OEM"s).  Id.

Count three alleges a claim for damages under section 1 of the Sherman Act, brought by twenty plaintiff States.  See id. at ¶ 111.  As do the plaintiff States who proceed pursuant to count two, these twenty plaintiff States allege that they, too, are entitled to damages as direct purchasers of DRAM from defendants.  They do not, however, rely on the same grounds for claiming direct purchaser status.  Rather, these twenty plaintiff States at issue allege that they can recover as classic direct purchasers, because their state agencies and/or political subdivisions purchased DRAM directly from defendant Micron, through one of Micron's company divisions, Crucial Technology.  Id. at ¶¶ 110-12.

2.      Second Claim for Relief (Cartwright Act)

Plaintiffs' second claim for relief alleges defendants' violation of California's state antitrust statute, the Cartwright Act.   This claim is alleged by seventeen plaintiff States and named plaintiffs the City and County of San Francisco, the County of Santa Clara, and the Los Angeles Unified School District, the latter three proceeding as class representatives for other state agencies and political subdivisions similarly situated.  See FAC at ¶ 114.

Plaintiffs allege that defendants' unlawful conspiracy was carried out and effectuated within California, and that defendants' conduct within California in turn caused injury to "natural persons and state agencies and political subdivisions" throughout the whole of the United States.  See id. at ¶ 115.  Plaintiffs then divide their Cartwright Act claim in accordance with these three distinct groups of injured parties.  Specifically, plaintiffs allege that their Cartwright Act claim is brought:  (1) in a parens patriae capacity by the Attorneys

United States District Court

For the Northern District of California

1   General of eight plaintiff States, on behalf of all natural persons in those states; (2) in a

2   parens patriae capacity, *or* in a proprietary/representative capacity, *or* in a class capacity,

3   by the Attorneys General and/or class representatives of sixteen plaintiff States, on behalf

4   of all state agencies in those states; and (3) in a parens patriae capacity, *or* in a

5   proprietary/representative capacity, *or* in a class capacity, by the Attorneys General and/or

6   class representatives of eleven plaintiff States, on behalf of all political subdivisions in those

7   states.[3]  Id.

8       All three plaintiff groups appear to include both direct and indirect purchasers,

9   although this is not entirely clear from the allegations of the complaint.

10              3.      Third Claim for Relief (State Antitrust and Unfair Competition Laws)

11      Finally, plaintiffs' third claim for relief alleges numerous violations of state antitrust

12   and unfair competition laws.  The claim is separated into forty separate state law counts,

13   one for each of the forty plaintiff States before the court.  See FAC at ¶¶ 123 et seq.

14   Depending on the particular plaintiff State at issue in any given count, plaintiffs' state law

15   claims are (a) alleged on behalf of the States themselves, natural persons, state agencies,

16   and/or political subdivisions, (b) brought by the States (and their Attorneys General) by

17   means of parens patriae or class action allegations, and/or (c) cover both direct and indirect

18   purchaser claims.  See id.

19      C.      The Instant Motion to Dismiss

20      Defendants now move to dismiss plaintiffs' complaint in part, pursuant to Federal

21   Rule of Civil Procedure 12(b)(6).[4]  Specifically, defendants seek dismissal of plaintiffs'

22

23      [3]       Since the hearing on the defendants' motion to dismiss, three plaintiff States –
    New Hampshire, Ohio, and Texas – have filed voluntary notices of dismissal, and dismissals
24   were ordered by the court on July 6, 2007, June 25, 2007, and August 15, 2007, respectively.
    Accordingly, those plaintiff States' claims are no longer at issue, and for purposes of this order,
25   the court omits all reference to them.

26      [4]       Defendants have also filed a motion to dismiss similar claims alleged in a
    separate but related case brought by the New York State Attorney General.  See In re DRAM
27   Antitrust Litigation, member case no. C 06-6436 PJH, State of New York v. Micron Technology,
    et al.  The merits of that motion are discussed by way of a separate order, filed concurrently
28   herewith.

5

United States District Court

For the Northern District of California

1    second and third claims for relief.  They seek dismissal in part of the former – brought

2    under the Cartwright Act – on grounds that standing to sue under the Act is generally

3    lacking for non-California persons and entities.  They seek dismissal in part of the latter –

4    brought pursuant to state antitrust and consumer protection claims – based on myriad

5    procedural and substantive arguments.

6                                         **DISCUSSION**

7           A.    Legal Standard

8           In evaluating a motion to dismiss, all allegations of material fact are taken as true

9    and construed in the light most favorable to the nonmoving party.  See, e.g., Burgert v.

10   Lokelani Bernice Pauahi Bishop Trust, 200 F.3d 661, 663 (9th Cir. 2000)(citations omitted).

11   In order to survive a dismissal motion, however, a plaintiff must allege facts that are

12   enough to raise his/her right to relief "above the speculative level."  See Bell Atlantic Corp.

13   v. Twombly, --- U.S. ---, 127 S. Ct. 1955, 1964-65 (2007).   While the complaint "does not

14   need detailed factual allegations," it is nonetheless "a plaintiff's obligation to provide the

15   'grounds' of his 'entitlement to relief' [which] requires more than labels and conclusions,

16   and a formulaic recitation of the elements of a cause of action will not do."  Id.

17          In short, a plaintiff must allege "enough facts to state a claim to relief that is plausible

18   on its face," not just conceivable.  Twombly, 127 S. Ct. at 1974.

19          B.    Cartwright Act Claims (Second Claim for Relief)

20          Defendants challenge nearly the whole of plaintiffs' second claim for relief, seeking

21   dismissal of every claim stated therein by all non-California plaintiffs.  Those claims, all

22   brought pursuant to California's Cartwright Act, are alleged in a variety of representative

23   capacities on behalf of natural persons, state agencies, and political subdivisions.  See,

24   e.g., FAC at ¶¶ 114-21.  Defendants seek dismissal based on three overriding arguments.

25   First, they argue that the six plaintiff States pursuing parens patriae claims on behalf of

26   non-California residents lack standing to do so under the Cartwright Act.  Second,

27   defendants contend that the twelve plaintiff States pursuing representative claims on behalf

28

                                               6

United States District Court

For the Northern District of California

1  of non-California government agencies – i.e., state agencies and political subdivisions –

2  also lack standing to bring such claims under the Act.  Third, defendants assert that, in

3  addition to lack of standing under the Cartwright Act itself, none of the plaintiff States at

4  issue authorize their Attorneys General to bring suit under the Cartwright Act in the first

5  place.

6             1.     Non-California Claims on Behalf of Natural Persons/Businesses

7         Six plaintiff States – Kentucky, Louisiana, North Dakota, the Northern Mariana

8  Islands[5], South Carolina, and Utah – assert parens patriae claims under the Cartwright Act

9  on behalf of all natural persons.  See FAC at ¶ 115.  Defendants, however, contend that the

10 Cartwright Act does not authorize parens patriae actions brought by non-California

11 Attorneys General on behalf of non-California residents.  Defendants argue that the plain

12 language of the Cartwright Act itself restricts parens patriae claims to those brought

13 exclusively by the California Attorney General, exclusively on behalf of California residents.

14        Defendants are correct.  In the section of the Cartwright Act specifically addressing

15 Attorney General enforcement suits brought as parens patriae actions, the Act provides:

16 "[t]he Attorney General may bring a civil action in the name *of the people of the State of*

17 *California*, as parens patriae on behalf of natural persons *residing in the state*, in the

18 superior court of any county which has jurisdiction of a defendant, to secure monetary relief

19 as provided in this section *for injury sustained by those natural persons* to their property by

20 reason of any violation of this chapter...".  See Cal. Bus. & Prof. Code §

21 16760(a)(1)(emphasis added).  This provision could not be plainer:  where the Attorney

22 General is empowered to bring a damages action seeking relief for violation(s) of the

23 Cartwright Act, it is only the *California* Attorney General who is so empowered, and on

24 behalf of *California* residents only.  The out-of-state Attorneys General therefore have no

25 parens patriae authority under the Act.

26

27        _____

       [5]      For purposes of the instant order, the court refers to plaintiff Northern Mariana
28 Islands as a plaintiff "State."

United States District Court

For the Northern District of California

Plaintiffs, for their part, have submitted no legal authority expressing a contrary view of section 16760, nor do their opposing arguments persuade the court to find otherwise. Plaintiffs argue, for example, that even if the above conclusion is true, out-of-state Attorneys General may still bring suit under the general enforcement provision of the Act, which provides a private right of action to "any person" injured under the Act.  See Cal. Bus. & Prof. Code § 16750(a)("Any person who is injured in his or her business or property by reason of anything forbidden or declared unlawful by this chapter, may sue therefor"). According to plaintiffs, their parens patriae action should be considered nothing more than a procedural device, similar to a class action, which *could* be filed on behalf of natural non-residents under the Cartwright Act.  For support, plaintiffs rely on California case law purportedly holding that class actions under the Cartwright Act are not precluded.  See, e.g., Bruno v. Superior Court, 127 Cal. App. 3d 120, 134-35 (Cal. Ct. App. 1981). However, while plaintiffs are generally correct that Bruno sanctions the use of private class actions under the Cartwright Act, this in no way establishes that parens patriae actions should also be allowed pursuant to the Cartwright Act's private right of action provision. This is because a parens patriae action is expressly defined as a means for a state to seek redress for wrongs affecting the *public* at large, while a class action is generally a means by which individual *private* rights may be collectively enforced.  See, e.g., Hawaii v. Standard Oil, 405 U.S. 251, 257-58, 266 (1972).  Plaintiffs have furthermore failed to present the court with any legal authority holding that parens patriae actions *are* the same as class actions, for purposes of maintaining a private right of action under the Cartwright Act. Accordingly, and without express authority adopting plaintiffs' position, the court will not assume that out-of-state parens patriae actions are specifically contemplated by the Cartwright Act's private enforcement provisions.

Plaintiffs also contend that sections 16750(e) and 16760(f) of the Cartwright Act authorize the non-California parens patriae claims before the court.  This is wrong.  Section 16750(e) permits the Attorney General to enter into contracts and cooperate with private

United States District Court

For the Northern District of California

parties and other government entities bringing antitrust actions.  See Cal. Bus. & Prof. Code § 16750(e)("In any action brought by the Attorney General pursuant to either state or federal antitrust laws ... the Attorney General may enter into contracts relating to the investigation and the prosecution of such action with any other party plaintiff who has brought a similar action...").  However, there is no legal authority that affirmatively interprets this statute as granting express parens patriae authority to non-California Attorneys General acting on behalf of non-California residents.  Nor is such an interpretation warranted.  The plain language of section 16750(e) avoids mention of parens patriae authority altogether, and merely grants the California Attorney General the right to cooperate with other plaintiffs in jointly investigating and/or prosecuting cases in which the other plaintiffs have brought "similar action[s] for the recovery of damages."  See id.  In other words, the California Attorney General is empowered to cooperate with other plaintiffs who have already, and independently, filed a similar claim.  It does not work the other way around – i.e., other party plaintiffs are *not* authorized to state a claim under the Cartwright Act, simply because they agree first to cooperate with the California Attorney General as part of the Attorney General's prosecution of an action under the statute.  Even assuming, therefore, that the non-California Attorneys General here do, in fact, proceed jointly with the California Attorney General pursuant to section 16750(e) of the Act, this provision grants them no greater authority than they otherwise would have under the Act.

Furthermore, plaintiffs' reliance on section 16760(f) of the Act is similarly misplaced.  This provision states that the parens patriae powers enumerated in that section "are in addition to and not in derogation of the powers granted to the Attorney General by common law with respect to bringing actions parens patriae."  See Cal. Bus. & Prof. Code § 16760(f).  Plaintiffs rely on this language for proof that plaintiffs' authority to bring a parens patriae suit under the Act is to be found in the common law parens patriae powers vested in all Attorneys General – which the Act itself recognizes.  This argument, however, is inapposite.  Section 16760(f) is but one provision contained within the broader section

9

United States District Court

For the Northern District of California

1    16760 – the Attorney General enforcement provision.  As such, and when viewed in the

2    larger context of the section as a whole, section 16760(f) is more correctly viewed as a

3    modifier to the broader section, which is limited to actions by the California Attorney

4    General, as noted above.  See generally Cal. Bus. & Prof. Code § 16760.  In other words,

5    the lesser provision relates only to those common law powers granted to the California

6    Attorney General, not to out-of state Attorneys General.

7          Finally, plaintiffs assert that parens patriae authority on behalf of out-of-state

8    residents is suggested by the California Supreme Court's holding in Pacific Gas & Electric

9    Co. v. County of Stanislaus, 16 Cal. 4th 1143 (1997).  But this argument, too, fails.  Pacific

10   Gas & Electric engaged in an exhaustive review of the statutory language of the Cartwright

11   Act, and specifically of the provisions of the Act that discuss the Attorney General's

12   capacity to sue under the Act.  See, e.g., id. at 1153.  The court found that the statute was

13   to be interpreted expansively, and in such a way that a county should be deemed able to

14   bring a representative action under the Act, even though counties are not explicitly

15   referenced in the Act.  See id. at 1154-55.  However, the case provides no support for

16   plaintiffs' sweeping conclusion that out-of-state Attorneys General should likewise be

17   allowed to bring suit under the Act.  Indeed, even though construing the Act broadly, the

18   Pacific Gas & Electric court specifically referred to the Act as recognizing "that not only the

19   Attorney General and local district attorneys, but also 'any county, city, public corporation or

20   public district of this state,' may bring a civil action under the Cartwright Act."  Id. at 1157

21   (emphasis added).  At no time did the court refer to out-of-state entities, let alone did it

22   touch upon the ability of such entities to state claims under the Act – in a parens patriae

23   capacity or otherwise.  The California Supreme court having declined to so construe the Act

24   there, this court will refrain from such a holding here.

25         Accordingly, the Cartwright Act claims asserted by plaintiff States Kentucky,

26   Louisiana, North Dakota, the Northern Mariana Islands, South Carolina, and Utah on behalf

27   of natural persons and/or residents, are hereby DISMISSED for lack of standing under the

28

1    Cartwright Act.

2            2.      Non-California Claims on Behalf of Government Entities

3            There are 12 non-California plaintiff States' Attorneys General who assert claims

4    pursuant to the Cartwright Act in a parens patriae, proprietary, and/or class capacity, on

5    behalf of state agencies and political subdivisions (collectively "government entities").[6]  See

6    FAC at ¶ 115.  Defendants seek dismissal of all these claims, once more arguing that

7    standing is lacking under the Cartwright Act.  They contend that the non-California

8    government entities do not constitute "persons" authorized to bring suit under the

9    Cartwright Act.  To that end, defendants seek dismissal of all claims brought on behalf of

10   government entities by the Attorneys General of plaintiff States Alaska, Delaware, Hawaii,

11   Kentucky, Louisiana, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island,

12   South Carolina, Utah, and Virginia.

13           Defendants contend, as they did with respect to their arguments in support of

14   dismissing non-California claims on behalf of natural persons, that the provisions of the

15   Cartwright Act expressly contemplate that only California's government entities may sue

16   under the Act, and that only the California Attorney General may sue as parens patriae on

17   their behalf.  Plaintiffs, for their part, respond with the argument that California state cases

18   have interpreted the Cartwright Act to allow suit by out-of-state government plaintiffs to the

19   same extent as any other "person" under the Act.

20           Defendants once again have the better argument.  Beginning, as the court must,

21   with the language of the Cartwright Act, its plain meaning is that only California government

22   entities are granted standing to sue as "persons" under the Act.  Section 16750, for

23   example – the civil enforcement provision that plaintiffs rely on for authority – provides that

24   "[a]ny person who is injured in his or her business or property by reason of anything

25   forbidden or declared unlawful by this chapter, may sue therefor...".  See Cal Bus. & Prof.

26   _____

27        [6]      Specifically, plaintiffs assert claims on behalf of 12 plaintiff States' state agencies,
28   and on behalf of 9 plaintiff States' political subdivisions.  See FAC at ¶ 115.

United States District Court
For the Northern District of California

Code § 16750(a).  The term "person" is, however, specifically defined elsewhere in the Act to include "corporations, firms, partnerships and associations existing under or authorized by the laws of this State *or any other State*...."  See id. at § 16702 (emphasis added). Accordingly, standing to sue under this provision of the Act is granted to all natural persons, corporations, firms, partnerships and associations – regardless whether they are California residents or not.

While government entities are not included in this group of permissible plaintiffs, this does not mean that they are precluded from bringing suit.  Rather, the California legislature saw fit to authorize government entities to bring suit by way of a separate provision, codified at section 16750(b) of the Cartwright Act.  That provision expressly states that the term "person," as set forth within the civil enforcement provision of section 16750, shall be deemed to include "[t]he [S]tate and any of its political subdivisions and public agencies." Cal. Bus. & Prof. Code § 16750(b).  The meaning of this language is clear:  the California Attorney General, and any of its political subdivisions and public agencies, also have standing to bring suit under the Act.

Out-of-state government entities, however, do not.  Section 16750(b) expressly limits the government entities authorized to bring suit to "[t]he [S]tate" – i.e., California – and *its* agencies and subdivisions.  See id.  The California legislature knew how to include out-of-state government entities as "persons" capable of suit, had it wanted to.  After all, it had previously defined "person" to include out-of-state "corporations, firms, partnerships and associations."  See id. at § 16702.  Thus, its failure to broaden the definition of "person" to include out-of-state government entities under section 16750(b) is logically viewed as proof that the legislature did *not* intend for these entities to be included in the group of potential plaintiffs capable of bringing suit pursuant to the Cartwright Act's enforcement provisions.

In the face of the Cartwright Act's express language limiting suit on behalf of government entities to California and its Attorney General, plaintiffs' citation to alternative case law in support of a contrary conclusion is unpersuasive.

12

United States District Court

For the Northern District of California

1    Plaintiffs rely, for instance, on FTC v. MTK Mktg. Inc., for the proposition that out-of-

2    state government plaintiffs should be treated as "persons" under a given statute, wherever

3    that statute refers to the phrase "person." See 149 F.3d 1036 (9th Cir. 1998).  In MTK

4    Mktg., the Ninth Circuit interpreted a California statute relating to bond enforcement, and

5    found that a federal government agency could constitute a "person" within the meaning of

6    the statute.  See id. at 1039.  Plaintiffs are correct that the Ninth Circuit there reasoned

7    that, in the face of statutory language that seemingly defined "person" to include only the

8    state and its political subdivisions and agencies, the court should nonetheless interpret the

9    statute in a manner that treated the federal government in the same manner as the state

10    government, absent some indication of legislative intent.  Id.  To that end, the Ninth Circuit

11    construed "person" to include the federal government agency.

12    This reasoning does not apply here, however.   For unlike the statute at issue in

13    MTK Mktg., the Cartwright Act here explicitly distinguishes between out-of-state

14    corporations, firms, partnerships and associations who can sue, and those out-of-state

15    government entities who cannot.  See Cal. Bus. & Prof. Code 16702, 16750(b, c).

16    Moreover, defendants' citation to legislative history further supports the conclusion that the

17    legislature did, in fact, intend to include only California government agencies as "persons"

18    capable of suit under the Cartwright Act.  See Nemerovski Decl. ISO Defendants' Motion to

19    Dismiss ("Nemerovski Decl."), Ex. 7 at 23-24.  Accordingly, all indications here are that the

20    California legislature did not intend to grant out-of-state government entities standing to sue

21    under the Cartwright Act.   And as the Ninth Circuit in MTK Mktg. indicated, courts should

22    defer to the legislative intent behind statutes, where ascertainable.

23    Plaintiffs also rely on cases construing the Sherman Act, in which courts conclude

24    that state government entities are "persons" capable of suit under the Act.  This reliance is

25    misplaced, however, as these cases are not controlling here.  It is true enough that the

26    Sherman Act ordinarily provides helpful guidance in construing state antitrust laws that are

27    modeled on the Sherman Act.  However, as even the California Supreme Court has

28

United States District Court
For the Northern District of California

1    explicitly noted, this is not necessarily so where the Cartwright Act is concerned.  See

2    California v. Texaco, 46 Cal. 3d 1147 (1988)(noting that, contrary to popular belief,

3    Cartwright Act was modeled on Texas state law rather than federal antitrust law, and

4    holding Sherman Act cases to be not directly probative regarding Cartwright Act

5    interpretation).  Even if the court *were* to rely on case law interpreting the Sherman Act, the

6    cases are not actually supportive of the point urged by plaintiffs.  This is because, while the

7    cases plaintiffs rely on do construe state governments as "persons" for purposes of section

8    4 of the Clayton Act – the Sherman Act's enforcement provision – the Clayton Act is

9    distinguishable from the Cartwright Act.  Specifically, the Clayton Act does not contain any

10   provision expressly defining or limiting the types of government entities who may sue under

11   the Act.  The Cartwright Act, as already explained above, does.  See Cal. Bus. & Prof.

12   Code 16750(b)("The [S]tate and any of its political subdivisions and public agencies shall

13   be deemed a person within the meaning of this section".).  Moreover, the Sherman Act

14   cases relied on by plaintiff consider only whether state governments may sue under the Act

15   in their own names, and do not consider the precise issue here – i.e., whether the state

16   government may sue on behalf of further removed state agencies and political subdivisions.

17   All of the foregoing suffices to distinguish the Sherman Act cases from the case at bar.

18       In sum, then, the court's consideration of the statutory language of the Cartwright

19   Act and its supporting legislative history persuade the court that the Cartwright Act was not

20   intended to, and by its language does not, support the inclusion of out-of-state government

21   entities as "persons" capable of suit under the Act, and upon whose behalf the plaintiff

22   States in question may sue.

23       Accordingly, defendants' motion to dismiss on this ground is granted, and plaintiffs'

24   Cartwright Act claims brought on behalf of government entities by the Attorneys General of

25   plaintiff States Alaska, Delaware, Hawaii, Kentucky, Louisiana, Northern Mariana Islands,

26   Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia, are hereby

27   DISMISSED.

28

                                        14

United States District Court

For the Northern District of California

3.   <u>Individual State Law Authorization for Cartwright Act Claims</u>

Finally, defendants also argue that, in addition to the language of the Cartwright Act itself, a further reason supports dismissal of *all* non-California plaintiff States' claims, on behalf of both natural persons and government entities:  namely, that these plaintiff States do not authorize their Attorneys General to bring suit on behalf of persons or government entities pursuant to another state's laws.[7]  Defendants look to the states' governing antitrust laws in particular, and note that their plain statutory language restricts suits on behalf of natural persons and government entities to violations of state antitrust law and in some instances, federal law, and does not permit suits for violation of *foreign* states' antitrust laws.  <u>See, e.g.</u>, Alaska Stat. § 45.50.577(a-b); Del. Code Ann. tit. 6 §§ 2105, 2108; Haw. Rev. Stat. § 480-14(b); Ky. Rev. Stat. Ann. § 367.200; La. Rev. Stat. Ann. §§ 51:128, 51:138; N.D. Cent. Code § 51-08.1-07; 4 N. Mar. I. Code § 5206; Okla. Stat. tit. 79 § 205; 71 Pa. Stat. Ann. § 732-204; R.I. Gen. Laws § 6-36-11(b); S.C. Code Ann. § 39-3-190; Va. Code Ann. § 59.1-9.15(a, c).

In response, plaintiffs contend that reliance on antitrust statutes alone is insufficient, as the plaintiff States' Attorneys General are authorized to bring Cartwright Act claims on behalf of residents and government entities by virtue of the powers and duties vested in them by other sources.  <u>See, e.g.</u>, Del. Code Ann. tit. 29, § 2504(3); Ky. Rev. Stat. § 15.020; N. Mar. I. Const. Art. III, § 11; N.D. Cent. Code § 54-12-02; Okla. Stat. tit 74 § 18b; Utah Code Ann. § 76-10-916(3).  Plaintiffs also urge the court to place the burden on defendants to prove that the individual plaintiff States affirmatively *prohibit* their Attorneys General from bringing Cartwright Act claims, rather than requiring plaintiffs to prove that state laws *allow* them to file such claims.

---

[7]      Defendants seek dismissal on this ground of the following plaintiff States' claims on behalf of natural persons:  Kentucky, Louisiana, North Dakota, Northern Mariana Islands, and South Carolina.  Defendants seek dismissal of the following plaintiff States' claims brought on behalf of government entities:  Alaska, Delaware, Hawaii, Kentucky, Louisiana, Northern Mariana Islands, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia. <u>See</u> FAC at ¶ 115; Def. Mot. to Dismiss at 19:9-11, 21:27-25:12.

United States District Court

For the Northern District of California

1    Defendants are correct, in the first instance, that the statutory language of the

2    various state antitrust statutes at issue limits suits brought by the various State Attorneys

3    General to suits for violation of their own antitrust laws and in some instances, federal law.

4    See, e.g., Alaska Stat. § 45.50.577(a-b)(authorizing Attorney General to bring civil action

5    on behalf of government entities to secure monetary relief "*by reason of any violation of AS*

6    *45.50.562-45.50.570*")(emphasis added); Haw. Rev. Stat. § 480-14(b)(authorizing Attorney

7    General action on behalf of government agencies "to recover the damages *provided for by*

8    *this section, or by any comparable provisions of federal law*")(emphasis added).  There is

9    no language in any of the antitrust statutes, nor can plaintiffs point to any, that expressly

10   authorizes any State Attorney General to bring suit for antitrust violations pursuant to a

11   foreign state's statute.[8]

12   Plaintiffs instead rely on alternative sources of authority – such as general

13   enforcement provisions, common law, and/or state constitutional provisions – in order to

14   invoke the authority that is lacking in the antitrust statutes themselves.  See, e.g., Del.

15   Code Ann. tit. 29, § 2504(3)(general empowerment statute authorizing Attorney General to

16   "exercise all such power and authority as the public interest may from time to time

17   require"); Commonwealth v. Meadow Gold Dairies, Inc., 1993 WL 476633, *3 (W.D. Va.

18   1993)(recognizing common law powers of Virginia Attorney General in bringing federal

19   Sherman Act claim in addition to state antitrust claim); La. Const. Art. IV, § 8 ("As

20   necessary for the assertion or protection of any right or interest of the state, the attorney

21   general shall have authority (1) to institute, prosecute, or intervene in *any civil action* or

22   proceeding...")(emphasis added).  According to plaintiffs, these alternative sources

23   _____

24   [8]    The only exception to this is Utah's antitrust statute, which, as plaintiffs point out,
     does contemplate suit by the Attorney General pursuant to "any" law.  See Utah Code Ann.
25   § 76-10-916(3)("The attorney general may proceed under *any antitrust laws in the state or*
     *federal courts* on behalf of this state, any of its political subdivisions or agencies, or as parens
26   patriae on behalf of natural persons in this state.")(emphasis added).  Despite this expansive
     language, however, the Cartwright Act is nonetheless unavailable to plaintiff State Utah, for
27   the reasons given above in connection with standing under the language of the statute itself.
     This result applies to parens patriae claims brought by Utah on behalf of residents, as well as
28   claims brought on behalf of government entities.  See FAC at ¶ 115.

United States District Court

For the Northern District of California

1    establish the right of the Attorneys General of the various states to do everything in their

2    power to represent the interests of the residents and entities within their states, and this

3    must necessarily include the ability to institute civil actions pursuant to another state's

4    antitrust law.

5          The problem with plaintiffs' argument, however, is that while the types of authorities

6    they cite do generally establish the ability of the State Attorneys General to do their utmost

7    to institute and prosecute suits in order to protect the well-being of their state's residents

8    and entities, those authorities also appear to contemplate that such representative suits will

9    be prosecuted under the laws of their own state, or in some instances, federal law.  Not a

10   single source relied on by plaintiffs expressly provides or even implies that a representative

11   action by an Attorney General may be brought pursuant to *another* state's laws, let alone

12   California's antitrust law specifically.  Nor could the court find any such authority.  Indeed,

13   even the most expansive of the general empowerment statutes relied on by plaintiffs, while

14   recognizing the Attorney General's ability to bring actions in out-of-state courts, stops short

15   of actually authorizing the Attorney General to bring actions in out-of-state jurisdictions

16   *pursuant to* out-of-state laws.  See, e.g., Ky. Rev. Stat. § 15.020 (general rights and duties

17   provisions establishing that Attorney General "shall also commence all actions or enter his

18   appearance in all cases, hearings, and proceedings in and before all other courts, tribunals,

19   or commissions in *or out of the state*, and attend to all litigation and legal business *in or out*

20   *of the state* required of him by law, or in which the Commonwealth has an

21   interest")(emphasis added).

22         This being the case, the court declines plaintiffs' invitation to find that the majority of

23   plaintiff States' Attorneys General are authorized, pursuant to their own state laws, to bring

24   suit pursuant to California's Cartwright Act, in addition to pursuing their own state law

25   claims.  In so holding, the court has also declined plaintiffs' invitation to place upon

26   defendants the burden of persuading the court that the plaintiff States affirmatively *prohibit*

27   their Attorneys General from bringing representative Cartwright Act claims, and has instead

28

17

United States District Court
For the Northern District of California

1   placed upon plaintiffs the burden of persuading the court that state laws *allow* them to file

2   the instant claims.  This is because, as the court has stated on prior occasions in

3   connection with related litigation, the court desires to avoid making affirmative

4   pronouncements regarding state law that would have the effect of substantially broadening

5   the legal rights available pursuant to that law, without some indication that such a result has

6   been expressly contemplated by the courts of a given state.

7        A conservative approach is also warranted, in the court's view, given the basic

8   nature of representative and/or parens patriae actions instituted by State Attorneys

9   General.  Parens patriae actions, for example, are unique vehicles that allow states to

10  vindicate "quasi-sovereign interests" – such as interests in the physical and economic

11  health and well-being of state residents and/or entities.  See, e.g., Alfred L. Snapp & Son,

12  Inc. v. Puerto Rico, 458 U.S. 592, 607 (1982).  And while neither party before the court has

13  expressly raised the issue, it appears to the court that an inherent presumption in state

14  actions brought to vindicate "quasi-sovereign" interests is that a state will necessarily

15  vindicate those interests through enforcement of its own state – or, where warranted,

16  federal – laws, given that the persons and entities from whom the state's quasi-sovereign

17  interests stem, and the authority for vindicating such interests, are both rooted in the state

18  itself and by extension, within its boundaries.  Here, because of the unduly broad nature of

19  plaintiffs' allegations, it is impossible for the court to tell at this juncture whether plaintiffs

20  are in fact asserting a parens patriae claim, a specifically defined "representative" claim, or

21  a class claim on behalf of both natural persons and government entities.  See FAC at ¶ 115

22  (asserting Cartwright Act claim on behalf of non-California state agencies and political

23  subdivisions "in *either* a parens patriae, a proprietary/representative, *or* a class

24  capacity")(emphasis added).  However, in view of plaintiffs' alternative allegations, the

25  concerns just noted counsel in favor of a conservative approach to the question whether

26  the non-California State Attorneys General have been expressly authorized to bring suit

27  pursuant to the Cartwright Act.

28

United States District Court

For the Northern District of California

1    In sum, therefore, the court concludes that the state laws of Alaska, Delaware,

2   Hawaii, Kentucky, Louisiana, North Dakota, Northern Mariana Islands, Oklahoma,

3   Pennsylvania, Rhode Island, South Carolina, and Virginia also fail to provide the necessary

4   standing for the plaintiff States' Attorneys General to bring their Cartwright Act claims on

5   behalf of natural persons and/or government entities.  Accordingly, these claims are

6   DISMISSED on this ground, in addition to lack of standing under the Cartwright Act itself.

7        C.      State Antitrust and Unfair Competition Claims (Third Claim for Relief)

8        Defendants also challenge the state law claims that are alleged by way of forty

9   separate counts in plaintiffs' third claim for relief.  Plaintiffs' claims are rooted in either state

10   antitrust statutes, or state unfair competition/consumer protection statutes, or both.

11   Regardless of the source of plaintiffs' claims, defendants target the majority.  They argue

12   that dismissal in whole or in part is required, for one or more of the following four reasons:[9]

13   (1) the Illinois Brick doctrine bars certain state law claims that seek recovery on behalf of

14   indirect purchasers; (2) certain state law claims are barred because plaintiffs have failed to

15   allege any intrastate activity, as required pursuant to state law; (3) that certain state law

16   claims are barred by the applicable statutes of limitations; and (4) certain state law claims

17   alleging parens patriae authority on behalf of natural persons and businesses are deficient,

18   because plaintiffs lack the parens patriae capacity to sue for monetary damages on behalf

19   of those entities.

20        1.      Illinois Brick

21        Defendants urge the court to dismiss several plaintiff States' claims brought

22   pursuant to their own antitrust and/or unfair competition/consumer protection statutes.

23   They argue that, to the extent plaintiffs seek recovery for indirect purchasers pursuant to

24   these statutes, relevant laws of these states specifically prohibit or limit indirect purchasers

25

26        [9]     Defendants originally moved to dismiss plaintiffs' claim for disgorgement or
27   restitution pursuant to Texas state law.  However, in view of the court's August 15, 2007 order
     granting plaintiff State Texas' voluntary dismissal of its claims, defendants' argument is now
28   moot.

19

United States District Court

For the Northern District of California

1  from bringing antitrust suits, in accordance with <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720

2  (1977).  According to defendants, since these states follow <u>Illinois Brick</u>'s general

3  prohibition on indirect purchaser suits alleging antitrust violations, the indirect purchaser

4  relief plaintiffs seek here is improper.  Defendants argue that, on this basis, the indirect

5  purchaser claims brought by Alaska, Arkansas, Florida, Hawaii, Kentucky, Louisiana,

6  Maryland, Oklahoma, Virginia, Washington, and West Virginia must be dismissed.

7                              a.      Alaska

8          Plaintiffs allege claims pursuant to Alaska's Monopolies and Restraint of Trade Act,

9  as well as Alaska's Unfair Trade Practices and Consumer Protection Act ("AUTPCPA").

10  <u>See</u> Alaska Stat. § 45.50.562 et seq.; § 45.50.471 et seq.; <u>see also</u> FAC at ¶¶ 123-28.

11  Specifically, plaintiffs seek relief – through Alaska's Attorney General – on behalf of the

12  state, and as parens patriae on behalf of state agencies, political subdivisions, and natural

13  persons.  <u>See</u> FAC at ¶¶ 125-27.

14          Defendants target all of these claims to the extent they seek relief on behalf of

15  indirect purchasers.  They contend that Alaska's antitrust statute does not cover indirect

16  purchaser claims that are based, as here, on conduct occurring prior to July 1, 2003, and

17  that Alaska's consumer protection statute cannot be used as an alternative to circumvent

18  the prohibition imposed by the state's antitrust statute.  In response, plaintiffs recognize

19  that Alaska did not enact a law granting indirect purchasers standing to sue until July 1,

20  2003, but they assert that indirect purchaser standing under both the antitrust and

21  consumer protection statutes was nonetheless recognized prior to passage of the 2003

22  law.

23          Beginning with Alaska's antitrust statute, both parties acknowledge that the statute

24  was amended in 2003 to expressly allow for indirect purchaser standing.  The amended

25  statute now empowers the Attorney General – and the Attorney General alone – to seek

26  monetary relief on behalf of indirect purchasers.  <u>See</u> Alaska Statute § 45.50.577(i)("Only

27  the attorney general, in a suit brought under this section, may seek monetary relief for

28

United States District Court

For the Northern District of California

injury indirectly sustained for a violation of [the Act]").  Plaintiffs are therefore generally correct that Alaska's antitrust statute would normally permit suit by the Attorney General for monetary relief on behalf of indirect purchasers.  However, this is not the case here.  For as defendants point out, the historical and legislative notes to the statute indicate that the amended provision of the statute governing Attorney General actions applies "to civil actions alleging a violation of [the state antitrust statute] that occurred *on or after July 1, 2003*."  See id. (editor's notes to the statute)(emphasis added).  Plaintiffs' complaint alleges violations of the antitrust statute that occurred between 1998 and 2002.  See FAC at ¶¶ 96, 99.  Accordingly, plaintiffs' allegations are not covered by the amended provision of the statute that would allow the Alaska Attorney General's suit to go forward on behalf of indirect purchasers.

Plaintiffs attempt to avoid this conclusion by arguing that, even prior to passage of the amended provision discussed above, Alaska's antitrust statute was already construed to allow for suits by the Attorney General on behalf of indirect purchasers.  Plaintiffs would invoke this prior authority as alternative grounds for the instant suit on behalf of indirect purchasers.  The court, however, is unpersuaded by these arguments.  The obvious implication of Alaska's amendment to its antitrust statute is that, prior to amendment, no indirect purchaser standing existed under the statute.  Else, there would have been no need to amend the statute to permit indirect purchaser claims.  This conclusion is further buttressed by the fact that the editor's notes to the statute explicitly state that the amended statute applies *prospectively* to conduct occurring *after* July 1, 2003.

Having concluded, therefore, that the instant claims by the Alaska Attorney General on behalf of indirect purchasers are barred under the state's antitrust statute, the issue remains whether the Attorney General may nonetheless bring indirect purchaser claims pursuant to the state's unfair competition statute.

The AUTPCPA provides:  "A person who suffers an ascertainable loss of money or property as a result of another person's act or practice declared unlawful [under AUTPCPA]

United States District Court

For the Northern District of California

1  may bring a civil action to recover for each unlawful act or practice three times the actual

2  damages or $500, whichever is greater." See Alaska St. § 45.50.531.  There is nothing in

3  the statute's language or definitions that specifically designates either direct or indirect

4  purchasers as "persons," or that distinguishes between the two.  Nor has either party

5  submitted any controlling case authority directly on point as to this issue, although plaintiffs

6  have pointed to one case that provides persuasive authority for the argument that the

7  Alaska Attorney General may seek restitution on behalf of indirect purchasers under the

8  unfair competition statute.  See FTC v. Mylan Labs., Inc., 99 F. Supp. 2d 1, 5 (D. D.C.

9  1999).   The court does not find Mylan instructive, however, in light of the fact that the

10  Mylan case predated Alaska's 2003 amendment to its antitrust statute, and did not contain

11  any discussion of indirect purchaser standing under AUTPCPA in light of the state's Illinois

12  Brick policy.  Specifically, the facts of the Mylan case provided no occasion for that court to

13  consider – as is squarely before the court here – the wisdom of allowing plaintiffs' claims to

14  proceed under Alaska's consumer protection statute where those exact same claims were

15  explicitly barred under the state antitrust statute.

16      As such, and furthermore recognizing that this court is not in the best position to

17  decide unresolved legal issues for the State of Alaska, the court adopts – as it has done

18  previously – the interpretation that will wreak the least amount of havoc on the existing law

19  in Alaska.  To that end, the court declines to read AUTPCPA to permit the Attorney General

20  to assert indirect purchaser claims here, since no court has affirmatively found to the

21  contrary, and since, under the current status of the antitrust laws in Alaska, the Attorney

22  General may only seek relief on behalf of indirect purchasers for conduct that is alleged to

23  have occurred after July 1, 2003.

24      For the above reasons, the court concludes that the indirect purchaser claims

25  brought by the Attorney General pursuant to Alaska's antitrust and consumer protection

26  statutes must be, and hereby are, DISMISSED.

27          b.      Arkansas

28

22

United States District Court

For the Northern District of California

1    Plaintiffs also assert claims under Arkansas law pursuant to the state's antitrust and

2  consumer protection statutes.  See Ark. Code Ann. § 4-75-301 et seq. (Arkansas Unfair

3  Practices Act ("AUPA")) ; Ark. Code Ann. § 4-88-101 et seq. (Arkansas Deceptive Trade

4  Practices Act ("ADTPA")); see also FAC at ¶ 130.  Acting through the Arkansas Attorney

5  General, they seek relief for plaintiff State Arkansas, its state agencies, and its natural

6  persons.  FAC at ¶ 130.

7    Defendants once again target the indirect purchaser claims.  As they did with

8  respect to plaintiffs' claims under Alaska law, defendants argue that Arkansas' antitrust

9  statute was only recently amended to allow the Attorney General to sue on behalf of

10  indirect purchasers, and that this amendment did not become effective until April 8, 2003 –

11  thereby failing to cover the pre-2003 conduct alleged by plaintiffs here.  See Ark. Code

12  Ann. § 4-75-315(b) ("The Attorney General also may bring a civil action in the name of the

13  state, as parens patriae on behalf of natural persons residing in this state, to secure

14  monetary relief as provided under this section for injury, directly or indirectly sustained by

15  those persons...")(effective April 8, 2003).  This being the case, defendants contend that

16  the indirect purchaser claims are barred under the Arkansas antitrust statute, and that such

17  claims under the state's consumer protection statute should also be barred, lest plaintiffs be

18  allowed to circumvent the Illinois Brick policies contemplated by the antitrust statute.

19    Although these arguments were persuasive with respect to claims under Alaska's

20  state laws, they are not similarly persuasive here.  For as plaintiffs point out, the Arkansas

21  antitrust statute here is not as narrow as Alaska's antitrust statute.  This is because the

22  2003 version of the Arkansas antitrust statute – including its amendments – does *not*

23  explicitly apply only to violations occurring *after* its enactment.  Rather, the Arkansas

24  statute elsewhere merely indicates that it does not "allow for the commencement of any

25  action by the Attorney General under the provisions of [the Act] for events occurring prior to

26  [April 8, 2003] *of which the Attorney General had actual knowledge*."  See Ark. Code Ann. §

27  4-75-320(c).  Thus, as plaintiffs argue, a fair reading of the amended statute is that it

28

United States District Court

For the Northern District of California

1  applies to actions commenced by the Attorney General that allege conduct occurring *prior*

2  to April 8, 2003, but only where the Attorney General had no actual knowledge of the

3  conduct at the time.

4         Pursuant to this plain reading of the statute, plaintiffs' claims here on behalf of

5  indirect purchasers pass muster.  For there are no allegations anywhere in plaintiffs'

6  complaint indicating that the Arkansas Attorney General had actual knowledge of

7  defendants' allegedly unlawful conduct.  To be sure, plaintiffs' complaint comes close to

8  alleging as much in the section of the complaint that alleges defendants' fraudulent

9  concealment of their activities.  See FAC at ¶¶ 4, 40, 84 (defendants concealed their

10 conduct "[f]rom approximately 1998 to June of 2002").  However, although defendants

11 argue that these fraudulent concealment allegations are sufficient to demonstrate that the

12 Attorney General had actual knowledge of defendants' purported antitrust violations – and

13 thus, that the amended statute does not apply – the court is not convinced.  The fraudulent

14 concealment allegations state only that the defendants stopped concealing their activities

15 from plaintiffs in 2002, not that plaintiffs – or more specifically, the Arkansas Attorney

16 General – actually knew of defendants' activities as of 2002.  As such, and in the absence

17 of allegations or proof indicating that the State Attorney General affirmatively had

18 knowledge of defendants' conduct prior to April 8, 2003, the antitrust claims alleged on

19 behalf of indirect purchasers are viable at this time.

20        Having ascertained that plaintiffs' claims on behalf of indirect purchasers pursuant to

21 the Arkansas antitrust statute may proceed, the court turns to plaintiffs' indirect purchaser

22 claims pursuant to the Arkansas consumer protection statute – ADTPA.  See Ark. Code

23 Ann. § 4-88-101 et seq.

24        While both parties rely on non-controlling authority for support of their contrary

25 positions, plaintiffs rely on the only case cited by the parties that specifically considered

26 whether antitrust indirect purchaser claims may be asserted pursuant to ADTPA.  See In re

27 New Motor Vehicles Canadian Export Antitrust Litig., 350 F. Supp. 2d 160, 178-79 (D. Me.

28

United States District Court

For the Northern District of California

1    2004).  The In re New Motor Vehicles court stated:  there is "no support in the ADTPA or

2    Arkansas case law for a ban on indirect purchaser suits. The ADTPA provides a private

3    cause of action for damages for any person injured by a violation of the ADTPA, and is not

4    limited to a cause of action for direct purchasers."  The court also noted that Arkansas

5    "does not prohibit indirect purchaser suits under its antitrust laws."  See id.

6         Given that In re New Motor Vehicles is the only case to construe indirect purchaser

7    claims under the ADTPA in light of the amended Arkansas antitrust statute, and in view of

8    defendants' failure to cite any directly contrary authority insofar as the ADTPA is

9    concerned, the court finds In re New Motor Vehicles persuasive.  For these reasons, and in

10   view of the fact that Arkansas' antitrust statute additionally allows for plaintiffs' indirect

11   purchaser claims as alleged in the instant complaint, the court concludes that plaintiffs'

12   claim under the ADTPA, on behalf of indirect purchasers, is viable and may proceed.

13        Accordingly, the court hereby DENIES defendants' motion to dismiss plaintiffs'

14   indirect purchaser claims pursuant to Arkansas' antitrust and consumer protection statutes.

15   The denial with respect to the antitrust statute is without prejudice, as the issue may be

16   revisited on summary judgment should discovery reveal that the Attorney General had

17   actual knowledge of the claims before the effective date of the statute.

18                        c.     Florida

19        Plaintiffs assert a claim pursuant to Florida's Antitrust Act, brought by plaintiff State

20   Florida, and on behalf of its natural persons, state agencies, and political subdivisions.  See

21   Fla. Stat. Ann. §§ 542.18 and 542.22; see also FAC at ¶¶ 134-39.  Defendants seek to

22   dismiss it, arguing that to the extent the claim seeks damages on behalf of indirect

23   purchasers, Florida courts have expressly held that indirect purchaser standing is barred

24   under the Act.  Plaintiffs respond by pointing to the portion of their complaint alleging that

25   Florida's state agencies and political subdivisions were the recipients of valid claim

26   assignments executed by direct purchaser OEMs.  Plaintiffs contend that, by virtue of these

27   assignments, any claims on behalf of state agencies and political subdivisions are direct

28

United States District Court

For the Northern District of California

1    purchaser claims, not indirect purchaser claims, thereby justifying recovery pursuant to

2    Florida's Antitrust Act.

3          Preliminarily, defendants are correct – and plaintiffs do not dispute – that Florida's

4    Antitrust Act prohibits indirect purchaser standing.  See Mack v. Bristol-Myers Squibb Co.,

5    673 So. 2d 100, 103 (Fla. Dist. Ct. App. 1996)(neither plaintiff nor court "challenge[d] the

6    trial court's conclusion that under [Illinois Brick, plaintiff] and the others in her class, all of

7    whom are indirect purchasers, cannot bring a Florida antitrust claim").   As such, the only

8    issue before the court is whether plaintiffs have adequately alleged direct purchaser claims

9    under the Act, as opposed to indirect purchaser claims.

10         With respect to claims brought by plaintiff State on behalf of state agencies and

11   political subdivisions, the court finds that plaintiffs have satisfactorily done so.  Plaintiffs'

12   direct allegations under the Act leave much to be desired; there is not a single allegation

13   that adequately describes or even alludes to the direct/indirect purchaser status of any of

14   the persons/entities on whose behalf plaintiffs purport to bring suit.  See FAC at ¶¶ 134-39.

15   Nonetheless, despite this lack of clarity, the court is persuaded that the allegations

16   contained in paragraphs 106 through 108 of the complaint *do* adequately state that

17   Florida's state agencies and political subdivisions are proceeding as direct purchasers, by

18   virtue of certain assignment clauses contained in executed contracts.  Accordingly, to the

19   extent that plaintiffs seek recovery under the Florida Antitrust Act on behalf of state

20   agencies and political subdivisions, it is reasonable to infer that plaintiffs are seeking such

21   recovery as direct purchasers, pursuant to the same assignment clauses that plaintiffs

22   allege earlier in the complaint.  If this is indeed the case, those claims may proceed under

23   the Act.

24         To the extent, however, that this is not the case, and plaintiffs in reality seek

25   recovery on behalf of state agencies and political subdivisions who do not invoke direct

26   purchaser status, such claims must fail.  For as noted above, only direct purchasers may

27   sue under Florida's Antitrust Act, and any indirect purchaser claims brought on behalf of

28

United States District Court

For the Northern District of California

1    state agencies and political subdivisions are accordingly barred.

2        Indeed, this is the conclusion that the court reaches with respect to plaintiffs' claims

3    pursuant to Florida's Antitrust Act on behalf of natural persons.  Plaintiffs' complaint alleges

4    these claims, in addition to claims brought on behalf of government entities.  Despite the

5    fact that defendants' motion to dismiss is also aimed at them, however, plaintiffs' opposition

6    mentions nothing about them – perhaps because plaintiffs' complaint is completely silent on

7    the question whether claims brought on behalf of natural persons are brought as

8    direct/indirect purchaser claims.  At any rate, given the lack of either argument or allegation

9    establishing that claims brought on behalf of natural persons under the Act are direct

10   purchaser claims, the court finds it more likely than not that plaintiffs' complaint alleges

11   indirect purchaser claims on behalf of natural persons.  As such, defendants' arguments in

12   favor of dismissing all such claims is well-taken, in view of Mack v. Bristol-Myers Squibb

13   Co.

14       Accordingly, the court concludes that, to the extent that plaintiffs' complaint alleges

15   (1) claims on behalf of state agencies and political subdivisions who do not invoke direct

16   purchaser status by virtue of direct claim assignments or otherwise; and (2) indirect

17   purchaser claims on behalf of natural persons, defendants' motion is granted and all such

18   claims under the Florida Antitrust Act are hereby DISMISSED.  Plaintiffs' claims under the

19   Act may proceed, however, with respect to state agencies, political subdivisions, and

20   natural persons who seek recovery as direct purchasers.

21                    d.    Hawaii

22       Plaintiffs assert a claim, brought by the Hawaii Attorney General on behalf of all

23   state agencies, pursuant to Hawaii Revised Statute § 480-2 et seq.  See FAC at ¶ 140.

24   Defendants challenge this claim, to the extent it includes claims on behalf of indirect

25   purchasers.  While they acknowledge that Hawaii's antitrust statute permits indirect

26   purchasers to sue for damages, and further permits the State Attorney General to sue as

27   parens patriae on behalf of indirect purchasers who are natural persons, they assert that

28

United States District Court

For the Northern District of California

1   the statute does *not* similarly recognize indirect purchaser standing for suits on behalf of

2   government entities.  Plaintiffs, for their part, object to defendants' challenge, referring to

3   the broad rights granted to all indirect purchasers under the statute, as indicated by the

4   legislative history and the statutory language.

5          The court's resolution of this issue begins and ends with the plain language of

6   Hawaii's antitrust statute. The statute provides: "The [A]ttorney [G]eneral may bring an

7   action on behalf of the [s]tate or any of its political subdivisions or government agencies to

8   recover the damages provided for by this section, or by any comparable provisions of

9   federal law."  See Haw. Rev. Stat. § 480-14(b).  Accordingly, it is clear from the outset that

10  the State Attorney General is expressly empowered to bring suit under the state antitrust

11  statute on behalf of government entities.  This says nothing, however, regarding suits on

12  behalf of government entities who are indirect purchasers.  For guidance as to this indirect

13  purchaser issue, the court must look to section 480-14(c) of the statute, which separately

14  grants the Attorney General the express right to bring "a class action for indirect purchasers

15  asserting claims under this chapter."  See Haw. Rev. Stat. § 480-14(c).  In granting this

16  express right, however, the statute also limits such actions to those brought on behalf of

17  natural persons only.  See id. ("Actions brought under this subsection shall be brought as

18  parens patriae on behalf of natural persons residing in the State").  Accordingly, and

19  considering each of the foregoing provisions of the state antitrust statute, the statute

20  appears to limit actions brought by the Attorney General on behalf of indirect purchasers to

21  those on behalf of natural persons.  They do not encompass state government entities – on

22  whose behalf the Attorney General is also permitted to sue, by way of a separate provision

23  that contains no authorization for indirect purchasers.

24         In sum, then, the court concludes that plaintiffs' claim, brought by the Hawaii

25  Attorney General on behalf of its state agencies, is barred to the extent it seeks relief on

26  behalf of indirect purchasers.  Defendants' motion to dismiss such claims is granted, and

27  the claims are accordingly DISMISSED.

28

United States District Court

For the Northern District of California

1

                    e.      Kentucky

2        Plaintiffs assert claims pursuant to both the antitrust and consumer protection

3   provisions of Kentucky's Consumer Protection Act.  See Ky Rev. Stat. Ann. §§ 367.175,

4   367.170; see also FAC at ¶¶ 145-46.  These claims are brought by plaintiff State Kentucky

5   on behalf of itself and its state agencies and political subdivisions, and as parens patriae on

6   behalf of natural persons within the state.  See FAC at ¶ 145.  Defendants claim that, to the

7   extent indirect purchaser claims are alleged under both statutes, they must be dismissed,

8   since Kentucky does not recognize indirect purchaser standing.

9        For support of their argument that dismissal of indirect purchaser claims is required,

10  defendants cite In re Microsoft Corp. Antitrust Litig., and In re New Motor Vehicles.  See

11  241 F. Supp. 2d 563, 565 (D. Md. 2003); 350 F. Supp. 2d at 186 n.39.  Both cases held

12  that indirect purchaser claims are prohibited, regardless whether they are brought pursuant

13  to the state's antitrust or consumer protection provisions.  See id.  Although neither case

14  emanates from a court with any controlling authority over Kentucky state law, they both rely

15  on an unpublished decision that does emanate from a controlling jurisdiction, and which

16  specifically holds that indirect purchaser standing is prohibited under Kentucky law – i.e.,

17  the Kentucky Court of Appeal's opinion in Arnold v. Microsoft Corp., 2001 WL 1835377 at

18  **3, 7 (Ky. Ct. App. Nov. 21, 2001)(holding that Illinois Brick bars suits by indirect

19  purchasers under Kentucky's version of the Sherman Act and Kentucky's Consumer

20  Protection Act).

21       In response, plaintiffs urge the court to ignore all of defendants' cited case law, since

22  the Arnold decision at the heart of all of them is unpublished and not available for citation

23  pursuant to Kentucky's rules of civil procedure.  Rather, plaintiffs direct the court's attention

24  to Federal Trade Comm'n v. Mylan Laboratories, Inc., 99 F.Supp.2d 1, 6 (D.D.C. 1999).

25  According to plaintiffs, Mylan recognizes the authority of the Kentucky Attorney General to

26  bring claims pursuant to the Consumer Protection Act, on behalf of Kentucky citizens.

27       On the whole, the court finds that defendants have the better argument.  It is true, as

28

United States District Court

For the Northern District of California

1    plaintiffs contend, that the Arnold decision is unpublished and thus has limited precedential

2    value in Kentucky.  See Ky. R. Civ. P. 76.28(4)(C).  However, both In re Microsoft Corp.

3    and In re New Motor Vehicles relied on Arnold substantively, and as the only Kentucky

4    guidance directly on point.  This court therefore relies on Arnold to the same extent as In re

5    Microsoft Corp. and In re New Motor Vehicles, finding these cases instructive.  Mylan, by

6    contrast, is not as helpful, as it is a district court case that relies on off-point Kentucky

7    authorities, and pre-dates the Arnold decision, at any rate.

8            Accordingly, and in the absence of directly contrary authority, the court adopts

9    Arnold's underlying reasoning here, and holds that indirect purchaser standing is prohibited

10   under the antitrust and consumer protection provisions of Kentucky's Consumer Protection

11   Act.  All indirect purchaser claims asserted under either statute are therefore DISMISSED.

12                            f.    Louisiana

13           Defendants move to dismiss all claims brought on behalf of indirect purchasers

14   under Louisiana's antitrust statute.  See La. Rev. Stat. Ann. 51:122 et seq.; see also FAC

15   at ¶ 147.  Defendants argue that, pursuant to the Fifth Circuit's holding in Free v. Abbott

16   Laboratories, Inc., indirect purchaser standing does not exist under the Act.  See 176 F.3d

17   298 (5th Cir. 1999).  Plaintiffs respond that a decision by a federal court of appeal is not

18   controlling on state law interpretation, and that Louisiana's antitrust statute must be

19   interpreted instead in pari materia with the Louisiana Unfair Trade Practices and Consumer

20   Protection Act, which would allow indirect purchasers to sue.

21           In Free, the Fifth Circuit interpreted Louisiana state law, and concluded that

22   Louisiana state courts would hold that indirect purchasers of consumer products lack

23   standing under the state antitrust statute to pursue price fixing claims.  See 176 F.3d at 299

24   ("In our best judgment, the Louisiana courts would follow the federal indirect purchaser rule

25   and deny standing to the appellants").  In arriving at this conclusion, the Fifth Circuit

26   engaged in a thorough discussion of relevant Louisiana precedent, and noted that the

27   Louisiana Supreme Court had previously found federal precedent useful in interpreting

28

                                        30

United States District Court

For the Northern District of California

1  state antitrust statutes that were analogous to federal antitrust statutes.  <u>See Louisiana</u>

2  <u>Power & Light Co. v. United Gas Pipe Line Co.</u>, 493 So.2d 1149, 1158 (La.1986)("the

3  United States Supreme Court's interpretation ... should be a persuasive influence on the

4  interpretation of our own state enactment.").  The Fifth Circuit then went on to hold that,

5  since the federal antitrust statute contains language virtually identical to Louisiana's

6  antitrust statute, the United States Supreme Court's finding that indirect purchaser standing

7  is prohibited under the Clayton Act, should also extend to interpretation of the state antitrust

8  statute.

9       <u>Free</u> is not a decision of the Louisiana state courts, as plaintiffs point out.

10  Nonetheless, the opinion issues from the highest federal court of appeals with jurisdiction

11  over Louisiana.  Indeed, the Fifth Circuit is well-versed in applying Louisiana law, and is

12  undoubtedly better-situated than this court to predict how Louisiana courts would interpret

13  questions of state law.  As such, the court finds <u>Free</u>'s reasoning instructive in interpreting

14  Louisiana's antitrust statute, and is persuaded that the statute should be interpreted so as

15  to deny indirect purchaser standing for plaintiffs' claims brought pursuant to that statute.

16       Moreover, although plaintiffs are correct that federal precedent is not controlling on

17  state law interpretation, plaintiffs have not actually cited any precedent that *is* controlling,

18  and that argues against the interpretation adopted by <u>Free</u> and urged on this court by

19  defendants.  In other words, plaintiffs have offered no convincing authority that indirect

20  purchasers *should* have standing under Louisiana's antitrust statute.

21       At best, plaintiffs can only point to Louisiana's consumer protection statute – which

22  expressly defines trade or commerce covered under the statute to include indirect

23  purchasers – and argue that its definitions should be read into the antitrust statute on the

24  theory that the two statutes must be read *in pari materia*.  The court, however, finds this

25  argument unavailing.  It is true enough that Louisiana law requires statutes to be construed

26  in harmony with each other where possible, <u>see</u> La. Civ. Code Ann. art. 13 ("Laws on the

27  same subject matter must be interpreted in reference to each other."); <u>see also City of</u>

28

United States District Court

For the Northern District of California

1    Opelousas v. Waterbury, 674 So.2d 1128, 1133 (La. Ct. App. 1996)(Courts have duty to

2    harmonize and reconcile statutes if possible).  However, it is simply not true that this

3    principle of construction requires or permits – as plaintiffs urge here – the definitions

4    contained in one law to be imported wholesale into another law.

5            Moreover, the court is not persuaded that the two statutes at issue – Louisiana's

6    antitrust statute and its consumer protection statute – must by force be harmonized here.

7    The two statutes have different goals and regulate different activity, even though they may

8    generally be related to commerce and/or trade.  As such, it is not necessarily problematic

9    to hold that the former does not allow for indirect purchaser standing, even if the latter

10   does.  Indeed, defendants do not even seek dismissal of plaintiffs' consumer protection

11   claim.  Accordingly, plaintiffs do not lose any right available to them as indirect purchasers

12   under that statute, as a result of the court's conclusion that they are prohibited from

13   asserting indirect purchaser claims under the antitrust statute.

14           In sum, then, and in view of all the above, the court adopts the Fifth Circuit's

15   reasoning as expressed in Free, and holds that indirect purchaser standing is unavailable

16   to plaintiffs under Louisiana's antitrust statute.  All indirect purchaser claims asserted

17   pursuant to that statute are accordingly DISMISSED.

18                          g.      Maryland

19           Plaintiffs bring claims pursuant to Maryland's Antitrust Act ("MATA").  See Md. Com.

20   Law Code Ann. § 11-201 et seq.  The claims are brought by plaintiff State Maryland, on

21   behalf of itself, its state agencies and political subdivisions, and as parens patriae on behalf

22   of all natural persons who purchased DRAM or DRAM-containing products.  See FAC at ¶¶

23   149-51.  Defendants target all claims except for those brought on behalf of the state itself,

24   to the extent they seek relief on behalf of indirect purchasers.  Defendants argue that

25   indirect purchaser standing under MATA has been flatly rejected by Maryland courts.

26   Plaintiffs, by contrast, insist that MATA expressly authorizes the Attorney General to seek

27   both restitution and damages on behalf of indirect purchasers.

28

United States District Court

For the Northern District of California

1  MATA allows the Attorney General to enforce the Act by instituting proceedings in

2  both law and equity.  With respect to equitable relief, the Attorney General is specifically

3  authorized to commence equity proceedings "to prevent or restrain violations" of MATA,

4  and is further authorized to seek equitable remedies from the court, including injunctive

5  relief and "restitution to *any* person of any money or real or personal property...."  See Md.

6  Com. Law Code Ann. § 11-209(a)(1).  MATA also contains a separate subsection on civil

7  enforcement, however, that expressly authorizes actions for monetary damages.  This

8  section allows the Attorney General to file an action for damages "on behalf of the State or

9  any of its political subdivisions or as parens patriae on behalf of persons residing in the

10  State...."  See id. at § 11-209(b)(2)(ii)(5).  In sum, then, the Maryland Attorney General is

11  empowered to bring (1) suits in equity in the name of the state and its state agencies and

12  political subdivisions; and (2) suits for damages on behalf of the state and its government

13  entities, or in a parens patriae capacity on behalf of natural persons.

14  The issue before the court is whether MATA contemplates that suits brought by the

15  Attorney General may include indirect purchasers.  On balance, the court finds that they

16  may not.

17  In Davidson v. Microsoft Corp., a Maryland appellate state court held that "only

18  direct purchasers may bring suit to recover an alleged illegal overcharge."  See 792 A.2d

19  336, 344 (Md. Ct. Spec. App. 2002).  Although Davidson involved a private suit under the

20  statute and not an action filed by the Attorney General, the suit was nonetheless brought

21  under the same general statutory enforcement subsection that plaintiffs invoke here.  See

22  Md. Com. Law Code Ann. § 11-209.  For that reason, and since the decision stems from a

23  controlling jurisdiction, the court finds Davidson persuasive here, and adopts its reasoning

24  that only direct purchasers are authorized to bring suit under MATA.

25  Furthermore, at least one federal court, has expressly rejected the Maryland

26  Attorney General's attempt to sue on behalf of indirect purchasers, based on Davidson.

27  See In re Relafen Antitrust Litigation, 225 F.R.D. 14, 25-26 (D. Mass. 2004).  While this

28

33

United States District Court

For the Northern District of California

1   decision issues from a non-controlling jurisdiction, the court finds it persuasive, in view of

2   Davidson.  Plaintiffs, for their part, have not submitted any contrary authority that would

3   support a differing construction of MATA.

4        For these reasons, plaintiffs' indirect purchaser claims pursuant to MATA are hereby

5   DISMISSED.

6                    h.      Oklahoma

7        Plaintiffs assert claims pursuant to both the Oklahoma Antitrust Reform Act and the

8   Oklahoma Consumer Protection Act.  See Okla. Stat. Ann. 79, § 201 et seq.; Okla. Stat.

9   Ann. 15, § 751 et seq.  Plaintiffs' claims are brought on behalf of all natural persons and

10  state agencies.  See FAC at ¶ 175.  Defendants challenge plaintiffs' claims pursuant to

11  both statutes to the extent they seek recovery on behalf of indirect purchasers, arguing that

12  Oklahoma state courts have specifically interpreted both statutes to preclude indirect

13  purchaser standing.  In response, plaintiffs concede that neither statute allows indirect

14  purchaser claims for damages to go forward, but assert that Oklahoma's Consumer

15  Protection Act does allow for indirect purchaser claims for restitution and other equitable

16  relief.

17       Plaintiffs' arguments fail.  For as defendants note, at least one Oklahoma state court

18  has expressly held that indirect purchaser standing under both the Oklahoma Antitrust

19  Reform Act and the Oklahoma Consumer Protection Act is barred.  See Major v. Microsoft

20  Corp., 60 P.3d 511, 512-13 (Okla. Civ. App. 2002)(affirming trial court's finding that Illinois

21  Brick applied to Antitrust Reform Act and that plaintiff could not make end-run around

22  Illinois Brick by alleging same claim under the Consumer Protection Act).  This case is

23  controlling, and compels the conclusion that plaintiffs' indirect purchaser claims under both

24  Oklahoma statutes must be dismissed for lack of standing.

25       Plaintiffs themselves appear to concede the inevitability of this conclusion, as their

26  opposition omits entirely any argument that either statute permits damages, and contains

27  only a suggestion that equitable relief is nonetheless available under the Consumer

28  Protection Act.  Even as to this latter point, however, plaintiffs' argument falters.  Plaintiffs,

                                           34

United States District Court

For the Northern District of California

1  for example, rely exclusively on <u>Mylan</u> for support. <u>See</u> 99 F. Supp. 2d at 8-9. But <u>Mylan</u> is

2  a non-controlling case that was decided approximately three years *prior* to <u>Major</u>, the

3  decision expressly holding that Oklahoma's Consumer Protection Act is unavailable to

4  indirect purchasers asserting claims based on antitrust violations. <u>Mylan</u> is therefore

5  outdated, in addition to the fact that it issues from a court with no controlling authority over

6  Oklahoma law. As such, it cannot be used to help plaintiffs overcome the Oklahoma

7  court's pronouncement in <u>Major</u> – or this court's resulting conclusion that all indirect

8  purchaser claims, regardless whether they seek monetary or equitable relief, are barred

9  pursuant to Oklahoma's antitrust and consumer protection statutes.

10     Accordingly, plaintiffs' claims on behalf of indirect purchasers, pursuant to both

11  statutes, are hereby DISMISSED.

12               i.     Virginia

13     Plaintiffs assert a claim pursuant to the Virginia Antitrust Act, brought by plaintiff

14  Commonwealth of Virginia on its own behalf, and on behalf of state agencies and political

15  subdivisions who purchased DRAM or DRAM-containing products. <u>See</u> Va. Code Ann. §

16  59.1-9.15(a-c); <u>see also</u> FAC at ¶ 188. Defendants contend that the claim must be

17  dismissed because, while there is no law or statute explicitly prohibiting indirect purchaser

18  standing, Virginia has no <u>Illinois Brick</u> repealer statute, and the Antitrust Act contains a

19  harmonization provision requiring that the statute be interpreted in accordance with federal

20  law. All of which, say defendants, requires the conclusion that the Virginia Antitrust Act

21  should be construed in conformity with the federal <u>Illinois Brick</u> prohibition on indirect

22  purchaser standing. Plaintiffs, in response, state that the Virginia Attorney General has

23  express statutory authority under the Act to represent all indirect purchasers in Virginia –

24  including, presumably, all state agencies and political subdivisions.

25     The Virginia Antitrust Act is, as defendants point out, silent on the specific question

26  whether indirect purchasers have standing to bring suit under the Act. <u>See</u> Va. Code Ann.

27  § 59.1-9.1 et seq. In the face of this silence, the court looks to the surrounding language of

28  the Act, along with the relevant legal authority cited by the parties, for some clue as to

United States District Court

For the Northern District of California

1    whether standing for indirect purchasers should be inferred.  Ultimately, and for the reasons

2    cited below, the court concludes that indirect purchaser standing should not be inferred.

3          First, defendants are correct that the Antitrust Act contains a construction provision

4    that mandates that the Act "shall be applied and construed to effectuate its general

5    purposes in harmony with judicial interpretation of comparable federal statutory provisions."

6    Va. Code Ann. § 59.19.17.  And since defendants are further correct that the Antitrust Act's

7    provision governing civil suits for injunctive relief and damages is substantively similar to

8    the federal antitrust provision that was construed to prohibit indirect purchaser standing in

9    Illinois Brick, it stands to reason that the Virginia Antitrust Act should similarly be construed

10   to prohibit indirect purchaser standing.  See Va. Code Ann. § 59.1-9.12; cf. 15 U.S.C. § 15.

11   Such a construction has the added benefit of doing the least amount of violence to the

12   existing state of law in Virginia, by avoiding any unwarranted expansion of the rights

13   available pursuant to Virginia's Antitrust Act, at least until Virginia courts themselves have

14   the occasion to weigh in on the issue.

15         Moreover, contrary to what plaintiffs would have this court believe, they have not

16   actually established that the Virginia Attorney General has express statutory authority

17   under the Antitrust Act to represent Virginia indirect purchasers, including state agencies

18   and/or political subdivisions.  To be sure, the Act does provide express statutory authority

19   for the Attorney General to bring suit on behalf of the Commonwealth, political subdivisions,

20   or natural persons for violation(s) of the Act.  See Va. Code Ann. § 59.1-9.15.  As noted

21   above, however, the statute is silent on the indirect purchaser question specifically.  It

22   therefore cannot be viewed as providing "express statutory authority" for indirect purchaser

23   claims brought by the Virginia Attorney General.

24         Nor have the parties cited, or the court discovered, any legal authority that *would*

25   provide plaintiffs with the express authority they are looking for.  Plaintiffs rely on two non-

26   controlling cases, In re Cardizem CD Antitrust Litig., and In re Lorazepam & Clorazepate

27   Antitrust Litig.  See 218 F.R.D. 508, 521 (D. Mich. 2003); 205 F.R.D. 369, 386 (D. D.C.

28   2002).  Both cases, however, held only that under the Virginia Antitrust Act, the Attorney

United States District Court

For the Northern District of California

1   General has the "express state statutory authority to represent consumers in a capacity

2   that is the functional equivalent of parens patriae authority."  See In re Cardizem, 218

3   F.R.D. at 521; In re Lorazepam, 205 F.R.D. at 386.  This is accurate.  See Va. Code Ann. §

4   59.1-9.15(d).  It is not to be confused, however, with an express grant of statutory authority

5   to represent *indirect purchasers* specifically.

6        In sum, then, and for the above reasons, the court concludes that the Virginia

7   Antitrust Act does not provide for indirect purchaser standing in the instant action, and

8   plaintiffs' claims, to the extent they state indirect purchaser claims under the Act, are

9   DISMISSED.

10                     j.      Washington

11       Plaintiffs allege a cause of action pursuant to Washington's Consumer Protection

12  Act, brought by plaintiff State Washington on behalf of itself, its state agencies, and all

13  natural persons who purchased DRAM and DRAM-containing products.  See Wash. Rev.

14  Code § 19.86; see also FAC at ¶ 189.  Defendants assert that all indirect purchaser claims

15  under the statute must be dismissed, pursuant to Blewett v. Abbott Labs – a Washington

16  state appellate decision they claim prohibits indirect purchaser standing.  See 938 P.2d

17  842, 844 (Wash. Ct. App. 1997).  Plaintiffs, for their part, challenge defendants'

18  characterization of Washington case law, and argue that indirect purchaser standing has

19  been expressly recognized in cases like this one, which are brought by way of an Attorney

20  General's suit.

21       The court's analysis begins with discussion of Washington's case law, for the parties

22  have both relied on Washington cases for support of their contrary arguments, and where

23  possible, the court endeavors to follow the guidance provided by controlling jurisdictions.

24       In Blewett v. Abbott Labs, relied on by defendants, a state appellate court

25  considered head-on the question whether indirect purchaser standing exists under the

26  state's Consumer Protection Act.  See generally 938 P.2d 842.  The court answered this

27  question in the negative, concluding that indirect purchasers do not suffer "cognizable

28  injury" under the Act.  The court was emphatic:  "[a]n indirect purchaser is not injured for

                                      37

United States District Court

For the Northern District of California

1  the purpose of an antitrust claim, not injured for the purpose of a unfair trade claim, and not

2  injured for the purpose of injunctive relief."  See id. at 847.  The court limited this holding,

3  however, to actions brought under section 19.86.090 of the statute – the provision of the

4  Act that governs civil suits for damages.  See Wash. Rev. Code § 19.86.090 ("Any person

5  who is injured in his or her business or property by a violation of [the Act] ... may bring a

6  civil action" for injunctive relief and/or damages).  In the Blewett court's view, the prohibition

7  on indirect purchaser standing stemmed from that provision's express language requiring

8  any "person" bringing suit under the Act to "be injured in his or her business or property."

9  See id.  Since that language is absent, however, from other sections of the statute –

10 specifically, the provisions of the Act governing suits by the Attorney General – the

11 prohibition on indirect purchaser standing does not extend to these sections.  See, e.g.,

12 Wash. Rev. Code § 19.86.090 (second paragraph)("Whenever the state of Washington is

13 injured, by reason of a violation of [the Act] ... it may sue therefor in the superior court to

14 recover the actual damages sustained by it...");  § 19.86.080 (attorney general may bring

15 action in name of the state to restrain and prevent unlawful conduct under the Act).  To that

16 end, the court directly implied that indirect purchasers who are barred from seeking

17 damages under section 19.86.090 of the statute may seek relief via Attorney General

18 actions.  Id.  ("If direct purchasers decide not to sue, the indirect purchaser is not entirely

19 without a remedy ... We conclude that direct purchasers and the attorney general are the

20 enforcers of antitrust law in Washington.").

21       This same result was contemplated earlier by a Washington superior court in State

22 v. American Tobacco Co., Inc., 1996 WL 931316 (Wash. Super. Ct. Nov. 19, 1996).  This

23 case, relied upon by plaintiffs, concerned the State of Washington's suit for damages

24 against numerous tobacco defendants who had allegedly conspired to prevent the

25 development and sale of safer tobacco products.  The state was seeking recovery for the

26 increased healthcare costs that it claimed had resulted from state consumers' use of

27 unsafe tobacco products.  See 1996 WL 931316 at *1.  Although the State of Washington

28 was not a purchaser in the allegedly restrained market – i.e., the market for tobacco

38

United States District Court

For the Northern District of California

1   products – the court nonetheless took the opportunity to analyze the indirect purchaser

2   standing issue vis-a-vis the Consumer Protection Act.  The court framed the question

3   before it as follows:  "whether the 'antitrust injury' and/or 'direct purchaser' tests are

4   applicable to a claim brought under the section of the [Consumer Protection Act]

5   authorizing damage actions by the State whenever it is 'injured.'"  See id. at 82.

6          The court concluded that a direct purchaser requirement was not applicable to state

7   actions for damages resulting from indirect injuries.  In reaching this decision, the court first

8   noted, as did the Blewett court later, that recovery for private plaintiffs pursuant to section

9   19.86.090 is restricted to direct purchasers, by virtue of that provision's inclusion of

10  language requiring any "person" bringing suit to "be injured in his or her business or

11  property."  Id. at *3.  The American Tobacco court then went on to hold, however, that the

12  provision of the Act that authorizes damages suits brought by the state whenever "injured"

13  – i.e., the second paragraph of section 19.86.090 – is not restricted to direct purchasers,

14  because it does not contain "business or property" language similar to the provision

15  governing private actions.  As such, the court reasoned that Attorney General actions for

16  damages as a result of indirect injuries are permissible.  See id. at **3-4.  In reconciling the

17  differences between the provisions governing private and state actions, the court stated: "It

18  is ... reasonable to assume that the legislature intended to define indirect injuries as a

19  violation of the [Consumer Protection Act] and then authorized the State, but not private

20  parties, to bring a damage action whenever it was indirectly injured."  Id. at *4.

21         The holdings of both the Blewett and American Tobacco decisions are consistent,

22  and provide guidance to this court.  Both cases indicate that, while indirect purchaser

23  standing is prohibited pursuant to the provision of the Act governing private suits for

24  damages, this same prohibition does not extend to actions brought pursuant to provisions

25  authorizing Attorney General suits, since the language of those provisions does not contain

26  the relevant "business or property" limitation discussed above.  Accordingly, the court

27  concludes that plaintiffs' action, brought by the Washington Attorney General on behalf of

28  the state, its state agencies and all persons who purchased DRAM and/or DRAM-

39

United States District Court

For the Northern District of California

1   containing products, is not barred by the indirect purchaser standing doctrine of Illinois

2   Brick.

3   Defendants urge the court to hold differently, attempting to distinguish Blewett and

4   American Tobacco to the extent that either or both suggest that Attorney General actions

5   are not subject to a direct purchaser standing requirement.  Defendants assert, for

6   example, that insofar as Blewett observed that indirect purchasers may seek recovery via

7   the Act's provision governing suits by the Attorney General, the Blewett court was referring

8   only to the provision of the Act allowing Attorney General suits for equitable relief – not

9   damages.  For support, defendants point to In re Relafen Antitrust Litig., 225 F.R.D. 14, 26

10  n.5 (D. Mass. 2004).  Defendants also claim that American Tobacco is irrelevant, since it is

11  not an indirect purchaser case, and therefore failed to implicate the policy concerns

12  encompassed within Illinois Brick.

13  The court is unpersuaded by these challenges.  First, defendants read Blewett too

14  narrowly.  In suggesting that indirect purchasers have standing vis-a-vis Attorney General

15  actions, Blewett reasoned that this is because the direct purchaser requirement is

16  compelled by the "business or property" language reflected in the Act's private right of

17  action provision – and which "does *not* exist in the section of the Act that enables actions

18  by the Attorney General."  See 938 P.2d at 847 (emphasis added).  Although defendants

19  correctly note that Blewett referred to the equitable relief provision of the Act in making

20  these observations, the take-away point from Blewett should be that all provisions of the

21  Act which enable Attorney General actions and do not contain the relevant "business or

22  property" language, allow for recovery regardless of direct or indirect injury.  This is true of

23  the second paragraph of section 19.86.090, which governs civil suits for damages.  In re

24  Relafen does not compel a contrary conclusion, for it is non-controlling authority that rests

25  on the Massachusetts district court's own "interpretation" of Blewett.

26  As for defendants' contention that American Tobacco is irrelevant since the state

27  was not an indirect purchaser, this is not so.  Regardless of the state's status as indirect

28  purchaser, the court's analysis and decision addressed head-on the question of indirect

United States District Court
For the Northern District of California

purchaser standing under the Act in suits for civil damages brought by the Attorney

General.  This is precisely the issue before the court here, and a state court decision

opining on that issue is not only relevant, it constitutes instructive guidance that this court

declines to overlook.

Moreover, the court finds added support for its ultimate conclusion here by way of

the Washington state legislature's recent amendments to the provisions of the Act

discussed herein.  As the court discovered in preparing the instant order, and plaintiffs have

since pointed out, the state legislature recently amended sections 19.86.080 and

19.86.090.  The amendments make clear (1) that the Attorney General has the express

authority to bring parens patriae actions for equitable relief on behalf of natural persons in

the state; and (2) the state has authority to institute suits for damages whenever it is injured

by violations of the Act, regardless whether the injuries be directly or indirectly sustained.

See Wash. Rev. Code §§ 19.86.080 and 19.86.090 (as amended April 17, 2007).  While

the court does not base its conclusion herein on the strength of these amendments, the

court nonetheless finds that the amendments suggest that the state legislature intends for

the Consumer Protection Act to be construed so as to give the Attorney General the right to

seek recovery for indirect injuries sustained by the state and its citizens, even as individual

recovery for indirect injuries continues to be denied.

In sum, and for all the above reasons, the court finds that plaintiffs' claim pursuant to

Washington's Consumer Protection Act is permissible, even to the extent it seeks recovery

for damages on behalf of indirect purchasers.  Defendants' motion to dismiss this claim is

therefore DENIED.

k.      West Virginia

Plaintiffs state claims pursuant to West Virginia's Antitrust Act, and Consumer Credit

and Protection Act.  See W. Va. Code § 47-18-16; W. Va. Code § 47-18-16; see also FAC

at ¶ 190.  Defendants argue that all indirect purchaser claims asserted under both statutes

must be dismissed.  Specifically, defendants contend that the Antitrust Act is to be

construed in accordance with federal law prohibiting indirect purchaser standing, and that

41

United States District Court

For the Northern District of California

1    the Consumer Credit and Protection Act should not be deemed to provide an alternate

2    remedy.  Plaintiffs, in response, point out that the West Virginia Attorney General has

3    promulgated a legislative rule, adopted by the legislature in 1990, that specifically grants

4    indirect purchaser standing, and that such standing should be recognized under both the

5    state antitrust and consumer protection statutes.

6         Generally speaking, defendants are correct that federal decisional law interpreting

7    the Sherman Act is to be applied in interpreting West Virginia's parallel antitrust statute,

8    and that this application would normally suggest that the state antitrust statute be

9    construed in accordance with Illinois Brick.  See W. Va. Code § 47-18-16; Gray, 367 S.E.

10   2d 751.  However, as plaintiffs point out, this conclusion is called into question by the fact

11   that the West Virginia Attorney General has promulgated a legislative rule expressly

12   *permitting* antitrust suits brought by indirect purchasers.  The Attorney General's ability to

13   promulgate such a rule is contemplated by the state's antitrust statute itself, which explicitly

14   grants the Attorney General the right to adopt rules and regulations interpreting and

15   enforcing it.  See W. Va. Code § 47-18-20 ("[t]he attorney general may make and adopt

16   such rules and regulations as may be necessary for the enforcement and administration of

17   [the statute]").

18        Moreover, at least two federal courts have found that the West Virginia legislative

19   rule allowing indirect purchaser standing is valid, and should be given effect.  See In re

20   New Motor Vehicles, 350 F. Supp. 2d at 173-75; In re Terazosin Hydrochloride Antitrust

21   Litigation, 160 F.Supp.2d 1365, 1376, n.8 (S.D. Fla. 2001).  While neither case emanates

22   from a court with jurisdictional authority over West Virginia, they are nonetheless

23   instructive.  In re New Motor Vehicles is particularly helpful.  The federal court there dealt

24   with the precise issue now before the court – i.e., whether indirect purchaser standing is

25   permitted under West Virginia law, in the face of apparent conflict between the State

26   Attorney General's rule, and the harmonization provision of the state antitrust statute.  After

27   engaging in a fairly comprehensive overview of West Virginia rules of statutory

28   interpretation and the relevant legislative history, the In re New Motor Vehicles court

42

United States District Court

For the Northern District of California

1   concluded that, since the harmonization provision at issue did not speak to indirect

2   purchaser standing specifically, but was more broadly worded to provide for a "liberal"

3   general interpretive approach, the State Attorney General's subsequent rule interpreting the

4   statute to allow for indirect purchaser standing was a "permissible" reading of the statute,

5   and entitled to deference.  See id.

6        The court applies that reasoning here.  Moreover, unless and until this issue is

7   raised and resolved by West Virginia state courts, the West Virginia Attorney General –

8   who is expressly granted the authority to interpret the very antitrust statute at issue here –

9   is entitled to some deference.  Accordingly, the court finds that plaintiffs' claims on behalf of

10  indirect purchasers under the state antitrust statute are permissible.

11       With respect to the state consumer protection statute, however, defendants'

12  arguments are more persuasive.  Plaintiffs claim that the statute applies to indirect

13  purchaser claims because "bid-rigging" is considered an unfair or deceptive act or practice

14  that is covered under the statute.  As defendants point out, however, bid-rigging is an act

15  that is specifically prohibited by the state's Antitrust Act, not the Consumer Credit and

16  Protection Act.  See W. Va. Code § 47-18-3.  As such, the court does not read this activity

17  to be covered by the Consumer Credit and Protection Act, which is generally intended to

18  apply to conduct that generally "creates a likelihood of confusion or of misunderstanding"

19  regarding goods and services.  See W. Va. Code § 46A-6-102.  This conclusion is further

20  buttressed by the fact that plaintiffs have failed to cite any controlling authority that

21  construes the state consumer protection statute to cover bid-rigging.  Moreover, even if bid-

22  rigging *were* covered under the state's consumer protection statute, the fact remains that

23  plaintiffs have not pointed to any allegations in their complaint that affirmatively plead bid-

24  rigging.  As a result, the court is compelled to conclude that plaintiffs' indirect purchaser

25  claims under the state consumer protection statute are barred.

26       In sum, the court finds that the indirect purchaser claims brought pursuant to West

27  Virginia's state antitrust statute are not barred from suit, while the indirect purchaser claims

28  brought pursuant to the state consumer protection statute are DISMISSED.  Defendants'

United States District Court

For the Northern District of California

1    motion to dismiss as to both statutes is therefore denied in part and granted in part.

2              2.    Intrastate Activity Allegations

3        Defendants also seek dismissal of all claims brought under the state antitrust

4    statutes of Maryland, Mississippi, Tennessee, and Wisconsin.[10]  Defendants contend that

5    dismissal of these claims is appropriate because plaintiffs have failed to allege the

6    existence of any "intrastate" activity in connection with each claim, as required by the

7    governing state statutes.

8              a.    Maryland

9        Plaintiffs have alleged a cause of action pursuant to the Maryland Antitrust Act

10   ("MATA").  See Md. Com. Law Code Ann. § 11-201 et seq.; see also FAC at ¶¶ 149-51.

11   According to defendants, MATA "is concerned exclusively with intrastate commercial

12   activity," and therefore requires plaintiffs to specifically allege that Maryland's intrastate

13   activity has been affected by defendants' conduct – something that plaintiffs have failed to

14   do.  In response, plaintiffs contend that MATA is to be liberally construed and has been

15   interpreted more broadly than defendants suggest, so that allegations of interstate

16   commerce activity – which plaintiffs point out are present in paragraph 29 of their complaint

17   – are sufficient to invoke coverage under the statute.

18       MATA, similar to federal law, makes it unlawful for a person "[b]y contract,

19   combination, or conspiracy with one or more other persons, [to] unreasonably restrain trade

20   or commere."  See Md. Comm. Code Ann. § 11-204(a).  However, unlike federal law –

21   which reaches interstate commerce activity – MATA explicitly defines "[t]rade or commerce"

22   to include "all economic activity *within* the State."  See id. at § 11-201(h)(emphasis added).

23   Indeed, MATA expressly states that its overall purpose is to regulate intrastate, as opposed

24   to interstate, activity.  See id. at § 11-202(a)(1)(emphasis added)(declaring purpose to be

25   _____

26           [10]    Defendants originally sought dismissal of all claims brought pursuant to Illinois'
     antitrust statute, as well.  However, in their reply brief in support of their motion to dismiss,
27   defendants stated that, upon review of the authorities cited in plaintiffs' opposition brief,
     defendants had decided "not to seek dismissal of Illinois' claims on intrastate commerce
28   grounds" at the present time.  Defendants' argument as to Illinois was, and is, accordingly
     withdrawn.

United States District Court

For the Northern District of California

1  that of "complement[ing] the body of federal law governing restraints of trade, unfair

2  competition, and unfair, deceptive, and fraudulent acts or practices in order to protect the

3  public and foster fair and honest *intrastate* competition."). Given these express limitations,

4  the court interprets MATA to mean what it says – that its reach shall extend over economic

5  activity that is intrastate in nature.

6      This does not mean that MATA should be read as reaching conduct that is

7  *exclusively* intrastate in nature. For as plaintiffs point out, in its provision setting forth the

8  governing principles to be employed in interpreting and construing MATA, the statute

9  expressly states that, "in deciding whether conduct restrains or monopolizes trade or

10 commerce or may substantially lessen competition within the State, determination of the

11 relevant market or effective area of competition *may not be limited by the boundaries of the*

12 *State*." See id. at § 11-202(a)(3)(emphasis added). In other words, in determining whether

13 conduct *within* the state is unlawful under MATA, anticompetitive activity *outside* the state

14 will also be considered.

15     This brings the court to the central issue presented by the parties' arguments –

16 whether plaintiffs' allegation that defendants "engaged in the business of marketing and

17 selling DRAM throughout the United States," see FAC at ¶ 29, is sufficient to allege

18 economic activity *within* Maryland, such that MATA's protections are triggered.

19     On balance, the court finds that this allegation is not sufficient. It sets forth what is

20 essentially interstate economic activity. As such, while it may be useful to plaintiffs in

21 establishing the scope or character of any violations under MATA, see, e.g., Md. Comm.

22 Code Ann. § 11-201(h), it does not aid plaintiffs in establishing that MATA applies

23 preliminarily. This is because the allegation sweeps too broadly – and without any

24 distinction among the forty plaintiff States – to credibly suggest that economic activity within

25 the State of Maryland has been affected in any way, thereby triggering MATA's protection

26 for economic activity occurring "within the State." Md. Comm. Code Ann. § 11-201(h).

27     This conclusion is reinforced upon examination of the legal authority cited by the

28 parties. Defendants, for example, have cited Maryland Staffing Serv., Inc. v. Manpower,

45

United States District Court

For the Northern District of California

1    Inc., a case that expressly holds that MATA targets intrastate conduct, and that dismissed

2    claims under MATA for failure to allege any intrastate conduct.  See 936 F. Supp. 1494,

3    1504-05 (E.D. Wisc. 1996).  While Maryland Staffing does not emanate from a controlling

4    jurisdiction, the court finds the case instructive nonetheless.  Furthermore, while plaintiffs

5    *have* relied on case law that stems from Maryland state courts, the case law does not

6    intimate, as plaintiffs suggest, that interstate commerce allegations are sufficient, standing

7    alone, to invoke MATA.  In fact, none of the state cases relied on by plaintiffs even address

8    the issue whether allegations of interstate or intrastate conduct are necessary to invoke

9    MATA's coverage, although it is true enough that they involved nationwide conspiracies.

10   Indeed, to the extent the issue of intrastate activity is even tangentially mentioned, the

11   cases presume the opposite – that allegations of economic activity or harm within Maryland

12   are prerequisites to invocation of MATA.  See, e.g., Maryland v. Philip Morris Inc., 934 F.

13   Supp. 173, 176 (D. Md. 1996)(remanding MATA and other claims to Maryland state court,

14   noting that state court had jurisdiction where it alleged "redress for harm inflicted *in*

15   *Maryland on Maryland residents*")(emphasis added).

16          In sum, and in view of all the above, the court concludes: (1) in order to state a claim

17   under MATA, plaintiffs are required to allege that economic activity within the State of

18   Maryland is implicated; and (2) plaintiffs have failed to sufficiently allege as much in their

19   complaint.  Plaintiffs' claims pursuant to MATA, as stated in their third claim for relief, are

20   accordingly DISMISSED.

21          In view of the fact that dismissal of plaintiffs' MATA claim is based on a deficiency

22   that might be cured by amendment, however, the court also grants plaintiffs leave to

23   amend their complaint in order to cure the above pleading deficiency.

24                          b.      Mississippi

25          Plaintiffs assert state law claims pursuant to Mississippi's Antitrust Act.  See Miss.

26   Code Ann. § 75-21-1 et seq.; see also FAC at ¶ 155.  As with plaintiffs' claims pursuant to

27   Maryland's antitrust statute, defendants contend that Mississippi's Antitrust Act requires

28   plaintiffs to allege at least some intrastate activity in their complaint, and that plaintiffs have

United States District Court
For the Northern District of California

failed to do so.  Plaintiffs, in response, assert that Mississippi's Antitrust Act is not limited to intrastate conspiracies.  To that end, they claim that as long as they sufficiently allege the presence of a nationwide conspiracy involving interstate commerce, sufficient intrastate effects are established such that a viable claim under Mississippi's Antitrust Act may be stated.

The question whether Mississippi's Antitrust Act applies exclusively to intrastate conduct has not been conclusively decided by Mississippi state courts.  As defendants note, the issue was first addressed by the Mississippi Supreme Court in 1914, in the case of Standard Oil Co. v. State ex rel. Attorney General, 65 So. 468 (Miss. 1914), overruled on other grounds in Mladinich v. Kohn, 164 So.2d 785 (Miss. 1964).  In Standard Oil, the court addressed allegations of a nationwide conspiracy to monopolize the trade in petroleum and in petroleum products "throughout the United States and its territories...".  See id.  Although no petroleum was actually produced in Mississippi, plaintiff alleged that defendants sold and distributed petroleum products in Mississippi after having received the petroleum products in interstate commerce, and that the petroleum products were therefore incorporated into the "general mass of property" located within the State of Mississippi.  Id. at 471.

In considering whether plaintiff's allegations were cognizable under the Mississippi Antitrust Act, the court preliminarily noted that, in order for an act to be punishable under the Mississippi Antitrust Act, the act "must have as one of its objects a monopoly in the intrastate trade [of Mississippi] to be accomplished in part at least by transactions which are also wholly intrastate."  See id. at 471.  The Standard Oil court then went on to conclude that plaintiff had sufficiently stated a claim under the Act, because the alleged conspiracy to monopolize the petroleum market had "as one of its objects a monopoly of that portion of the trade in petroleum products which lies wholly within the [s]tate of Mississippi, to be accomplished in part at least by transactions lying wholly within the state."  Id.

While Standard Oil may rightly be read to suggest, as defendants contend, that allegations of at least some intrastate activity must be made before the Mississippi Antitrust

47

United States District Court

For the Northern District of California

1  Act may be invoked, no subsequent case from the Mississippi Supreme Court has ever

2  confirmed this, nor has any published decision emanating from the state courts.  Further

3  casting doubt on the import to be given Standard Oil is the fact that, as at least one case

4  cited by the parties demonstrates, Standard Oil's reasoning appears to have been largely

5  based on the now discredited "dual sovereignty" view of the Commerce Clause, pursuant to

6  which the exclusive authority of federal law was presumed over all things interstate in

7  nature, and the exclusive authority of state laws presumed over all things intrastate in

8  nature.

9       Ultimately, the court is persuaded – based on review of the parties' cited authorities

10 and the absence of subsequent controlling authority demanding otherwise –  that the

11 Mississippi Antitrust Act should be construed to require allegations of at least some activity

12 or conduct occurring in intrastate commerce or trade.   Plaintiffs, for example, rely on

13 Moore ex rel. State of Mississippi v. Abbott Labs.  See 900 F. Supp. 26 (S.D. Miss. 1995).

14 In Moore, the court declined to hold that the Mississippi Antitrust Act is limited to intrastate

15 conspiracies, and allowed plaintiff's claim to go forward under the Act.  Although the claim

16 was allowed to go forward, however, the court did not actually hold that the Act is *not*

17 limited to intrastate conspiracies and furthermore noted that plaintiff's claim was

18 nonetheless supported by allegations of *intrastate* activity.  See, e.g., id. at 28 (allegations

19 that defendants shared 80% of the Mississippi market allegedly restrained, that defendants

20 conspired to fix prices in Mississippi sales market, and that Mississippi consumers were

21 "grossly overcharged" for products).  Likewise, defendants' reliance on In re Microsoft

22 Corp. Antitrust Litig., see 2003 WL 22070561 (D. Md. 2003), also supports the notion that

23 at least some allegations of wholly intrastate conduct are required under the Mississippi

24 Antitrust Act.  See id. at *8 ("The question thus becomes whether plaintiffs have alleged at

25 least *some* conduct by [defendant] which was performed wholly intrastate").

26      Turning, then, to plaintiffs' complaint, such allegations are conspicuously absent.

27 Plaintiffs have nowhere alleged any activity of any kind – sales, purchases, or other

28 activities in trade or commerce – that took place in Mississippi and are in any way related to

48

**United States District Court**
For the Northern District of California

1    defendants' allegedly unlawful conduct.  Plaintiffs urge the court to overlook this deficiency

2    by arguing that, as in Standard Oil, some of the DRAM and DRAM-containing products

3    whose prices were allegedly restrained by defendants here were actually "incorporated into

4    the general mass" of property within Mississippi, and sold there – thereby becoming

5    intrastate sales.  This argument, however, is unavailing.  While it might ultimately aid

6    plaintiffs in demonstrating that such allegations, if made, state a viable claim under the

7    Antitrust Act, the argument is not a substitute for *alleging* intrastate sales in the first place.

8         In sum, the court finds that plaintiffs' complaint, since it is wholly devoid of any

9    allegations relating to intrastate trade or commerce, fails to properly allege a claim under

10   the Mississippi Antitrust Act, as contemplated by Standard Oil and subsequent

11   interpretations of that case.  Accordingly, the court grants defendants' motion on this

12   ground, and plaintiffs' claim pursuant to the Mississippi Antitrust Act is accordingly

13   DISMISSED.

14        The dismissal is with leave to amend, so that plaintiffs might attempt to cure the

15   deficiency noted above.

16                        c.      Tennessee

17        Plaintiffs' third cause of action states a claim pursuant to the Tennessee Unfair

18   Trade Practices Act ("TTPA").  See Tenn. Code Ann. § 47-25-101 et seq.; see also FAC at

19   ¶ 184.  Defendants argue that plaintiffs have failed to properly allege this claim, since they

20   fail to allege that defendants' conduct affected Tennessee commerce to a "substantial

21   degree," as required by the Tennessee Supreme Court in Freeman Indus., LLC v. Eastman

22   Chem. Co., 172 S.W.3d 512 (Tenn. 2005).  In response, plaintiffs do not dispute that

23   Freeman is controlling authority, or that it requires plaintiffs to allege "substantial effects" on

24   Tennessee commerce.  Rather, they contend that their allegation that consumers paid

25   artificially high prices for DRAM and DRAM products, sufficiently alleges that Tennessee

26   commerce has been affected to a substantial degree.  See, e.g., FAC at ¶¶ 89-91.

27        The Freeman case dealt with similar allegations of a nationwide price fixing

28   conspiracy, and sought to resolve a motion to dismiss brought against an indirect

49

United States District Court
For the Northern District of California

1   purchaser plaintiff's claims, including a claim brought under the TTPA.  See 172 S.W.3d at

2   516.  In ruling on defendant's motion, the Freeman court had occasion to pass upon the

3   issue whether the TTPA targets only intrastate commerce and/or activity.  The court stated:

4   "The [TTPA] does not contain any language indicating that the legislature intended that the

5   scope of the act be limited to intrastate commerce."  See id. at 522.  The court held,

6   however, that a "substantial effects" standard nonetheless applies to claims under the

7   TTPA, pursuant to which "courts must decide whether the alleged anticompetitive conduct

8   affects Tennessee trade or commerce to a substantial degree."  Id. at 523 (emphasis

9   added).

10      Since neither party disputes the applicability of either Freeman or the substantial

11  effects test enunciated therein to the case at bar, the sole question is whether the

12  substantial effects standard is satisfied here.

13      Freeman compels the court to answer this question in the negative.  In Freeman, the

14  court applied the substantial effects test and found that plaintiff's allegations – which stated

15  that defendant had taken sales orders and implemented sales to customers at artificially

16  raised prices from its principal place of business in Tennessee – were too "bare" to

17  sufficiently establish that Tennessee commerce was substantially affected.  See id. at 524.

18  Despite the fact that plaintiff had alleged that the Tennessee defendant had engaged in

19  sales activity within the state, the court found that plaintiff failed to allege that defendant's

20  anticompetitive conduct had any actual effect on Tennessee commerce or, at a minimum,

21  that the Tennessee defendant had manufacturing ties to the product that plaintiff, a New

22  York resident, ultimately purchased at an inflated price.  Id.

23      Here, plaintiffs' complaint is completely devoid of any mention of Tennessee

24  commerce.  Plaintiffs do not specifically allege that any defendant engaged in sales in

25  Tennessee specifically, that defendants manufactured any product that Tennessee

26  residents or plaintiffs purchased, or even that Tennessee residents or plaintiffs purchased

27  any product in Tennessee at artificially raised prices.  At most, and as plaintiffs themselves

28  note, they have alleged in broadest fashion that "they" paid artificially high prices for DRAM

50

United States District Court

For the Northern District of California

1   and DRAM-containing products.  See FAC at ¶¶ 89-91.  This allegation, however, is made

2   with no differentiation among particular states as to which plaintiffs and consumers paid the

3   artificially high prices, or even purchased DRAM and DRAM-containing products.  In short,

4   the court can glean no allegations that sufficiently describe any connection between

5   defendants' allegedly anticompetitive conduct and Tennessee commerce, or otherwise

6   allege any impact upon Tennessee commerce.

7        As such, the court concludes that plaintiffs have failed to properly allege that

8   defendants' anticompetitive conduct affects Tennessee trade or commerce to a substantial

9   degree.  Plaintiffs' claim brought pursuant to the TTPA must accordingly fail, and is hereby

10  DISMISSED.

11       As was the case in connection with the court's review of plaintiffs' claim pursuant to

12  MATA, however, dismissal of plaintiffs' TTPA claim is based on a deficiency that might be

13  cured by amendment.  The court therefore grants plaintiffs leave to amend their complaint

14  as to this claim.

15                           d.     Wisconsin

16        Plaintiffs have alleged a cause of action pursuant to Wisconsin's antitrust statute.

17  See Wis. Stat. § 133.03; see also FAC at ¶ 191.  As part of their claim, plaintiffs allege that

18  defendants' unlawful activity "substantially affected the people of Wisconsin and had

19  impacts within the State of Wisconsin," such that relief is warranted.  See id.  Defendants,

20  however, contend that this general allegation is insufficient to state a claim under

21  Wisconsin's antitrust statute, because plaintiffs are required to demonstrate with more

22  particularized allegations the manner in which Wisconsin commerce was "substantially

23  affected" by defendants' purportedly unlawful conduct.  Plaintiffs, for their part, contend that

24  more detailed allegations need not be made, and that their general allegation that the

25  people of Wisconsin were substantially affected, as a result of artificially inflated prices

26  stemming from defendants' conduct, is sufficient.  Both parties rely on competing

27  Wisconsin case law for support.

28        The parties' dispute is capable of ready resolution without resort to that competing

51

United States District Court

For the Northern District of California

case law, thanks to the Wisconsin Supreme Court's recent decision in Meyers v. Bayer AG, 735 N.W.2d 448 (Wis. 2007).  In Meyers, the state Supreme Court faced head-on the issue pressed upon this court by the parties – i.e., the degree of detail needed to allege that a defendant's conduct "substantially effects" Wisconsin commerce, such that a claim may be stated under Wisconsin's antitrust statute.  The Meyers court concluded: "a complaint under the Wisconsin Antitrust Act, where the circumstances involve interstate commerce and the challenged conduct occurred outside of Wisconsin, is sufficient if it alleges price fixing as a result of the formation of a combination or conspiracy that substantially affected the people of Wisconsin and had impacts in this state.... [R]equiring greater specificity [] would create a heightened pleading standard for Chapter 133 actions that would bar otherwise legitimate suits, thus undermining the Act's purposes of fostering competition and prohibiting unfair discriminatory business practices."  See 735 N.W.2d at at 461.  The Meyers court then went on to hold that plaintiff's allegation that "thousands of Wisconsin residents" suffered harm as a result of defendant's nationwide and anticompetitive actions sufficiently stated a claim under the Act.  See id. at 464.

The Meyers decision is controlling legal authority that is directly on point.  It clearly dictates that, as long as plaintiffs allege in their complaint that defendants unlawfully conspired to fix the price of DRAM, in a manner that substantially affected the people of Wisconsin and had impacts in this state, a claim is stated under Wisconsin's antitrust statute.  It matters not that the allegation is bare, so long as it is made.  See id. at *12 ("Turning to [defendant's] contention that the 'substantially affects' standard requires more than 'bare allegations' that indirect purchasers in Wisconsin paid higher prices as a result of the challenged conduct, we disagree.").

With this legal standard in mind, the court turns to plaintiffs' complaint, and finds that the allegations stated therein are sufficient to state a claim under Wisconsin's antitrust statute.  Plaintiffs have alleged that defendants engaged in unlawful price fixing in the market for DRAM, that consumers and businesses who purchased DRAM during the conspiracy period paid artificially high prices for DRAM, and that these violations

United States District Court

For the Northern District of California

1  "substantially affected the people of Wisconsin and had impacts within the State of

2  Wisconsin."  See, e.g., FAC at ¶¶ 29, 34, 89-91, 191.  Under Meyers, this is all that is

3  required to state a viable claim pursuant to Wisconsin's antitrust statute.

4      For these reasons, the court hereby DENIES defendants' motion to dismiss plaintiffs'

5  claims brought under Wisconsin's Antitrust Act, pursuant to their third claim for relief.

6              3.   Timeliness Claims

7      Defendants assert that claims brought by the Attorneys General under the state laws

8  of Oklahoma and South Carolina are time-barred.  Specifically, defendants argue that,

9  pursuant to the allegations of plaintiffs' complaint, plaintiffs either knew or should have

10  known of defendants' allegedly unlawful conduct as of June 2002.  See FAC at ¶¶ 4, 40,

11  49, 84 (allegations regarding DOJ investigation announcements in June 2002 and

12  defendants' fraudulent concealment until June 2002).  As of this date, defendants contend

13  that the statutes of limitations began to run under the above States' laws, with the end

14  result that Oklahoma's and South Dakota's claims, filed as part of this action on July 14,

15  2006, were untimely.

16              a.   Oklahoma

17      Plaintiffs assert a claim pursuant to Oklahoma's Consumer Protection Act. The Act

18  provides a statute of limitations of either one, or three years.  See 12 Okla. Stat. ' 95(A)(2)

19  and (A)(4).  Assuming that the longer 3 year statute of limitations applies, defendants argue

20  that Oklahoma's complaint should have been filed by June 2005 -- three years after

21  plaintiffs became aware in June 2002 of the underlying facts supporting plaintiffs' claim in

22  June 2002.

23      Preliminarily, the court accepts, as do the parties, that the governing statute of

24  limitations is 3 years.  This being the case, plaintiffs had three years from the point at which

25  their claim accrued, to file the instant complaint. The critical inquiry, of course, is to

26  determine when plaintiffs' claim accrued.

27      Oklahoma recognizes the "discovery rule" which provides that the statute of

28  limitations on a claim does not begin to run until the plaintiff knows or reasonably should

53

United States District Court

For the Northern District of California

1   have known of its injury due to defendants' conduct.  See, e.g., Lincoln Bank & Trust Co. v.

2   Neustadt, 917 P.2d 1005, 1009 (1996)("Discovery rule" in tort cases tolls running of

3   applicable limitations period until damaged party knows, or in exercise of reasonable

4   diligence should have known, of damage).  To establish the accrual date of plaintiffs' claim

5   here, then, the relevant question is whether plaintiffs' complaint discloses the time as of

6   which plaintiffs knew or should have reasonably known of their claim.  According to

7   defendants, plaintiffs' allegations regarding the June 2002 announcement of the DOJ's

8   criminal investigation demonstrate that as of June 2002, plaintiffs "became aware" of their

9   claim.  Plaintiffs, by contrast, argue that the complaint does not disclose sufficient facts

10  from which to conclude whether plaintiffs knew or should have known of defendants'

11  unlawful conduct as of June 2002.

12          The court agrees with plaintiffs on this point.  None of the allegations of plaintiffs'

13  complaint actually establishes the date when plaintiffs became aware of their claim against

14  defendants.  At most, plaintiffs' allegations state only that, as of June 2002, defendants'

15  activity was no longer being concealed from plaintiffs.  See FAC at ¶ 84.  This is not the

16  same, however, as alleging that plaintiffs were actually aware of their claim, or even that

17  they reasonably should have been aware of it.  It is likely, for example, that upon learning of

18  defendants' alleged misconduct, plaintiffs would have needed additional time to conduct a

19  reasonable investigation of facts, in order to determine whether they in fact

20  had any claim against defendants.  Only after having had sufficient time to do so, could the

21  argument be made that plaintiffs should have reasonably been aware of their legitimate

22  claims.  While the court cannot say, without additional facts that discovery may provide,

23  what would constitute a sufficient amount of time for investigation in the context of the instant

24  case, it is clear that, at this juncture, no allegations are present that would allow the court to

25  conclude that plaintiffs should have reasonably been aware of their claim as of June 2002.

26          Moreover, the court notes that plaintiffs have argued in opposition to defendants'

27  motion that they entered into a tolling agreement with defendants in August 2005.  If this is

28  indeed the case, then the question before the court is really whether the allegations of

United States District Court

For the Northern District of California

the complaint are sufficient for the court to conclude that plaintiffs should have been reasonably aware of their claims against defendants prior to August 2002.  This is a mere two months after the DOJ announced its criminal investigation in June 2002.

Given that a pre-filing investigation of some sort is mandatory, see Federal Rule of Civil Procedure 11, the court is not prepared to find that two months was a sufficient amount of time within which plaintiffs should have reasonably discovered their claims against defendants.  Indeed, plaintiffs argue that the earliest date the statute of limitations could have begun to run was May 11, 2005 -- the date that the first defendant actually pled guilty to violations of the Sherman Act.  While it is probable that plaintiffs should have reasonably known of their claims prior to this date, the court is at the very least convinced that plaintiffs may not reasonably have known of their claims by August 2002.

In sum, the court concludes that plaintiffs' complaint fails to set forth any allegations that would allow the court to determine, at the pleading stage, the actual date of accrual of plaintiffs' claim under Oklahoma's consumer protection statute.  Accordingly, defendants' motion to dismiss plaintiffs' claim pursuant to Oklahoma's consumer protection statute, on grounds that the claim is time-barred, is DENIED.  The denial is without prejudice; the issue may be revisited on summary judgment should discovery reveal facts that establish the actual accrual date.

                    b.      South Carolina

Plaintiffs bring a claim on behalf of South Carolina, and its state agencies and natural persons, pursuant to the state's Unfair Trade Practices Act ("UTPA").  Like Oklahoma's statute, the Unfair Trade Practices Act is subject to a three year statute of limitations.  See S.C. Code Ann. § 39-5-150 ("any such claim must be brought "within three years of discovery of [defendants'] unlawful conduct.").  Defendants once more assert that plaintiffs' complaint violates this three year deadline.

Like Oklahoma, South Carolina has adopted the discovery rule for claim accrual.  Indeed, the UTPA's statute of limitations codifies the rule.  See id.; see also Grillo v. Speedrite Prod., Inc., 532 S.E.2d 1, 3 (S.C. App. Ct. 2000)(claim must be commenced

1   "within three years after [plaintiffs] knew or by the exercise of reasonable diligence should

2   have known that they had a cause of action").  Defendants are also correct that, under

3   general principles of South Carolina law, "the exercise of reasonable diligence means

4   simply that an injured party must act with some promptness where the facts and

5   circumstances of an injury would put a person of common knowledge and experience on

6   notice that some right of his has been invaded or that some claim against another party

7   might exist."  See Grillo, 532 S.E.2d at 3.  South Carolina courts have also said, in

8   interpreting the general personal injury statute of limitations – which also recognizes the

9   discovery rule – that the statute of limitations is triggered "not merely by knowledge of an

10  injury, but by knowledge of facts, diligently acquired, sufficient to put a person on notice of

11  the existence of a cause of action against another."  Id.  This is an objective determination.

12  Id.

13          Applying these principles here, the court comes to the same conclusion as it did with

14  respect to Oklahoma's law.  In sum, there is no basis from which to conclude, based on

15  plaintiffs' complaint, that plaintiffs were in fact aware of their claim against defendants as

16  early as June 2002, and the court is furthermore unwilling to find that plaintiffs' should have

17  been aware of their claims by July 2002 -- a mere month after the DOJ investigation was

18  announced.

19          Moreover, in determining under South Carolina law whether plaintiffs should have

20  known of their claims against defendants, South Carolina requires an objective factual

21  basis from which to decide whether plaintiffs acted with promptness to diligently acquire

22  facts, such that they could have had sufficient notice of their claim.  Since this objective

23  factual basis does not appear in the complaint, the court is not in a position to identify here

24  the date that plaintiffs' claim began to accrue.

25          For these reasons, the court similarly DENIES without prejudice defendants' motion

26  to dismiss plaintiffs' claim pursuant to South Carolinas UTPA on grounds that the claim is

27  time-barred.

28                    4.        Individual State Authority for Parens Patriae Actions

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Finally, defendants target the claims brought by eight different plaintiff States, this

2   time on grounds that those plaintiff States do not permit plaintiffs to allege – as they try to

3   do here – parens patriae actions for damages on behalf of natural persons or businesses.

4   Specifically, defendants contend that the parens patriae claims brought by plaintiff States

5   Arizona, Illinois, Mississippi, New Mexico, North Dakota, South Carolina, Tennessee, and

6   Wisconsin must be dismissed because those states have not expressly authorized their

7   Attorneys General to sue for damages in a parens patriae capacity on behalf of natural

8   persons, consumers, or businesses.   See, e.g., FAC at ¶¶ 129, 143, 155, 159, 169, 183-

9   84, 191.  The gist of defendants' argument is that, pursuant to Ninth Circuit authority as set

10   forth in California v. Frito-Lay, 74 F.2d 774 (9th Cir. 1973), no state can recover damages

11   on behalf of individuals or entities absent a specific legislative grant of parens patriae

12   authority.  Since no such statutory authority exits in the above named plaintiff States, all

13   such parens patriae claims for damages must fail.

14    Plaintiffs, in response, argue that contrary to defendants' argument, the Ninth Circuit

15   has acknowledged that states have a parens patriae interest in protecting the health of their

16   citizens by redressing antitrust violations, and that this authority includes the right to seek

17   both damages and injunctive relief.   See, e.g., In re Insurance Antitrust Litig., 938 F.2d 919,

18   927 (9th Cir. 1991), aff'd in part & rev'd in part sub nom. Hartford Fire Ins. Co. v. California,

19   509 U.S. 764 (1993).  Furthermore, plaintiffs point out that the laws of each of the above

20   states generally grant parens patriae authority to their Attorneys General to act for the

21   benefit of each state's citizens, and that this grant of power is sufficient for the damages

22   claims asserted here.

23    The issues that the court must therefore resolve are whether, in fact, the Attorneys

24   General of the above plaintiff States must have specific legislative authority prior to seeking

25   damages on behalf of individuals and businesses via parens patriae actions, and if so,

26   whether such authority has in fact been granted.

27    The court answers the first inquiry in the affirmative.  Preliminarily, however, it is

28   worth noting that Frito-Lay, on which defendants rely in support of the argument that no

United States District Court
For the Northern District of California

1   state can assert a parens patriae claim for damages without express statutory authority, is

2   not wholly on point.  In Frito-Lay, the California Attorney General asserted the right to bring

3   a parens patriae action on behalf of its citizens, in order to recover damages pursuant to

4   section 1 of the Sherman Act.  The Ninth Circuit squarely rebuffed this attempt, noting that

5   parens authority to seek injunctive relief is different from parens authority to seek monetary

6   relief, and while the former can be grounded in common law, the latter must be grounded in

7   a legislative grant of authority.  See Frito-Lay, 74 F.2d at 775-76.  To that end, the absence

8   of legislative authority granting the Attorney General the right to institute a parens patriae

9   action for damages meant that no such authority could be presumed.[11]

10   Frito-Lay therefore dealt with parens patriae authority vis-a-vis federal antitrust law.

11   Here, by contrast, plaintiff States are asserting parens patriae authority via individual state

12   laws.  As such, while the general principle espoused by Frito-Lay is instructive, it is not

13   controlling.

14   With these distinctions in mind, the court nonetheless concludes that Frito-Lay's

15   general reasoning should govern the court's decision here.  To that end, in order to

16   determine whether the Attorneys General here have the authority to bring parens patriae

17   suits for monetary damages on behalf of their citizens, businesses and/or consumers, the

18   court looks to those states' individual laws to determine whether such authority has been

19   provided.  Unlike Frito-Lay, however, the court does not require that any affirmative grant of

20   authority be rooted solely in statutes.  Rather, the court employs the following principle:

21   where there exists controlling legal authority specifically indicating that monetary damages

22   – as opposed to other types of relief – may be sought through a parens patriae claim, the

23   court will presume such authority to be present, regardless whether such authority is

24   indicated by common law, statutory law, or otherwise.  Where no such authority exists,

25   however, the court will not make the same presumption.

26

27

28   ---

[11]   In response to Frito-Lay, Congress passed the Scott-Hart-Rodino Act, which does specifically grant state Attorneys General the parens patriae authority to sue for monetary damages on behalf of natural persons, pursuant to federal antitrust law.

United States District Court

For the Northern District of California

1    With the above principles in mind, the court turns to each plaintiff State at issue.

2            a.    Arizona

3    Defendants correctly contend that nothing in Arizona's antitrust statute grants the

4    Attorney General parens patriae authority to bring claims for monetary damages.  Arizona's

5    antitrust statute contains two relevant provisions:  Ariz. Rev. Stat. §§ 44-1407 and 44-1408.

6    The former grants the Attorney General permission to bring an appropriate action for

7    "injunctive or other equitable relief ... in the name of the state for a violation of this article,"

8    and the latter affirms that "[t]he state, a political subdivision or any public agency

9    threatened with injury or injured in its business or property by a violation of this article may

10   bring an action for appropriate injunctive or other equitable relief, *damages sustained* and

11   ...[costs and fees]."  See id. (emphasis added).  The first provision governs injunctive and

12   equitable relief, and the second governs damages.  Notably lacking from the provision

13   governing damages, however, is any express grant of authority to the state or its Attorney

14   General to bring suit on behalf of "natural persons" – i.e., parens patriae authority.  Cf. Cal.

15   Bus. & Prof. Code § 16760 (a)(1)("Attorney General may bring a civil action ... as parens

16   patriae on behalf of natural persons residing in the state").

17   Plaintiffs respond that, notwithstanding the language of Arizona's antitrust statute,

18   two district courts have held that Arizona has "express statutory authority to represent

19   consumers in a capacity which is the functional equivalent of parens patriae."  See In re

20   Cardizem, 218 F.R.D. at 521; In re Lorazepam, 205 F.R.D. at 386-87.  However, plaintiffs'

21   reliance on these cases is misplaced.

22   First, both cases – neither of which constitutes controlling authority – deal with the

23   ability of State Attorneys General to settle and release parens patriae claims on behalf of

24   consumers, not the ability of State Attorneys General to bring parens patriae claims for

25   damages on behalf of consumers.  See id.  Moreover, the In re Lorazepam decision, upon

26   which the In re Cardizem decision heavily relies, expressly noted that no challenge to the

27   states' parens patriae authority had been made.  This is not the case here.

28   Second, although it cannot be disputed that both courts found Arizona Revised

United States District Court

For the Northern District of California

1   Statute § 44-1407 to set forth "the functional equivalent of parens patriae" authority, it is

2   equally undisputed that this section, as noted above, provides for actions by the Arizona

3   Attorney General for injunctive and equitable relief in the "name of the state."  See In re

4   Cardizem, 218 F.R.D. at 521; In re Lorazepam, 205 F.R.D. at 386-87; Ariz. Rev. Stat. § 44-

5   1407.  Accordingly, even if the court were to credit both courts' finding that statutory

6   authorization for Attorney General actions in the "name of the state" are equivalent to an

7   express grant of parens patriae authority, this would extend only to suits for equitable relief,

8   not damages.  Indeed, even applying both courts' reasoning, damages suits *cannot* be

9   authorized, since Arizona's provision governing damages – Ariz. Rev. Stat. § 44-1408 –

10  lacks similar language that allows for suits by the Attorney General in the "name of the

11  state."

12          In sum, therefore, the court concludes that no authority has been presented that

13  expressly authorizes the Arizona Attorney General to assert a parens patriae claim for

14  damages on behalf of Arizona consumers.  Accordingly, to the extent such relief is sought,

15  plaintiff State Arizona's claim is hereby DISMISSED.

16                              b.     Illinois

17          The Illinois antitrust statute expressly addresses actions brought by the State

18  Attorney General, and provides that the Attorney General may bring an action "on behalf of

19  this State, counties, municipalities, townships and any political subdivision ... to recover the

20  damages under this subsection or by any comparable federal law."  See 740 Ill. Comp.

21  Stat. 10/7(2).  The statute also provides that only the Attorney General is authorized to

22  maintain a class action in any court of th[e] State for indirect purchasers...."  Id.  Thus, as

23  does the Arizona antitrust statute, the Illinois antitrust statute nowhere provides the

24  Attorney General with a direct mandate to bring suit in a parens patriae capacity, on behalf

25  of Illinois persons or businesses.

26          Plaintiffs, for their part, contend that aside from this statute, the Illinois Attorney

27  General *does* have parens authority, and that this authority is rooted in the Attorney

28  General's constitutional and common law powers.  In support of this argument, plaintiffs

United States District Court

For the Northern District of California

rely on Illinois case law, as well as case law that issues from non-controlling jurisdictions. See, e.g., People ex rel. Barrett v. Finnegan, 378 Ill. 387, 392-93 (1941)(recognizing common law power of Attorney General to institute actions affecting the public); In re Volpert, 175 B.R. 247, 256 (Bankr. N.D. Ill. 1994); Illinois v. Bristol-Myers Co., 470 F.2d 1276, 1278 (D. D.C. Cir. 1972)(Attorney General has legal authority, based on common law powers and duties, to sue for the state "to recover damages wrought by alleged antitrust violations outside the assertedly restrictive terms of the Illinois Antitrust Act").  Plaintiffs also once again invoke In re Cardizem, and In re Lorazepam, for the proposition that Illinois' antitrust statute conveys to the Attorney General the "functional equivalent" of parens patriae authority.  See 218 F.R.D. at 521; 205 F.R.D. at 386-87.

With the exception of Bristol-Myers, plaintiffs' cited authority largely establishes a proposition with which defendants have no quarrel – i.e., that the State Attorney General is vested with broad common law rights and duties that allow him to institute civil actions for the purpose of vindicating the interests of the state and the public at large. The court has no trouble finding that this is so.  It does not, however, answer the question that is actually before the court:  whether the broad common law rights and duties vested in the Attorney General allow for parens patriae suits that specifically seek *damages* on behalf of persons or businesses.

Bristol-Myers is the only authority relied on by plaintiffs that answers this question in the affirmative.  In Bristol-Myers, the D.C. Circuit Court of Appeals affirmed the district court's denial of appellants' request for leave to intervene in an action filed by the State of Illinois, seeking treble damages for Sherman Act violations.  The state – through the Illinois Attorney General – had brought suit on behalf of all political subdivisions pursuant to Illinois' antitrust statute, and as the class representative for private purchasers and consumers, pursuant to Federal Rule of Civil Procedure 23.  See 470 F.2d at 368.  Appellants also sought to represent all consumers and purchasers of the products at issue, claiming that the Illinois Attorney General lacked authority under state law to represent the interests of private consumers.  Id.  The appellate court found that the Attorney General was

United States District Court

For the Northern District of California

1    empowered to act as the class representative of private purchasers, once it had properly

2    invoked a lawsuit on behalf of itself and its political subdivisions under federal law.  Id.  The

3    court then went on to find that, even under Illinois state law, the Attorney General would be

4    empowered to seek relief on behalf of private purchasers, due to the broad duties and

5    powers vested in the Attorney General under state law.  Id. at 369.

6          While Bristol-Myers might normally be compelling, however, defendants have

7    pointed the court to more recent Illinois case law that rejects Bristol-Myers' reasoning.  See

8    State of Illinois v. Daicel Chem. Indus., No. 02 CH 19575 (Ill. Cir. Ct. Sept. 23, 2003),

9    attached as Exhibit 1 to Defendants' Response to Plaintiff State of Illinois' Opp. Re Request

10   for Judicial Notice.[12]  The Daicel Chemicals court expressly considered the question

11   whether the Illinois Attorney General may assert parens patriae claims on behalf of Illinois

12   citizens in the absence of express authorization in the antitrust statue, and held: "the law of

13   the State of Illinois does not support the Attorney General's argument that parens patriae

14   standing, which covers quasi-sovereign interests, can be used to recover individual injuries

15   to citizens under the Illinois Antitrust Act."  See id. at 7.  In so holding, the Illinois court

16   expressly rejected Bristol-Myers, and noted that other courts with jurisdiction over Illinois

17   state law had done the same.  See, e.g., In re General Motors Corp. Engine Interchange

18   Litig., 594 F.2d 1106, 1127 (7th Cir. 1979)("In the absence of statutory authorization, Illinois

19   cannot maintain this action in federal court as a [p]arens patriae action"); In re Rusty Jones,

20   Inc., 128 B.R. 1001, 1008 (Bkrtcy. N.D. Ill.1991)("if [Illinois] has not suffered the same injury

21   as members of the putative class, it may not act on behalf of its citizens unless it is

22   authorized to do so under state statutory law, regardless of whether the state constitution

23   recognizes the role of the State as parens patriae").

24         So here.  As such, in view of plaintiffs' inability to demonstrate that express parens

25   patriae authority to bring claims for monetary damages on behalf of natural persons and

26

27         [12]    Plaintiff State Illinois submitted an opposition objecting to defendants' request
28   that the court take notice of the Daicel Chemicals decision.  The court hereby OVERRULES
     the objection.

United States District Court

For the Northern District of California

1  businesses has been vested in the Illinois Attorney General, plaintiff State Illinois' parens

2  patriae claim for monetary damages on behalf of natural persons and businesses is hereby

3  DISMISSED.

c.      Mississippi

5  Defendants assert that neither Mississippi's antitrust law nor its consumer protection

6  law grant the State Attorney General the requisite parens patriae authority to sue for

7  damages on behalf of natural persons and businesses.  As a practical matter, this is

8  correct; the state consumer protection law allows for Attorney General actions only where

9  the Attorney General is seeking injunctive relief "in the name of the State," while the state

10 antitrust statute appears to limit Attorney General actions brought "in the name of the State"

11 to those seeking the imposition of penalty amounts only.  See Miss. Code Ann. § 75-24-9

12 (limiting Attorney General actions to those seeking injunctive relief only); Miss. Code Ann. §

13 75-21-7 (setting forth penalty for violation of statute).

14  This does not the end the inquiry, however.  Plaintiffs rely on common law and legal

15 precedent holding that the Mississippi Attorney General *is* empowered to bring a parens

16 patriae action for damages on behalf of its natural persons.  See Hood ex rel. Mississippi v.

17 Microsoft Corp., 428 F. Supp. 2d 537, 545-46 (S.D. Miss. 2006)(finding that Mississippi

18 Attorney General had parens patriae authority to bring damages claim under state law, on

19 behalf of state and natural persons); Moore ex rel. Mississippi v. Abbott Labs., 900 F. Supp.

20 26, 31 (S.D. Miss. 1995)(Mississippi Attorney General has parens patriae authority to

21 assert claims on behalf of state).  These cases, which issue from federal district courts

22 familiar with Mississippi law, recognized the State Attorney General's parens patriae

23 authority to sue for damages and other relief under the private right of action provisions of

24 the above statutes, despite the lack of any language therein affirmatively granting parens

25 patriae authority.  See id.  As such, the cases are instructive here, and ultimately

26

27

28

63

United States District Court

For the Northern District of California

1   persuasive.[13]

2       Accordingly, based on the express authority recognized by Mississippi legal

3   authorities, the court concludes that plaintiff State Mississippi is entitled to pursue its

4   parens patriae claim seeking damages on behalf of natural persons and businesses, and

5   hereby DENIES defendants' motion.

6                   d.   New Mexico

7       The relevant language of the New Mexico antitrust statute provides: "The attorney

8   general may bring an action under Subsection A of this section on behalf of the state, a

9   political subdivision thereof or any public agency." See N.M. Stat. Ann. § 57-1-3.

10  Subsection A in turn grants "any person" – defined as "an individual, corporation, business

11  trust, partnership, association or any governmental or other legal entity with the exception

12  of the state" – the right to sue for injunctive relief *and* damages. See id.; see also N.M.

13  Stat. Ann. § 57-1-1.2.  In other words, the Attorney General may sue for injunctive relief

14  and damages on behalf of the state, a political subdivision thereof, or any of its public

15  agencies, and a natural person may sue for damages on his own behalf.  The question

16  here, is whether the Attorney General may sue for damages on behalf of natural persons.

17      Plaintiffs have not relied on any authority that answers this question in the

18  affirmative.  In re Lorazepam and In re Cardizem, both state only that New Mexico is a

19  state that has had a federal court interpret its antitrust statute to effectively "grant parens

20  patriae authority."  See 205 F.R.D. at 386; 218 F.R.D. at 521.  These statements, however,

21  say nothing of the Attorney General's ability to bring a parens patriae suit for damages on

22  behalf of natural persons, and set forth only the generic proposition that the Attorney

23  General is, in fact, vested with parens patriae authority.  Likewise, the federal district court

24  opinion that these two cases – and plaintiffs – rely upon also contains no express

25

26      [13]   Defendants have also moved to dismiss plaintiff State Mississippi's parens

27  patriae claims on behalf of businesses specifically, on grounds that the statutes pursuant to
    which plaintiffs bring suit do not expressly authorize suits on behalf of "businesses."  However,

28  since defendants make this argument conclusorily, and provide no controlling authority in
    support thereof, the court accordingly rejects it.

United States District Court

For the Northern District of California

1    statement that parens patriae authority for damages actions are authorized, even while

2    expressly recognizing that parens patriae authority is vested in the New Mexico Attorney

3    General.  See State of N. M. v. Scott & Fetzer Co., 1981 WL 2167, at *1 (authorizing

4    parens patriae action in order to "*enforce*[] of the 'due-on-sale' law")(emphasis added).

5        In sum, and in the absence of any authority specifically indicating or implying that the

6    New Mexico Attorney General's suit for damages may go forward in a parens patriae

7    capacity on behalf of natural persons, the court concludes that this claim must be, and is

8    hereby DISMISSED.

9                        e.      North Dakota

10       North Dakota's antitrust statute has two relevant provisions.  First, the statute

11   provides for civil penalties and enforcement by the State Attorney General, who "may bring

12   an action for appropriate injunctive relief and civil penalties in the name of the state for a

13   violation of this chapter."  See N.D. Cent. Code § 51-08.1-07.  Second, the statute provides

14   that an action for damages may be brought by "[t]he state, a political subdivision, or any

15   public agency threatened with injury or injured in its business or property by a violation of

16   this chapter."  See id. at § 51-08.1-08.

17       The former provision grants the North Dakota Attorney General the right to bring a

18   suit "in the name of the state."  This, as plaintiffs point out, has been relied upon by other

19   district courts as an express grant of authority which is the "functional equivalent of parens

20   patriae."  See In re Cardizem, 218 F.R.D. at 521; In re Lorazepam, 205 F.R.D. at 386-87.

21   However, this provision is also expressly limited to injunctive and equitable relief.  It is only

22   the *latter* provision that allows for the recovery of damages, and this provision specifically

23   limits damages actions brought by the Attorney General to those brought on behalf of the

24   state and its government entities – i.e., in the state's own proprietary capacity.  See N.D.

25   Cent. Code § 51-08.1-08 (omitting all reference to phrase "in the name of the state").

26       Plaintiffs contend that North Dakota's antitrust statute need not include an express

27   legislative grant of parens patriae authority in order for the Attorney General to sue for

28   damages sustained by North Dakota citizens.  Plaintiffs base this assertion on state legal

                                            65

United States District Court

For the Northern District of California

1  authorities that have recognized the common law right of the state to institute any and all

2  suits when required for the general welfare of the North Dakota citizenry.  See, e.g., State

3  ex rel. Burgum v. Hooker, 87 N.W.2d 337, 340 (N.D. 1957)("It has been repeatedly held

4  that the [S]tate has the right, independent of any statutory provision, to institute a suit in any

5  of its courts when it is required for the general welfare of its people.").

6        In making this argument, however, plaintiffs ignore the fact that the common law

7  right of the states to sue as parens patriae on behalf of the general welfare of their people,

8  has not traditionally included suits for monetary damages.  See, e.g., Alfred L. Snapp &

9  Son, Inc. v. Puerto Rico, 458 U.S. at 600-07 (describing history of common law parens

10  patriae authority and citing relevant case law, under which state attorneys general sought

11  injunctive relief).  Indeed, the recognition that common law parens patriae authority did not

12  embrace damages actions is precisely what led the Ninth Circuit in California v. Frito-Lay to

13  decline to allow a parens patriae action for damages to go forward, absent affirmative

14  authorizing legislation.  See 74 F.2d 777 (parens patriae actions for damages are "not the

15  type of state action taken to afford the sort of benefit that the common law concept of

16  parens patriae contemplates").  This same rationale has led this court, too, to demand that

17  some conclusive authority be present that expressly permits such claims.

18        To that end, and plaintiffs having failed to present the court with any indication that

19  North Dakota's Attorney General has been vested with the express authority to bring

20  parens patriae suits for damages on behalf of natural persons and/or businesses, the court

21  concludes that any such claim must be and is hereby DISMISSED.

22                    f.        South Carolina

23        Plaintiffs assert that South Carolina's Unfair Trade Practices Act ("SCUTPA"), and

24  state common law, vest the South Carolina Attorney General with parens patriae authority

25  to sue for monetary damages on behalf of natural persons.  However, while both sources of

26  law do contemplate that the Attorney General has the authority to bring parens patriae

27  claims, there are no grounds for holding that either contemplates extending parens patriae

28  authority to suits for monetary damages.

United States District Court

For the Northern District of California

1    SCUTPA, for example, allows the Attorney General to "bring an action in the name

2  of the State against [violators of the statute] to restrain by temporary restraining order,

3  temporary injunction or permanent injunction the use of [any unlawful] method, act or

4  practice."  See S.C. Code Ann. § 39-5-50(a).  On its face, this language condones actions

5  by the Attorney General that seek injunctive relief, not monetary damages.  And while it is

6  true, as plaintiffs point out, that SCUTPA also allows courts to issue additional orders

7  restoring to any persons property that was acquired by reason of a defendant's violations of

8  the statute, this provision reaches only equitable relief, as is indicated by use of the word

9  "restore," within a statutory provision targeted at injunctive relief.  See S.C. Code Ann. § 39-

10  5-50(b)(courts may "make such additional orders or judgments as may be necessary to

11  restore to any person ... any moneys or property, real or personal, which may have been

12  acquired by means of any practice declared to be unlawful in this article").

13    The conclusion to be reached from this is that, to the degree that the Attorney

14  General may proceed under SCUTPA in a parens patriae capacity on behalf of natural

15  persons – as plaintiffs note is suggested by In re Lorazepam, 205 F.R.D. at 386-87 – he

16  may only do so in order to seek injunctive relief, not damages.

17    Consideration of South Carolina common law does not compel a different result.

18  Plaintiffs rely on Condon v. Hodges, 562 S.E.2d 623, 627 (S.C. 2002).  However, while

19  Condon does, indeed, embrace the general principle that the State Attorney General has

20  constitutional and statutory authority to bring whatever claims he sees fit in the name of the

21  state, Condon did not address monetary damages.  Rather, it dealt with the Attorney

22  General's right to bring an equitable claim against the governor of the state.  Id.  This being

23  the case, Condon's general affirmation of the Attorney General's parens patriae authority,

24  as recognized at common law, fails to provide support for a finding that such authority

25  extends beyond its normal common law boundaries, to include suits for monetary

26  damages.

27    In short, the court declines to hold that South Carolina's parens patriae claim for

28  damages on behalf of natural persons may go forward.  Such claim is accordingly

67

United States District Court

For the Northern District of California

1    DISMISSED.

2                    g.      Tennessee

3        Plaintiffs argue that the Tennessee Attorney General has parens patriae authority to

4    sue for monetary damages on behalf of consumers, by virtue of the Attorney General's

5    status as a constitutional officer, with statutory and common law duties and powers.  See,

6    e.g., Tenn. Code Ann. § 8-6-109 (noting constitutional and statutory rights and duties of

7    Attorney General); State v. Heath, 806 S.W.2d 535, 537 (Tenn. Ct. App.1990)("the attorney

8    general may exercise such authority as the public interest may require and may file suits

9    necessary for the enforcement of state laws and public protection").

10       None of these sources, however, provide express authority for the filing of a parens

11   patriae action for monetary damages on behalf of natural persons or consumers.  Indeed,

12   Tennessee's antitrust statute fails to even grant the Attorney General the authority to bring

13   any type of suit under the statute, let alone a parens patriae right suit seeking monetary

14   damages.  See Tenn. Code Ann. § 47-25-106 (stating only that "[a]ny person who may be

15   injured or damaged by" unlawful conduct under the statute may sue for and recover "the full

16   consideration or sum paid by the [injured] person for any goods, wares, merchandise, or

17   articles....").  Tennessee's Consumer Protection Act – pursuant to which its Attorney

18   General also brings suit here – does allow for Attorney General actions "in the name of the

19   state" and on behalf of injured citizens, but such relief is limited to injunctive and equitable

20   relief.  See Tenn. Code Ann. § 47-18-108(a-b).  Finally, while it is true that other statutory

21   provisions empower the Attorney General to generally institute all actions necessary to

22   enforce the laws, including actions on behalf of the state and its agencies to recover "public

23   funds," this is not synonymous with the power to seek monetary damages specifically.  See

24   id. at § 8-6-109 (district attorney empowered to sue on "behalf of the state, local

25   government units or local education agencies to recover public funds from entities financed

26   by such funds and their directors or officers when such funds through the improper actions

27   of such directors or officers have been used for unauthorized purposes, misapplied or

28   misappropriated").  At most, this could be seen as support for the Attorney General's ability

                                              68

**United States District Court**
For the Northern District of California

1    to seek equitable relief on behalf of appropriate government entities.

2         Moreover, as defendants point out, at least one Tennessee court has expressly

3    rejected the very proposition urged by plaintiffs here.  In <u>State ex rel. Leech v. Levi Strauss</u>

4    <u>& Co.</u>, a Tennessee chancery court expressly considered the State Attorney General's

5    request to seek monetary damages on behalf of private citizens under Tennessee's

6    antitrust laws.  <u>See</u> 1980 WL 4696, at *4 (Tenn. Ch. Ct. 1980).  After noting that parens

7    patriae actions had received "no judicial recognition in this country as a basis for recovery

8    of money damages for injuries suffered by individuals," the court concluded that "such a

9    drastic departure from accepted practice must result from acts of the Legislature."  <u>Id</u>. at *5.

10   Finding no affirmative grant of authority to be present in the Tennessee antitrust statute, the

11   court dismissed the Attorney General's parens patriae claim for damages.

12        The same result is compelled here.  For as noted both above and by the Tennessee

13   Chancery Court, there is simply no statutory authority relied on by plaintiffs that expressly

14   grants the Attorney General the right to assert a parens patriae claim for damages on

15   behalf of natural persons or consumers.  Absent such authority, Tennessee's parens

16   patriae claim for damages on behalf of natural persons and businesses, is accordingly

17   DISMISSED.

18                     h.     Wisconsin

19        Plaintiffs concede that the Wisconsin Attorney General has no authority to prosecute

20   litigation on behalf of Wisconsin citizens unless such authority is granted by statute.  <u>See</u>,

21   <u>e.g., State v. City of Oak Creek</u>, 605 N.W.2d 526, 533 (Wis. 2000).  They contend,

22   however, that Wisconsin's antitrust statute expressly grants the Attorney General the

23   authority to prosecute any and all violations of state antitrust law, including the authority to

24   seek monetary redress for consumers harmed by antitrust violations.  <u>See</u> Wis. Stat. §§

25   133.16-133.17.

26        This is incorrect.  The Wisconsin antitrust statute expressly limits the department of

27   justice – which includes the State Attorney General – and district attorneys to suits for

28   injunctive relief only.  <u>See</u> Wis. Stat. § 133.16.  And while it does empower the Attorney

United States District Court

For the Northern District of California

1    General to prosecute any and all violations under the act, the antitrust statute does not

2    define the contours of this authority, stating only that the department of justice shall have all

3    powers conferred upon district attorneys in prosecuting violations under the act.  Id. at §

4    133.17.  In other words, there is no express grant of parens patriae authority to sue for

5    damages on behalf of consumers in Wisconsin's antitrust statute.

6         Plaintiffs also rely on In re Lorazepam for the proposition that the Wisconsin antitrust

7    statute expressly grants the Attorney General the "functional equivalent" of parens patriae

8    authority to seek damages on behalf of consumers.  For the reasons already detailed

9    above, In re Lorazepam is distinguishable, and fails to provide the requisite support.

10        Accordingly, to the extent plaintiff State Wisconsin asserts a parens patriae claim for

11   damages on behalf of natural persons, this claim is DISMISSED.

12        D.      Request for Judicial Notice

13        In conjunction with the instant motion to dismiss, defendants have also submitted a

14   request for judicial notice of various documents that include state legislative reports,

15   legislative bills, and pleadings or decisions filed in unrelated actions.  See Declaration of

16   Peter Nemerovski ISO Defendants' Request for Judicial Notice.  Finding the documents to

17   be appropriate subjects for judicial notice, the court hereby GRANTS defendants' request.

18        E.      Conclusion

19        For the foregoing reasons, defendants' motion to dismiss plaintiffs' second and third

20   claims for relief is GRANTED in part, and DENIED in part.  Specifically, the court holds as

21   follows:

22        1.      Defendants' motion to dismiss plaintiffs' second claim for relief is GRANTED.

23   To the extent plaintiffs' claim under the Cartwright Act alleges claims on behalf of non-

24   California Attorneys General seeking relief on behalf of non-California residents, state

25   agencies and political subdivisions, plaintiffs lack standing and/or authority to do so.  These

26   claims are therefore DISMISSED with prejudice.

27        2.      Defendants' motion to dismiss plaintiffs' third claim for relief is GRANTED in

28   part and DENIED in part, as follows:

**United States District Court**
For the Northern District of California

1    (a)  Defendants' motion to dismiss indirect purchaser claims brought

2 pursuant to the antitrust statutes and provisions of Alaska, Florida, Hawaii, Kentucky,

3 Louisiana, Maryland, Oklahoma, and Virginia, is GRANTED, based on those states'

4 adherence to the <u>Illinois Brick</u> doctrine. All such claims are DISMISSED with prejudice.

5 However, defendants' motion with respect to the indirect purchaser claims brought

6 pursuant to the antitrust statutes and provisions of Arkansas and West Virginia, is DENIED.

7 The denial with respect to Arkansas is without prejudice to the parties' ability to raise the

8 issue on summary judgment once relevant discovery is completed;

9    (b)  Defendants' motion to dismiss indirect purchaser claims brought

10 pursuant to the consumer protection statutes and provisions of Alaska, Kentucky,

11 Oklahoma, and West Virginia is GRANTED, also based on those states' adherence to the

12 <u>Illinois Brick</u> doctrine. All such claims are similarly DISMISSED. Defendants' motion with

13 respect to the indirect purchaser claims brought pursuant to the consumer protection

14 statutes and provisions of Arkansas and Washington, is DENIED;

15    (c)  Defendants' motion to dismiss all claims brought pursuant to the

16 antitrust statutes of Maryland, Mississippi, and Tennessee is GRANTED, based on

17 plaintiffs' failure to allege intrastate activity, as required pursuant to these statutes. These

18 claims are DISMISSED. The dismissal is without prejudice, however, and leave to amend

19 is granted to allow plaintiffs to cure the deficiencies with respect to these claims.

20 Defendants' motion to dismiss plaintiffs' claim pursuant to Wisconsin's antitrust statute on

21 similar grounds, is DENIED;

22    (d)  Defendants' motion to dismiss all claims brought pursuant to

23 Oklahoma's consumer protection statute and South Carolina's antitrust statute, on grounds

24 that the claims are barred under the applicable statutes of limitations, is hereby DENIED.

25 The denial is without prejudice, however, to the parties' ability to raise the issue on

26 summary judgment, once relevant discovery is complete; and

27    (e)  Defendants' motion to dismiss all parens patriae claims seeking

28 monetary damages on behalf of natural persons and/or businesses is GRANTED in part

United States District Court

For the Northern District of California

1   and DENIED in part.  The motion is GRANTED with respect to plaintiff States Arizona,

2   Illinois, New Mexico, North Dakota, South Carolina, Tennessee, and Wisconsin.  All such

3   claims are therefore DISMISSED with prejudice.  Defendants' motion to dismiss all such

4   claims brought by plaintiff State Mississippi, however, is DENIED.

5          Leave to amend is permitted *only* as specified herein.  Amendment as to additional

6   matters is not permitted without prior leave of court.  The court does note, however, that in

7   addition to the complaint's deficiencies highlighted throughout this order, plaintiffs'

8   complaint also appears to suffer from an additional deficiency.  Namely, plaintiffs' complaint

9   fails to set forth with any degree of clarity or specificity the nature of DRAM purchases

10  made by any given plaintiff State, its entities, and its citizens (e.g., purchases of free-

11  standing DRAM v. products in which DRAM is a component).  While the court believes this

12  deficiency is significant, given that the complaint is already unwieldy and difficult to review

13  or manage, the court declines to order additional amendment on this point at the present

14  juncture.

15         Any amended complaint shall be filed no later than **October 1, 2007**.

16  **IT IS SO ORDERED.**

17  Dated: August 31, 2007

18                                                    _____

19                                                    PHYLLIS J. HAMILTON
                                                      United States District Judge

20

21

22

23

24

25

26

27

28