1  EDMUND G. BROWN, JR.
   Attorney General of the State of California
2  THOMAS GREENE
   Chief Assistant Attorney General
3  KATHLEEN E. FOOTE
   Senior Assistant Attorney General
   State Bar No. 65819
4  NICOLE GORDON
   Deputy Attorney General
5  State Bar No. 224138
   SANGEETHA M. RAGHUNATHAN
6  State Bar No. 229129
   EMILIO E. VARANINI
7  Deputy Attorney General
   State Bar No. 163952
8  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
9  Telephone: (415)703-5908
   Fax: (415)703-5480
10 Email: emilio.varanini@doj.ca.gov
   Attorneys for Plaintiffs
11

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15

16 | THE STATE OF CALIFORNIA BY ITS        | Case No.:  C 06-4333 PJH
   | ATTORNEY GENERAL EDMUND G.            |
17 | BROWN, JR. AND THE CITY AND COUNTY    | **THIRD AMENDED COMPLAINT**
   | OF SAN FRANCISCO EX REL DENNIS J.     |
18 | HERRERA, THE COUNTY OF SANTA          | DEMAND FOR JURY TRIAL
   | CLARA, AND THE LOS ANGELES UNIFIED    |
19 | SCHOOL DISTRICT ON BEHALF OF ALL      |
   | OTHER POLITICAL SUBDIVISIONS          |
20 | SIMILARLY SITUATED;                   |

21 **THE STATE OF ALASKA BY ITS
   ATTORNEY GENERAL TALIS J. COLBERG;**
22
   **THE STATE OF ARIZONA BY ITS
23 ATTORNEY GENERAL TERRY GODDARD;**

24 **THE STATE OF ARKANSAS BY ITS
   ATTORNEY GENERAL DUSTIN
25 MCDANIEL;**

26 **THE STATE OF COLORADO BY ITS
   ATTORNEY GENERAL JOHN W. SUTHERS;**
27
   **THE STATE OF DELAWARE BY ITS
28 ATTORNEY GENERAL JOSEPH R. BIDEN,
   III;**

                                    1

THE STATE OF FLORIDA BY ITS
ATTORNEY GENERAL BILL MCCOLLUM;

THE STATE OF HAWAII BY ITS
ATTORNEY GENERAL MARK J. BENNETT;

THE STATE OF IDAHO BY ITS ATTORNEY
GENERAL LAWRENCE G. WADSEN;

THE STATE OF ILLINOIS BY ITS
ATTORNEY GENERAL LISA MADIGAN;

THE STATE OF IOWA BY ITS ATTORNEY
GENERAL THOMAS J. MILLER;

THE COMMONWEALTH OF KENTUCKY
BY ITS ATTORNEY GENERAL, GREGORY
D. STUMBO;

THE STATE OF LOUISIANA BY ITS
ATTORNEY GENERAL CHARLES C. FOTI,
JR.;

THE STATE OF MAINE BY ITS ATTORNEY
GENERAL G. STEVEN ROWE;

THE STATE OF MARYLAND BY ITS
ATTORNEY GENERAL DOUGLAS F.
GANSLER;

THE COMMONWEALTH OF
MASSACHUSETTS BY ITS ATTORNEY
GENERAL MARTHA COAKLEY;

THE STATE OF MICHIGAN BY ITS
ATTORNEY GENERAL MICHAEL A. COX;

THE STATE OF MINNESOTA BY ITS
ATTORNEY GENERAL LORI SWANSON;

THE STATE OF MISSISSIPPI BY ITS
ATTORNEY GENERAL JIM HOOD;

THE STATE OF NEBRASKA BY ITS
ATTORNEY GENERAL JON BRUNING;

THE STATE OF NEVADA BY ITS
ATTORNEY GENERAL CATHERINE
CORTEZ MASTO

THE STATE OF NEW MEXICO BY ITS
ATTORNEY GENERAL GARY KING AND
THE COUNTY OF SANDOVAL ON BEHALF
OF ALL OTHER POLITICAL SUBDIVISIONS
SIMILARLY SITUATED;

2

1  THE STATE OF NORTH CAROLINA BY ITS
   ATTORNEY GENERAL ROY COOPER;

2  THE STATE OF NORTH DAKOTA BY ITS
   ATTORNEY GENERAL WAYNE
3  STENEHJEM;

4  THE COMMONWEALTH OF THE
   NORTHERN MARIANA ISLANDS BY ITS
5  ATTORNEY GENERAL MATTHEW T.
   GREGORY;
6
   THE STATE OF OKLAHOMA BY ITS
7  ATTORNEY GENERAL W. A. DREW
   EDMONDSON;
8
   THE STATE OF OREGON BY ITS
9  ATTORNEY GENERAL HARDY MYERS;

10 THE COMMONWEALTH OF
   PENNSYLVANIA;
11
   THE STATE OF RHODE ISLAND BY
12 PATRICK C. LYNCH IN HIS CAPACITY AS
   ATTORNEY GENERAL;
13
   THE STATE OF SOUTH CAROLINA BY ITS
14 ATTORNEY GENERAL HENRY
   MCMASTER;
15
   THE STATE OF TENNESSEE BY ITS
16 ATTORNEY GENERAL ROBERT E.
   COOPER, JR.
17
   THE STATE OF UTAH BY ITS ATTORNEY
18 GENERAL MARK L. SHURTLEFF;

19 THE STATE OF VERMONT BY ITS
   ATTORNEY GENERAL WILLIAM H.
20 SORRELL;

21 THE COMMONWEALTH OF VIRGINIA BY
   ITS ATTORNEY GENERAL ROBERT F.
22 MCDONNELL;

23 THE STATE OF WASHINGTON BY ITS
   ATTORNEY GENERAL ROB MCKENNA;
24
   THE STATE OF WEST VIRGINIA BY ITS
25 ATTORNEY GENERAL DARRELL V.
   MCGRAW, JR.;
26
   THE STATE OF WISCONSIN BY ITS
27 ATTORNEY GENERAL J.B. VAN HOLLEN;

28                              Plaintiffs,

                                          3

v.

INFINEON TECHNOLOGIES AG; INFINEON
TECHNOLOGIES NORTH AMERICA CORP.;
HYNIX SEMICONDUCTOR, INC.; HYNIX
SEMICONDUCTOR AMERICA, INC.;
MICRON TECHNOLOGY, INC.; MICRON
SEMICONDUCTOR PRODUCTS, INC.;
MOSEL VITELIC, INC.; MOSEL VITELIC
CORP.; NANYA TECHNOLOGY
CORPORATION; NANYA TECHNOLOGY
CORPORATION USA, INC.; ELPIDA
MEMORY, INC.; ELPIDA MEMORY (USA)
INC.; NEC ELECTRONICS AMERICA, INC.;
                              Defendants.

## INTRODUCTION

1.      This action arises from indictments of and admissions of guilt by members of a
cartel to fix the price of dynamic random access memory ("DRAM"). United States Department
of Justice officials have called the DRAM price fixing agreement "one of the largest cartels ever
discovered." Computers, Printers, and Networking Equipment include DRAM. DRAM stores
information temporarily for quick access by a computer, or other product. Consumers purchase
DRAM separately or as part of other products. The amount of DRAM in such products is often a
key factor in a consumer's purchase decision. DRAM and products with DRAM are purchased
by a variety of customers, including individuals, businesses, schools and government entities.
The higher the price of DRAM; the lower the quality and quantity of memory incorporated into
products offered to these customers for purchase.

## JURISDICTION AND VENUE

2.      This complaint alleges violations of the Sherman Act, 15 U.S.C. §1. It is filed
under, and jurisdiction is conferred upon this Court by, sections 4, 4C, 12 and 16 of the Clayton
Act, 15 U.S.C. §§ 15, 15c, 22 and 26. The Plaintiffs also allege violations of State antitrust,
consumer protection and/or unfair competition and related laws, and seek damages, restitution,
civil penalties, and/or other equitable relief under those State laws. All claims under federal and
state law are based upon a common nucleus of operative facts, and the entire action commenced
by this Complaint constitutes a single case that would ordinarily be tried in one judicial

4

1  proceeding.

2      3.      The Court further has jurisdiction over the federal claims under 28 U.S.C. §§

3  1331 and 1337.  The Court has jurisdiction over the state law claims under 28 U.S.C. § 1367

4  because those claims are so related to the federal claims that they form part of the same case or

5  controversy.

6      4.      Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391

7  because each of the Defendants resides, transacts business, committed an illegal or tortious act,

8  or is found in this District, within the meaning and scope of 15 U.S.C. § 22, Cal. Bus. & Prof.

9  Code § 1672 and 28 U.S.C. § 1391 (b) and (c), and a substantial part of the events giving rise to

10  the claims arose in this District.

11      5.      The activities of the Defendants and their co-conspirators, as described herein,

12  were within the flow of, were intended to, and did have a substantial effect on the foreign and

13  interstate commerce of the United States.

14                              **DEFINITIONS**

15      6.      Computer means desktops, laptops (or notebooks), servers, workstations and

16  super computers.  The term "Computers" excludes special purposes devices such as PDAs, cell

17  phones, telecommunications devices, set-top boxes, home appliances, game machines, printers,

18  copiers or facsimile machines.

19      7.      Dynamic Random Access Memory ("DRAM") means the semiconductor memory

20  chip providing high-speed storage and retrieval of electronic information for electronic devices,

21  such as personal computers and servers around the world.  These memory chips are used to store

22  data in a wide variety of computing and other electronic devices while the device is in operation.

23   DRAM includes, but is not limited to DRAM, Synchronous Dynamic Random Access Memory

24  ("SDRAM") and Double Data Rate Dynamic Random Access Memory ("DDR") chips.  DDR

25  and SDRAM chips are higher speed, higher performance types of DRAM chips.  "Random

26  Access Memory" means that the data, stored in the form of binary digits (or "bits"), 0s and 1s,

27  can be accessed directly from any part of the memory.  DRAM is called "dynamic" because it

28  must have its information refreshed, or recharged electronically, every few milliseconds.  DRAM

5

1   as used in Computers consists of individual chips, or discrete industry-standard or proprietary

2   modules which are available in a number of standard memory sizes, e.g. 128, 256 or 512

3   megabytes ("MB"), that incorporates multiple DRAM chips and support circuitry onto a printed

4   circuit.

5        8.     "DRAM Containing Products" means Computer, Printer and Networking

6   Equipment as those terms are defined in this complaint.

7        9.     "Networking Equipment" means devices that control the transfer of data in

8   computer networks, including routers, switches, repeaters, bridges and firewalls.

9       10.    "Printer" means a computer output device used to produce hard copies of

10   documents stored in electronic form and includes laser, inkjet, plotters, dot matrix, dye

11   sublimation and inkless devices.

12       11.    "Political Subdivisions" means counties, cities, towns, K-12 school districts,

13   public undergraduate and graduate educational institutions, and other government units, entities,

14   and instrumentalities, that are autonomous or independent from the State itself under the

15   Eleventh Amendment of the Constitution of the United States or otherwise treated as being

16   autonomous from the State itself, as well as all electric, utility, water, sewer, fire, port authority

17   and other special districts and tax-supported institutions that are either autonomous or

18   independent from the State itself under the Eleventh Amendment or otherwise treated as being

19   autonomous from the State itself, where state law permits such to be represented by the Attorney

20   General of a State, all as provided in the applicable state laws of the respective Plaintiff States.

21       12.    "State Agencies" means all departments, divisions, boards, councils, committees,

22   institutions, agencies, offices of a State, public undergraduate and graduate educational

23   institutions, and other government units, entities, and instrumentalities, that either constitute an

24   arm of the State for Eleventh Amendment purposes or are not otherwise treated under state law

25   as being autonomous from the State itself, all as provided in the applicable state laws of the

26   respective Plaintiff States.

27

28

**THE PARTIES**
**The Plaintiffs**

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

13.    Plaintiffs bring this action by and through their Attorneys General. The persons and entities each Attorney General represents are outlined in each specific count. In general, the Attorneys General may represent one or more of the following: State Agencies, Political Subdivisions, Political Subdivisions as a class representative, natural person consumers as *parens patriae*, natural person consumers as a class representative and business consumers as *parens patriae*. Pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, certain state Plaintiffs assert a class action as further described below insofar as they represent State Agencies and Political Subdivisions located in their states in a class capacity that were indirect or direct purchasers of DRAM. Regardless of the representative capacities in which the Plaintiff States, by and through their Attorneys General, file this action on behalf of the aforementioned groups pursuant to their state laws, the issues of liability, impact, damages, and defenses are common to all of these groups.

## The Defendants

14.    Defendant Micron Technology, Inc. is a Delaware Corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period covered by this Complaint, Defendant Micron Technology, Inc., manufactured, sold and distributed DRAM throughout the United States.

15.    Defendant Micron Semiconductor Products, Inc. is a wholly owned and controlled subsidiary of Defendant Micron Technology, Inc., with its principal place of business at 8000 South Federal Way, Boise, Idaho. During the time period covered by this Complaint, Defendant Micron Semiconductor Products, Inc. sold and distributed DRAM to customers throughout the United States, including sales through its Crucial Technology division. Micron Technology, Inc., Micron Semiconductor Products, Inc., and the Crucial Technology division are referred to collectively herein as "Micron."

16.    Defendant Infineon Technologies AG is a German corporation with its principal place of business at Am Campeon 1-12, D-85579, Neubiberg, Germany. During the time period covered by this Complaint, Defendant Infineon Technologies AG manufactured, sold and

7

1  distributed DRAM throughout the United States.

2      17.    Defendant Infineon Technologies North America Corp. is a wholly owned and

3  controlled subsidiary of Infineon Technologies AG with its principal place of business at 1730

4  North First Street, San Jose, California. During the time period covered by this Complaint,

5  Defendant Infineon Technologies North America Corp. sold and distributed DRAM to customers

6  throughout the United States. Infineon Technologies AG and Infineon Technologies North

7  America Corp. are referred to collectively herein as "Infineon."

8      18.    Defendant Hynix Semiconductor, Inc. is a business entity organized under the

9  laws of South Korea, with its principal place of business at SAN 136-1, Ami-Ri Bubal-eub,

10  Ichon-si, Kyongki-do, Korea. During the time period covered by this Complaint, Defendant

11  Hynix Semiconductor, Inc. manufactured, sold and distributed DRAM to customers throughout

12  the United States.

13      19.    Defendant Hynix Semiconductor America, Inc. is a wholly owned and controlled

14  subsidiary of Defendant Hynix Semiconductor, Inc., with its principal place of business at 3101

15  North First Street, San Jose, California. During the time period covered by this Complaint,

16  Defendant Hynix Semiconductor America, Inc. sold and distributed DRAM to customers

17  throughout the United States. Hynix Semiconductor, Inc. and Hynix Semiconductor America,

18  Inc. are referred to collectively herein as "Hynix."

19      20.    Defendant Mosel Vitelic, Inc. is a business entity organized under the laws of

20  Taiwan, with its principal place of business at No. 19 Li Hsin Road, Hsinchu Science Based

21  Industrial Park, Hsinchu, Taiwan, R.O.C. During the time period covered by this Complaint,

22  Defendant Mosel Vitelic, Inc., manufactured, sold and distributed DRAM to customers

23  throughout the United States.

24      21.    Defendant Mosel Vitelic Corporation ("MVC") is a wholly owned and controlled

25  subsidiary of Mosel Vitelic, Inc. ("MVI"), with its principal place of business at 3910 North First

26  Street, San Jose, California. During the time period covered by this Complaint, Defendant MVC

27  sold and distributed DRAM to customers throughout the United States. MVC and MVI are

28  referred to collectively herein as "Mosel Vitelic."

8

1       22.    Defendant Nanya Technology Corporation is a business entity organized under the

2  laws of Taiwan, with its principal place of business at HWA YA Technology Park, 669, Fu

3  Hsing 3rd Rd., Kueishan, Taoyuan, Taiwan, R.O.C.  During the time period covered by this

4  Complaint, Defendant Nanya Technology Corporation manufactured, sold and distributed

5  DRAM to customers throughout the United States.

6       23.    Defendant Nanya Technology Corporation USA, Inc. is a wholly owned and

7  controlled subsidiary of Nanya Technology Corporation with its principal place of business at

8  675 E. Brokaw Road, San Jose, California.  During the time period covered by this Complaint,

9  Defendant Nanya Technology USA, Inc. sold and distributed DRAM to customers throughout

10  the United States.  Nanya Technology Corporation and Nanya Technology Corporation USA,

11  Inc. are referred to collectively herein as "Nanya."

12       24.    Defendant Elpida Memory, Inc. is a business entity organized under the laws of

13  Japan, with its principal place of business at Sumitomo Seimei Yaesu Bldg., 3F, 2-1 Yaseu 2-

14  chome, Chuo-ku, Tokyo 104-0028, Japan.  During the time period covered by this Complaint,

15  Defendant Elpida Memory, Inc. manufactured, sold and distributed DRAM to customers

16  throughout the United States.

17       25.    Defendant Elpida Memory (USA), Inc. is a wholly owned and controlled

18  subsidiary of Elpida Memory, Inc., with its principal place of business at 2001 Walsh Avenue,

19  Santa Clara, California.  During the time period covered by this Complaint, Defendant Elpida

20  Memory (USA) Inc. sold and distributed DRAM to customers throughout the United States.

21  Elpida Memory, Inc. and Elpida Memory (USA), Inc. are referred to collectively herein as

22  "Elpida."

23       26.    Defendant NEC Electronics America, Inc. ("NEC") is a wholly owned and

24  controlled subsidiary of NEC Electronics Corporation, with its principal place of business at

25  2880 Scott Boulevard, Santa Clara, California, and its manufacturing plant in Roseville,

26  California.  During the time period covered by this Complaint, Defendant NEC sold and

27  distributed DRAM to customers throughout the United States.

28  ///

9

**Co-Conspirators**

27.    Various others, presently unknown to Plaintiffs, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

28.    The acts charged in this Complaint have been done by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.

29.    Each of the Defendants named herein acted as either the agent, joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein. Each Defendant which is a subsidiary of a foreign parent acts as a United States agent for DRAM made by its parent company.

**TRADE AND COMMERCE**

30.    Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of marketing and selling DRAM throughout the United States.

31.    DRAM is the dominant, most common form of memory chip. It is a large-scale integrated circuit with electronic interfaces, physical form factors, and packaging that have been established as industry standards. As such, DRAM is a commodity, with each Defendant's products being easily interchangeable with the products of another company when designing electronic systems making use of DRAM.

32.    Worldwide sales of DRAM totaled approximately $14 billion in 2001, and increased to approximately $17 billion in 2003, with the United States accounting for a significant share of worldwide DRAM sales. There were more than $5 billion in DRAM sales annually in the United States in 2003. The top four manufacturers, Micron, Samsung, Hynix and Infineon, controlled approximately 70% of U.S. DRAM sales during the time period of the conspiracy. Mosel Vitelic, Elpida, NEC, and Nanya, were DRAM manufacturers with a

10

1 | substantial portion of the remaining 30% of U.S. DRAM sales.

2

3 | **THE MARKET FOR DRAM**

4 | 33. DRAM is sold either individually, as a component of a DRAM module, or as a

5 | component incorporated into an electronic system, such as a Computer, Printer or Networking

6 | Equipment.

7

8 | **SEPARATE DRAM PURCHASES**

9 | 34. Consumers of all kinds; natural persons, governments and businesses purchase

10 | DRAM, usually in the form of modules, for three reasons: 1) to repair a product which has a

11 | defective DRAM module; 2) to increase the functionality of an existing DRAM Containing

12 | Product such as a Computer; and 3) to build a DRAM Containing Product from scratch.

13 | 35. All of the Defendants manufacture DRAM modules.

14 | 36. Such DRAM may be purchased from a Defendant like Micron or another vendor

15 | such as CDW (formerly Computer Discount Warehouse), Staples, Office Depot or Office Max or

16 | from an Original Equipment Manufacturer ("OEM") like Dell, Hewlett-Packard Company

17 | ("HP") or Gateway.

18 | 37. Over various spans of the period from 1998-2002, from 5 % to 36% of all DRAM

19 | used in electronic data processing equipment was purchased separately for those purposes

20 | according to Gartner/Dataquest estimates.

21

22 | **DRAM CONTAINED IN OTHER PRODUCTS**

23 | 38. DRAM is used in DRAM Containing Products to allow fast and efficient use of

24 | electronic resources.

25 | 39. In a Computer, DRAM is used to store data (in the form of documents,

26 | spreadsheets or pictures, for example), while the Computer processes that data. These processes

27 | could involve editing a document, performing mathematical computation to information on a

28 | spread sheet, or resizing or enhancing a picture.

11

40.     Each of the functions would take dramatically more time, if accomplishable at all, without DRAM.

41.     In a Printer, DRAM is used to store the document or other item to be printed.  For network printers, i.e., those that have more than one user's computer attached to the Printer, DRAM enables the Printer to store a large number of documents from a variety of sources.

42.     Printing would be much slower without DRAM and would result in greatly reduced performance of attached Computers.

43.     In Networking Equipment, DRAM temporarily holds data such as that contained in electronic mail while it is being transferred through the network.  Because the amount of traffic on networks has steadily increased due to the convenience of sharing data, such as when a large document or picture is attached to an e-mail, DRAM is essential to the function of Networking Equipment.

44.     Computers, Printers and Networking Equipment require specific amounts of DRAM for their key functions.

# COMPUTERS

45.     All Computers have essential components, which include a microprocessor (central processing unit), a hard drive and DRAM.

46.     Nearly all Computer advertisements note the amount of DRAM in a particular model.

47.     For example, in PC World advertisements from 1999 to 2001, Gateway, Compaq, and Dell consistently listed DRAM at the top of the specifications list, generally only behind the processor speed. In the January 2001 edition of PC World, Dell advertised its Dimension L in the following manner: Intel Pentium III Processor at 800MHz, 64MB SDRAM, 20GB (7200 RPM) Ultra ATA HD and other features for $899.

48.     Models with increased functionality usually have more DRAM. For example, in the January 2001 edition of PC World, Compaq advertised multiple versions of the Presario desktop PC. The base model included only 64MB of DRAM and was advertised as a family PC.

12

1  Models advertised for power users and music/photo enthusiasts, who require more functionality,

2  included 128MB of DRAM.

3      49.    Similarly, in the July 1999 edition of PC World, Dell advertised its Dimension

4  L400c with 32MB of DRAM as a value desktop PC. Adjacently, Dell advertised the Dimension

5  XPS T450, its high performance model, which included 64 MB of DRAM.

6      50.    Consumers can add DRAM at the time of purchase to most models. For example,

7  in the July 1999 edition of PC World, Compaq provided upgrade offers allowing consumers to

8  upgrade to 128MB of DRAM for $120 or 256MB of DRAM for $300. Similarly, in the June

9  2001 edition of PC World, Dell sold 128MB of DRAM for $60 as an upgrade for desktops

10 containing only 64MB of DRAM. The December 2001 edition contained an offer from Dell for a

11 256MB DRAM upgrade for $80.

12     51.    Statewide requirements contracts for Computers may contain terms stating the

13 cost of DRAM upgrades to base-model Computers purchased under those contracts.  This allows

14 individual State Agencies to procure Computers adequately configured for their individual needs

15 and budget considerations.   An agency purchasing under this type of contract must make a

16 conscious decision regarding the amount of memory supplied versus the price of the upgrade,

17 and determine whether or not to purchase this upgrade.

18     52.    Approximately 5-10% of a personal computer's cost is DRAM. In workstations,

19 the cost share of DRAM can be considerably higher.

20     53.    Business, natural person, and government consumers all select a desired amount

21 of installed DRAM on Computers because all software installed on such devices requires a

22 certain amount of DRAM for the software to operate properly. When DRAM prices are high,

23 Computer OEMs respond by offering less memory with their base Computer models to

24 consumers. Consumers respond to higher memory prices by trading off better computer

25 performance against higher computer prices.

26     54.    Producers of software applications designed to run on computers specify the

27 minimum amounts of DRAM and the suggested amounts of DRAM to successfully run these

28 applications.  These specifications are readily available to the end user.  They are published in

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1 | multiple forms often as part of the "system requirements" included on product packaging, Web

2 | sites and printed advertising materials.

3 |     55.    Minimum and suggested system requirements for amounts of DRAM begin with

4 | the operating system itself. For example, Windows 98 requires a minimum of 16 MB of DRAM,

5 | and a suggested amount of 24 to 64 MB of DRAM. Windows ME requires 32 MB of DRAM,

6 | with 64 MB or 128 MB providing better performance, Windows 2000 requires a minimum of

7 | 64MB. Windows XP requires a minimum of 64 MB of DRAM memory, and at least 128MB to

8 | run with minimally acceptable performance levels. Reasonable levels of performance are ensured

9 | by configuring at least 256MB in the computer. The popular application software Microsoft

10 | Office 98 requires a minimum of 8 MB of DRAM to run with Windows 95 or 16 MB of DRAM

11 | to run with Windows NT workstation. Purchasers of Computers often use these suggested

12 | system requirements, which specify the amount of DRAM necessary for operation, to purchase

13 | the amount of DRAM required for their needs.

14 |     56.    As DRAM becomes more expensive, purchasers of Computers can and do reduce

15 | the amount of DRAM installed in the Computer to reduce the price of the Computer to stay

16 | within their budgets. The consequence of doing so is that consumers will have a machine which

17 | performs less capably than a machine with more DRAM.

18 |     57.    Purchasers of Computers may also purchase additional DRAM to keep pace with

19 | the rapidity of technological advancement in the Computer industry. Information technology

20 | professionals often recommend purchasing as much DRAM in a new Computer as the budget

21 | will allow, thus extending the useful lifespan of the Computer and providing increased

22 | performance. For example, Kingston, a manufacturer and retailer of memory modules,

23 | recommends that a Windows NT workstation used for administration and service should be

24 | equipped with between 64 and 256 MB of DRAM, depending on whether the usage is light,

25 | medium or heavy. It further recommends that this same machine, when used for engineering and

26 | design work, should be equipped with between 96 MB and 1 GB of DRAM, depending on

27 | whether the usage is light, medium or heavy. The current market price for DRAM factors into

28 | how much DRAM may be purchased.

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

58.    DRAM is even more important in a subset of Computers known as servers. Servers are computers which connect to other computers to share files, software applications, and other functions like printing.

59.    Like other Computers, servers contain a central processing unit, a data storage media like a hard drive, and DRAM.

60.    Because servers are meant to handle functions from multiple computers simultaneously, servers rely heavily on DRAM for this functionality.

61.    As much as 70% of the cost of a server is attributable to DRAM.

62.    Increases in the amount of DRAM in a server will increase its functionality.

63.    Servers are used in situations where multiple persons connect to the same network. Servers are purchased almost entirely for business or government use.

## PRINTERS

64.    Most computers are connected to Printers.

65.    A Printer may be connected to a single computer or to multiple computers.

66.    When a computer user prints a document, the document is moved from the computer's DRAM to the Printer's DRAM.

67.    If the Printer's DRAM has enough memory to hold the entire document, then the computer's DRAM is freed to perform other functions.

68.    The amount of DRAM in the Printer thus determines how efficiently a computer and Printer function.

69.    While certain inexpensive Printers come only with a set amount of DRAM, other larger, more expensive Printers, especially Printers designed to service more than one computer at a time, can have DRAM added to them either at the factory or subsequently.

70.    How much DRAM is contained in inexpensive Printers or is standard or added to other Printers is determined by the price of DRAM.

71.    In 2000, a color laser jet 8550 from HP was available with 32MB to 128 MB of DRAM from the manufacturer, and was upgradeable to 512 MB of DRAM.  A Lexmark Optra

15

1  series printer in 1999 was available with 4MB to 8MB of DRAM from the manufacturer. These

2  printers could later be upgraded to 64-132 MB of DRAM, depending on the specific model.

3  Other manufacturers have similar base and upgrade specifications.

4

5                              **NETWORKING EQUIPMENT**

6      72.    Networking Equipment devices receive data going from one computer or network

7  and send it on to another computer or network.

8      73.    In the process of transferring data, Networking Equipment uses DRAM to

9  temporarily store data while the transfer takes place.

10     74.    The more DRAM the Networking Equipment has, the more quickly data can

11  move either among computers or among networks.

12     75.    DRAM memory used in Networking Equipment is substantial. For example, a

13  2002 Cisco configuration guide shows that its 1751 router, sold as a SOHO/SMB (small or home

14  office/small-medium business) came with 32 Mb of DRAM memory as a base configuration,

15  which could be expanded to 128Mb at the option of the user. The Cisco 7500 series (RSP-16)

16  core router, sold to large organizations, came with 128Mb DRAM as standard, and could be

17  expanded to 1024 Mb of DRAM.  Other manufacturers had similar base and expansion

18  specifications for their Networking Equipment.

19

20          **OTHER FACTORS AFFECTING CONSUMER DRAM NEEDS**

21     76.    During the period of the conspiracy, the use of the Internet expanded greatly.  In

22  this time period, the Internet came to be used to gather information and to make a variety of

23  transactions from purchasing airplane tickets to trading stock to buying shoes.

24     77.    As a consequence, the Web sites consumers used over the Internet added more

25  features, including new graphics, streaming audio and video and the ability to encrypt financial

26  transactions.

27     78.    Each of these innovations on Web sites required additional DRAM on the user's

28  computer for the pages to be viewed quickly and easily, and in some cases to work properly.

16

79.   States also enhanced their Web sites during the period of the alleged conspiracy, allowing, among many other activities, the renewal of licenses, the downloading of forms, laws and regulations and the payment of taxes.

80.   Each of these and the many other functions performed on state Web sites required increased DRAM on the states' Computers.

81.   As DRAM prices rise, the ability of natural persons as users of Web sites and the ability of businesses and government entities, like states, as users and operators of Web sites to access and provide enhanced Web site services are either curtailed or made more expensive.

82.   A substantial proportion of worldwide DRAM sales occur in California, which is one of the world-wide centers of the computer industry that depends upon DRAM.

## DRAM PURCHASING BY MANUFACTURERS OF DRAM CONTAINING PRODUCTS

83.   . Manufacturers of Computers, Printers and Networking Equipment purchase DRAM either from the Defendants or from wholesale distributors who have purchased DRAM from the Defendants.  These manufacturers then sell these DRAM Containing Products to end-users, as well as DRAM itself to end-users (e.g., for upgrades or repairs).

84.   DRAM memory module-makers purchase DRAM chips from the Defendants in order to manufacture modules with these chips, and then resell DRAM in said memory-modules to manufacturers of Computers, Printers, and Networking Equipment for resale to end-users, to wholesale distributors for resale to end-users, or directly to end-users.

85.   The largest OEMs of Computers, Printers, and Networking Equipment, purchase the bulk of their DRAM modules directly from the Defendants pursuant to periodic transactions that take place under the terms of negotiated agreements or contracts.  Seventy-five to eighty percent of DRAM memory is estimated to be sold in this "contract" market. Large customers such as OEMs negotiate with the Defendants or wholesale distributors for bulk purchases at favorable prices under these contracts.

86.   Absent the alleged anti-competitive conduct of the Defendants, this contract price generally would have been lower than actually observed. Information on currently negotiated

17

1  contract prices is collected from both DRAM buyers and sellers, and offered for sale by industry

2  consultants on a weekly or monthly basis (such organizations as Gartner/Dataquest, Semico, De

3  Dios, ICIS/LOR, iSuppli and others track and publish this information).

4      87.    OEMs also sometimes purchase memory in a "spot" market (consisting of

5  brokers, distributors, and dealers, other than DRAM manufacturers and their authorized

6  distributors) when their needs exceed the quantities negotiated or available under the terms of

7  agreements to purchase directly from DRAM makers.  These purchases are typically on a "spot"

8  basis (i.e., for immediate delivery), and do not represent longer term commitments to deliver

9  product in the future. When OEMs purchase or acquire greater quantities of DRAM than

10  anticipated or needed for equipment production requirements, they will sell their excess

11  inventories into the spot market.  If spot prices are substantially below contract prices, OEMs can

12  shift their purchases into the spot market and take advantage of the lower spot market price.

13      88.    Thus, contract DRAM prices are integrally linked to the prices available on the

14  spot market for DRAM. Moreover, the spot market price is openly advertised, easy to track, and

15  influences contract price negotiations.

16      89.    High spot market prices for DRAM thus enable the Defendants to obtain higher

17  contract prices for DRAM than they would otherwise receive.  A DRAM manufacturer knows

18  that a DRAM purchaser has little choice but to agree to pay a higher contract price during periods

19  when DRAM spot market prices are high.  Moreover, if contract prices are substantially higher

20  than spot prices for DRAM, this can cause spot prices to rise as well, as OEMs compete with

21  others for what is available in the spot market.

22      90.    Between the years 1998 to 2003, the largest OEM's, (Dell, HP, International

23  Business Machines Corp. ("IBM"), Compaq and Gateway) accounted for approximately 60% of

24  the U.S. computer market.

25      91.    Between the years 1999 to 2001, five companies; Dell, HP, IBM, Compaq and

26  Sun accounted for more than 75% of the U.S. server market.

27

28                      **DEFENDANTS' ILLEGAL CONDUCT**

18

92.    In or around 1998, the Defendant DRAM manufacturers discussed and coordinated the prices that they charged to OEMs, and to their other customers. The manufacturers did not limit this pricing coordination to isolated or occasional conversations. To the contrary, during a roughly four-year period, there were frequent pricing communications among the conspiring manufacturers, exchanges that intensified in the days immediately preceding the dates on which they submitted bids to supply DRAM to the OEMs, their largest and most important customers.

93.    In June, 2002, the U.S. Department of Justice launched a criminal investigation. Although initially denying any culpability, one of the conspirators, Micron, agreed to cooperate with federal investigators, revealing the details of the conspiracy in exchange for amnesty from federal criminal charges. To date, four manufacturers – Samsung, Hynix, Infineon, and Elpida – and twelve individuals have been charged with, and have pleaded guilty to, criminal price fixing as a result of the investigation, and they have paid fines in excess of $730 million.

94.    As early as spring of 1998 a Vice President of Hyundai Electronics America, a predecessor of Defendant Hynix, writing to the industry in general, proposed, as a solution to the problem of excess supply, that DRAM makers shut down production for a limited time to stabilize prices. The article stated that "if the plan is to work ... all DRAM makers must play fairly for the overall good of our industry. A rogue player ... can keep the DRAM business on thin ice." In or around 1998, price-related discussions were conducted by certain Defendants regarding certain OEMs, which involved the exchange of pricing information.

95.    Beginning in the mid 1990s through 2002, dramatic consolidation occurred among DRAM manufacturers, leading to a 40% reduction in the number of DRAM manufacturers worldwide.

96.    In 2001, Defendants agreed to reduce supply in order to artificially raise prices. At a meeting among DRAM manufacturers in the fall of 2001, a Mosel Vitelic executive stated that a "basis for understanding had been reached" in which the Defendants were to "trim some production starting in September." The Mosel Vitelic executive indicated that all DRAM makers would have to agree for the plan to have the desired effect of raising prices.

19

97. Defendants' manipulation of the price charged to OEMs (contract price) and the spot market price resulted in elevated prices for all DRAM units sold.

98. In 1999, 61% of total DRAM was installed in Computers either by original equipment manufacturers or by end-users.

99. Defendants and their co-conspirators have engaged in a contract, combination, trust or conspiracy the effect of which was to stabilize prices at which they sold DRAM and to artificially inflate the price levels at which they sold DRAM.

100. Defendants' contract, combination, trust, or conspiracy was centered in, carried out, and effectuated through frequent communications substantially originating from, occurring in, or directed to the state of California among the Defendants themselves and between the Defendants and OEM manufacturers located in California and elsewhere.

**Micron**

101. Between 1999 and June 2002, at least 19 Micron employees exchanged price-related data in communication with employees of competitors Samsung, Hynix, Mosel Vitelic, Nanya, Elpida, NEC, Infineon and Toshiba.

102. The pricing data Micron employees exchanged with Micron's co-conspirators related to prices the Defendant would charge OEMs for DRAM. Such OEM customers of Micron and its co-conspirators included Apple Computer, Inc., Compaq Computer Corp., Dell Inc., Gateway Inc., HP, and International Business Machines Corp. ("IBM").

103. Micron employees and their counterparts at competing DRAM manufacturers exchanged pricing information by telephone and in meetings. Information exchanged in these discussions included prices to be charged to specific DRAM customers, and at times, information about specific prices that they planned to charge their key corporate accounts.

104. Micron employees passed on price-related information they received from competitors to their superiors either orally or by e-mail.

105. Mike Sadler is Vice President of Worldwide sales for Micron. Since 1997, he has overseen the sales activity for all Micron DRAM products. He is the Micron executive with

20

1  ultimate pricing responsibility.

2       106.    During the relevant time period, Mike Sadler had discussions concerning pricing

3  and other competitive strategies with his counterparts at Samsung, Infineon, Hynix, Nanya,

4  Elpida and Mosel Vitelic.

5       107.    On separate occasions Sadler discussed directly with the CEOs of Samsung and

6  Infineon the "problem" of oversupply in the DRAM market.

7       108.    On November 11, 2004, Micron's CEO, Steve Appleton, admitted that "the

8  DOJ's investigation has revealed evidence of price fixing by Micron employees and its

9  competitors on DRAM sold to certain computer and server manufacturers."

10

11  **Samsung**

12       109.    Samsung Electronics Company and Samsung Semiconductor, Inc., ("Samsung")

13  pled guilty on November 30, 2005, in the Northern District of California to a Criminal

14  Information charging the companies with participating in a conspiracy to suppress and eliminate

15  competition by fixing the prices of DRAM to be sold to OEMs during certain periods of time

16  between April 1, 1999, to about June 15, 2002, in violation of the Sherman Antitrust Act, 15

17  USC § 1.

18       110.    Samsung admitted during the sentencing hearing that in furtherance of the

19  conspiracy, its officers and employees engaged in discussions and attended meetings with

20  representatives of other DRAM manufacturers.  During these discussions and meetings

21  agreements were reached to fix the price of DRAM to be sold to OEMs.  Samsung was sentenced

22  to pay a fine of $300 million.

23       111.    Samsung's DRAM sales directly affected by the conspiracy in the United States

24  totaled at least $1.2 billion.  The conspiracy unlawfully fixed the prices that Dell, HP, Compaq,

25  IBM, Apple and Gateway paid for DRAM.

26       112.    During the period of the conspiracy at least 48 Samsung officers and employees,

27  including senior executives with final pricing authority had price-related contacts with employees

28  of Defendant competitors Micron, Elpida, Hynix, Infineon, Toshiba, NEC, Infineon, Hitachi,

21

1    Mitsubishi, Nanya, and Mosel Vitelic.

2        113.   H.J. Kim, President of Samsung Semiconductor, Inc., had discussions with both

3    Mike Sadler, the Micron executive with final pricing authority, and with Steve Appleton, the

4    CEO of Micron.

5        114.   Dieter Mackowiak, Senior Vice President of Sales and Marketing at Samsung

6    Semiconductor had discussions on market conditions and pricing trends with Mike Sadler of

7    Micron, Peter Schaefer of Infineon, and Farhad Tabrizi of Hynix.

8        115.   The contacts between Samsung officers and employees and their competitors

9    included participating in meetings, conversations and communications to discuss the price of

10   DRAM to be sold to customers and agreeing with their competitors to charge prices of DRAM to

11   their customers at specific levels.  These agreements also included issuing price quotes that had

12   been agreed upon and exchanging information on sales in order to monitor and enforce their

13   agreements.

14       116.   Samsung officers and employees communicated price-related discussions with

15   competitors to their superiors at Samsung by e-mail, phone or in person.

16       117.   Three senior Samsung executives agreed to plead guilty and serve periods of

17   imprisonment for participating in the DRAM price fixing conspiracy.

18

19                                    **Hynix**

20       118.   Hynix Semiconductor, Inc., pled guilty on May 11, 2005, in the Northern District

21   of California to a Criminal Information charging it with participating in a conspiracy to suppress

22   and eliminate competition by fixing the prices of DRAM to be sold to OEM customers during

23   certain periods of time between April 1, 1999, to about June 15, 2002, in violation of the

24   Sherman Antitrust Act, 15 USC § 1.

25       119.   Hynix admitted during the sentencing hearing that, in furtherance of the

26   conspiracy, its officers and employees engaged in discussions and attended meetings with

27   representatives of other DRAM manufacturers.  During these discussions and meetings,

28   agreements were reached to fix the price of DRAM to be sold to OEMs.  Hynix was sentenced to

                                      22

1 | pay a fine of $185 million.

2 |     120.    Hynix's DRAM sales directly affected by the conspiracy in the United States

3 | totaled at least $839 million. The conspiracy unlawfully fixed the prices that Dell, HP, Compaq,

4 | IBM, Apple and Gateway paid for DRAM.

5 |     121.    During the period of the conspiracy at least 19 Hynix officers and employees,

6 | including senior executives with final pricing authority, had price-related contacts with

7 | employees of Defendant competitors Samsung, Micron, Infineon, Toshiba, Elpida, Mosel Vitelic

8 | and NEC.

9 |     122.    C.K. Chung, the Director of World Wide Strategic Account Sales for Hynix, had

10 | pricing discussions with his counterparts at Samsung both in person and on the phone.

11 |     123.    Gary Swanson, Hynix's Vice President in charge of U.S. memory sales and a

12 | member of the Hynix semiconductor America Board of Directors, had price-related contacts with

13 | Mike Sadler, Vice President of World Wide sales for Micron.

14 |     124.    The contacts between the 19 Hynix officers and employees and their competitors

15 | included participating in meetings, conversations and communications to discuss the price of

16 | DRAM to be sold to customers; agreeing with their competitors to charge prices of DRAM at

17 | certain levels to be sold to certain customers; issuing price quotes in accordance with the

18 | agreements reached; and exchanging information on sales in order to monitor and enforce their

19 | agreements.

20 |     125.    Hynix officers and employees communicated price-related discussions with

21 | competitors to their superiors at Hynix by e-mail, telephone and in person. During Hynix sales

22 | and marketing conference calls, participants discussed the fact that competitive pricing

23 | information had been obtained from competitor contacts.

24 |     126.    Four Hynix executives, including C.K. Chung, have agreed to plead guilty and

25 | serve jail time for participating in a global conspiracy to fix DRAM prices.

26 |

27 | **Infineon**

28 |     127.    Infineon Technologies A.G. pled guilty in October 2004 in the Northern District

23

1    of California to a Criminal Information charging it with participating in a conspiracy to fix the

2    prices of DRAM sold to OEM customers during certain periods of time between July 1, 1999,

3    and June 15, 2002, in violation of the Sherman Antitrust Act, 15 USC § 1.

4           128.    Infineon admitted during the sentencing hearing that its officers and employees

5    engaged in discussions and attended meetings with representatives of other DRAM

6    manufacturers. During these discussions and meetings, agreements were reached to fix the price

7    of DRAM to be sold to OEMs. Infineon and its co-conspirators reached agreements to both limit

8    the rate of price declines during periods when DRAM prices decreased, and reached agreements

9    on price increases on sales to certain OEMs. Infineon was sentenced to pay a fine of $160

10    million.

11           129.    Between July 1, 1999, and June 15, 2002, Infineon sold DRAM to IBM, Compaq,

12    HP, Dell and Gateway. Infineon executives negotiated the prices of DRAM sold to each OEM

13    every two weeks.

14           130.    During the time period of the conspiracy at least 12 Infineon officers and

15    employees, including senior executives with final pricing authority, had price-related discussions

16    with counterparts at their competitors including Samsung, Micron, Hynix, Elpida, Nanya, Mosel

17    Vitelic and Toshiba.

18           131.    T. Rudd Corwin, Infineon's Vice President for Customer Marketing and Sales for

19    Memory Products in North America, authorized his employees to obtain pricing information

20    from competitors in exchange for Infineon pricing information for DRAM.

21           132.    Peter Schaefer was head of marketing, sales and logistics for Infineon memory

22    products between October 2000 and February 2003. In 2001, Schaefer had direct

23    communications with Dieter Mackowiak, Senior Vice President of Sales and Marketing for

24    Samsung, and with Mike Sadler of Micron. During these communications, price increases for

25    certain DRAM products were discussed.

26           133.    At the beginning of December 2001, Infineon and other DRAM manufacturers

27    increased prices to OEMs following a series of communications in which Infineon and certain

28    competitors indicated their intention to increase prices.

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

134. The contacts between Infineon officers and employees and their competitors included participating in meetings, conversations and communications to discuss the price of DRAM to be sold to customers; agreeing with their competitors to charge prices of DRAM at certain levels to be sold to certain customers; issuing price quotes in accordance with the agreements reached; and exchanging information on sales in order to monitor and enforce the agreements.

135. Infineon officers and employees communicated to their superiors by e-mail, telephone and in person price-related information they had exchanged with competitors.

136. Four Infineon executives, including T. Rudd Corwin and Peter Schaefer, agreed to plead guilty and have served jail time for participating in the worldwide DRAM price fixing conspiracy.

### Elpida

137. Elpida Memory, Inc., agreed on January 30, 2006, to plead guilty in the Northern District of California to a two-count Criminal Information. The first count charged Elpida with participating in a conspiracy to fix the prices of DRAM sold to OEM customers between April 1, 1999, and June 15, 2002, in violation of § 1 of the Sherman Antitrust Act, 15 USC § 1. The second count also charged that Elpida violated §1 of the Sherman Antitrust Act by reaching agreements with competitors to allocate and divide among themselves a bid offered by Sun Microsystems. Elpida has agreed to pay a fine of $84 million.

138. The Criminal Information charges that Elpida officers and employees carried out the price fixing conspiracy by participating in meetings, conversations and communications in the United States and elsewhere with competitors to discuss the prices of DRAM to be sold to certain customers; and agreed during those meetings, conversations and communications to fix prices of DRAM at certain levels for certain customers. Elpida and its co-conspirators issued price quotations in accordance with the agreements reached, and exchanged information on sales of DRAM to certain customers, for the purpose of monitoring and enforcing adherence to the agreed upon prices.

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1    139.    During the period of the conspiracy at least 19 Elpida officers and employees had

2  price-related contacts with officers and employees of competitors including Infineon, Toshiba,

3  Hynix, Micron, Samsung, Mitsubishi and Nanya.

4    140.    Elpida officers and employees communicated price-related discussions with

5  competitors to their superiors at Elpida by e-mail, telephone and in person.

6    141.    One Elpida executive,  Dimitrios James ("Jim") Sogas, agreed to plead guilty and

7  has served jail time for participating in the worldwide DRAM price fixing conspiracy.

8

9              **Mosel Vitelic, Nanya, NEC, Toshiba, Hitachi and Mitsubishi**

10    142.    Officers, agents, and employees of Mosel Vitelic, Nanya, NEC, Toshiba, Hitachi,

11  and Mitsubishi had numerous price-related discussions with their counterparts at competitors

12  Samsung, Micron, Hynix, Infineon and Elpida.

13    143.    On information and belief, officers, agents, and employees of Mosel Vitelic,

14  Nanya, NEC, Toshiba, Hitachi, and Mitsubishi communicated price-related discussions with

15  competitors through their superiors.

16

17              **FRAUDULENT CONCEALMENT**

18    144.    From approximately 1998 to June of 2002, Defendants effectively, affirmatively,

19  and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs.

20    145.    Defendants engaged in a successful, illegal price fixing conspiracy that by its

21  nature was inherently self-concealing.

22    146.    Defendants' wrongful conduct was carried out in part through means and methods

23  that were designed and intended to avoid detection, including numerous telephone calls and in

24  person meetings among the conspirators which, in fact, successfully precluded detection.

25  Plaintiffs could not have discovered Defendants' unlawful scheme and conspiracy earlier because

26  of Defendants' effective, affirmative, and fraudulent concealment of their activities.

27    147.    Defendants communicated to their United States entities false reasons to explain

28  price increases, such as seasonal ebb and flow and restriction in output, and instructed them to

1    use these false reasons with U.S. customers.  Plaintiffs are informed and believe that Defendants

2    communicated said reasons to OEMs who inquired as to the reason for price increases.

3        148.    Plaintiffs have exercised due diligence by promptly investigating the facts giving

4    rise to the claims asserted herein upon having reasonable suspicion of the existence of

5    Defendants' conspiracy to the extent permitted by law.

6

7                                    **INJURY**

8        149.    But for Defendants' anticompetitive acts, Plaintiffs would have been able to

9    purchase DRAM and the DRAM Containing Products of Computers, Printers, and Networking

10   Equipment at lower prices, and would have been able to purchase more capable and higher

11   performance DRAM Containing Products than were actually offered for sale to them.

12       150.    As a direct and proximate result of the unlawful conduct alleged above, the

13   Plaintiffs were not able to purchase DRAM and DRAM Containing Products at prices which

14   were determined by free and open competition.  Consequently, they have been injured in their

15   business and property in that, *inter alia*, they have paid more, and continue to pay more, for such

16   products than they would have paid in a free and open competitive market, and were not offered

17   more capable and higher performance products that would have been offered in a free and open

18   competitive market.

19       151.    Prices for DRAM are cyclical.  As a new DRAM chip is introduced (i.e. one with

20   larger capacity), the chip is generally priced higher than the chip it replaces.  Over the lifecycle of

21   the chip its price declines until it is no more expensive than the chip it replaces.  OEMs rely on

22   declining chip prices to offer more powerful equipment at lower prices.

23       152.    One OEM, Dell Computer Corp., steadily gained market share due to close

24   inventory controls.  In 1998, Dell's United States market share was 13.4%.  By 2002, it had risen

25   to 27.7%.  Dell's inventory control system used just-in-time management of computer

26   components to take advantage of the steady downward trend in component prices.  This allowed

27   Dell to gain significant market share by passing this reduction in component prices on to the

28   consumer.  This is referred to by some in the industry as "relentless price cutting," which has

                                            27

1  forced other OEMs to pass on their savings as well or lose market share to Dell.

2      153.    Dell's inventory control system is adversely affected by unexpected increases in

3  component costs.  Unexpected increases in costs deprive Computer purchasers of pass through

4  savings.  When component cost increases prevented Dell from cutting prices, other OEMs

5  likewise did not cut their prices.  Purchasers of devices made by OEMs were therefore deprived

6  of price declines in components such as DRAM that they would have otherwise enjoyed due to

7  such component cost increases.

8      154.    Computer component prices overall were steadily falling or holding steady for

9  much of the time period from 1998 until 2002, sometimes declining as much as one to two

10  percent per week. The only major components that experienced significant price increases were

11  LCD monitors and DRAM.  LCD monitors were not a standard component at that time and were

12  considered an upgrade.

13      155.    During the relevant time period, OEMs published the price of memory upgrades

14  for available computer models.  Price increases in DRAM caused the price of memory upgrades

15  to increase.

16      156.    DRAM price increases caused OEMs to offer less DRAM as a standard feature of

17  their products for a given price than they would have otherwise. Since purchasers of DRAM

18  Containing Products paid the same price for a device with less memory than they otherwise

19  would, they effectively paid more than they should have.

20      157.    Moreover, purchasers needed DRAM upgrades to meet suggested system

21  requirements, depending upon the intended level of usage of the device.  Such purchasers paid

22  the full price increase in DRAM as passed through the price of an upgrade.

23      158.    The Defendants' actions resulted in purchasers of DRAM and DRAM Containing

24  Products paying higher prices for DRAM Containing devices or in buying products with less

25  performance than they would have preferred.

26      159.    Numerous businesses, government entities, and natural persons in each of the

27  Plaintiff States all faced increased costs as a direct result of Defendants' cartel to increase the

28  price of DRAM.

28

160.     As a direct and proximate result of the unlawful conduct alleged above, the Defendants have unjustly benefited from the artificially inflated prices for DRAM itself, regardless of whether its end-use was as a component of a Computer, Printer, server, or network equipment or as an upgrade to such DRAM Containing devices. Defendants' increased revenues and profits on their sale of DRAM products resulting from their unlawful and inequitable conduct have thus far been retained by the Defendants.

## ASSIGNMENT CLAUSES

161.     The Plaintiff States of California, Florida, Pennsylvania, Virginia, and Wisconsin (hereinafter "Assignment Clause States") require, in most instances, contractors who sell products or services to them to assign claims those contractors have against others for violation of federal and/or state antitrust laws to either the state or to the state agency or Political Subdivision purchasing the products or services.

162.     For example, Pennsylvania inserts the following language into its purchase contracts:

> "The Contractor and the Commonwealth recognize that in actual economic practice, overcharges by the Contractor's suppliers resulting from violations of state or federal antitrust laws are in fact borne by the Commonwealth. As part of the consideration for the award of the Purchase Order, and intending to be legally bound, the Contractor assigns to the Commonwealth all right, title and interest in and to any claims the Contractor now has, or may acquire, under state or federal antitrust laws relating to the item(s) which are the subject of the Contract."

163.     Contractors to the Plaintiff States such as OEMs, distributors and other vendors purchased DRAM directly from the Defendants for resale to others. These OEMs, distributors and other vendors ("DRAM Resellers") sold the DRAM individually, and also incorporated the DRAM into DRAM Containing Products sold by the DRAM Resellers.

164.     The DRAM Resellers paid higher-than-competitive prices for DRAM and DRAM Containing Products as result of the Defendants' unlawful conduct.

1     165.    In the Plaintiff States of California, Florida, Pennsylvania, Virginia, and

2  Wisconsin (hereinafter "Assignment Clause States"), State Agencies and Political Subdivisions

3  bought DRAM or DRAM Containing Products from DRAM Resellers pursuant to bid

4  documents, contracts and/or purchasing agreements. These bid documents, contracts and/or

5  purchasing agreements contained clauses that assigned to the State, State Agency or Political

6  Subdivision (hereinafter "Assignees") all of the DRAM Resellers' antitrust claims under state

7  and federal laws relating to the DRAM or DRAM Containing Products that the DRAM Resellers

8  had purchased and then resold to the State Agencies and Political Subdivisions.

### Assignment of Direct Claims

10     166.    In each of the Assignment Clause States, the assignment clauses assigned to the

11  Assignees the "direct purchaser" antitrust claims of DRAM Resellers that had purchased DRAM

12  directly from the Defendants.

13     167.    The direct purchaser antitrust claims assigned to the Assignees in the Assignment

14  Clause States retain their original character as direct purchaser claims. With the assignment of

15  these direct purchaser claims from DRAM Resellers, the Assignees received all right, title and

16  interest that the DRAM Resellers had in those claims against the Defendants.

### Assignment of Indirect Claims

18     168.    In the Assignment Clause States of California and Wisconsin, applicable state law

19  allows for recovery of antitrust damages by "indirect purchasers." Thus, in California and

20  Wisconsin, because the assignment clauses assigned antitrust claims under both federal and state

21  law, the assignment clauses assigned not only "direct purchaser" claims, but also the "indirect

22  purchaser" claims of DRAM Resellers that had purchased DRAM or DRAM Containing Product

23  from other DRAM Resellers.

24     169.    As an example, in California, an assignment clause in a contract document

25  relating to the purchase of DRAM Containing Products read in part as follows:

26       In submitting a bid to a public purchasing body, the bidder offers and agrees that if the bid is

27          accepted, it will assign to the purchasing body all rights, title, and interest in and to all

28          causes of action it may have under Section 4 of the Clayton Act (15 U.S.C. Sec. 15) or

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1  under the Cartwright Act (Chapter 2 (commencing with Section 16700) of Part 2 of

2  Division 7 of the Business and Professions Code), arising from purchases of goods,

3  materials, or services by the bidder for sale to the purchasing body pursuant to the bid.

4       170.    The effect of this assignment clause was to transfer the bidding DRAM Reseller's

5  causes of action against the Defendants under federal antitrust laws (direct purchaser claims) and

6  the California Cartwright Act (direct and indirect purchaser claims).

7

8                                    **UNJUST ENRICHMENT**

9       171.    Defendants' financial benefits resulting from their unlawful and inequitable

10 conduct are economically traceable to overpayments for DRAM and DRAM Containing Products

11 by Plaintiffs.

12      172.    Plaintiffs have conferred upon Defendants an economic benefit, in the nature of

13 anti-competitive profits resulting from unlawful overcharges and monopoly profits, to the

14 economic detriment of the States and consumers.

15      173.    The economic benefit of overcharges and unlawful monopoly profits derived by

16 Defendants through charging artificially inflated prices for DRAM is a direct and proximate

17 result of Defendants' unlawful practices.

18      174.    It would be inequitable and unjust for Defendants to be permitted to retain any of

19 the unlawful proceeds resulting from their fraudulent, illegal, and inequitable conduct.

20

21                                 **CLASS ACTION ALLEGATIONS**

22      175.    Plaintiff states of California and New Mexico bring this action pursuant to Rules

23 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of the following Class

24 pursuant to state and federal laws governing representation by Attorneys General: a Class of

25 State Agencies and Political Subdivisions, excluding federal government entities, in California

26 and New Mexico that purchased DRAM directly or indirectly from approximately 1998 to

27 December of 2002, to the extent that the entities in said classes are not covered by either the

28 Attorneys General acting in their *parens patriae* capacities or their proprietary/sovereign

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1    capacities and to the extent that a given state law permits such a class.  This Class suffered

2    damages that, with trebling provisions applicable pursuant to the relevant state laws, amount to

3    $5 million or more.

4        176.    Plaintiff States who are members of the above-described Class and other class

5    representatives such as the City and County of San Francisco, County of Santa Clara, Los

6    Angeles Unified School District, and County of Sandoval, New Mexico, may sue on behalf of the

7    Class because:

8            a. This Class is so numerous that joinder of all members is impracticable.  The class of

9                State Agencies and Political Subdivisions numbers in the thousands in Plaintiff

10               States such as California.  The exact number and identities of members in this

11               Class are currently unknown to Plaintiff States.

12          b. Questions of law and fact are common to the Class, including but not limited to the

13               following:

14               (i)   whether Defendants have conspired to fix, raise, stabilize or maintain the

15                        prices of DRAM;

16               (ii)  whether Defendants' conduct caused injury to the business or property of

17                        Plaintiffs and the members of the Class;

18               (iii) the operative time period of Defendants' conspiracy and the effects

19                        therefrom;

20               (iv)  the amount of aggregate damages suffered by the Class as a whole;

21               (v)   whether the Class suffered antitrust injury;

22               (vi)  whether Defendants were unjustly enriched to the detriment of the Class

23                        entitling Plaintiff States and the Class to disgorgement of all monies

24                        resulting therefrom; and

25               (vii) whether the Class is entitled to restitution and/or disgorgement, in addition

26                        to or as a substitute for damages, under applicable state laws.

27          c. Plaintiff States and their class representatives' claims are typical of the Class

28               because Plaintiff States and all members of the Class were injured, and may

32

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1        continue to be injured, in the same manner by Defendants' unlawful, anti-

2        competitive and inequitable methods, acts and practices, *i.e.*, they have paid

3        artificially high prices for DRAM and DRAM Containing Products and may be

4        forced to do so in the future. The defenses would involve common issues with

5        respect to the Plaintiff States and their class representatives and each class member.

6      d. Plaintiff States and their class representatives will fully and adequately protect the

7        interest of all members of the Class. Plaintiff States' counsel are experienced in

8        antitrust litigation, including class action litigation. Plaintiff States have no

9        interests that are adverse to or in conflict with those of the Class.

10     e. The questions of law and fact common to the members of the Class predominate

11        over any questions that may affect only individual members.

12     f. For those Plaintiff States and class representatives bringing this as a class action, a

13        class action is equivalent or superior to other available methods for the fair and

14        efficient adjudication of this controversy. Joinder of all state agency and political

15        subdivision purchasers of DRAM and DRAM Containing Products would be

16        impracticable. The Class is readily definable and prosecution as a class action will

17        eliminate the possibility of duplicative litigation, while also providing redress for

18        claims that would otherwise be too small to support the expense of individual

19        complex litigation.

20

21                        **VIOLATIONS ALLEGED**

22                        **<u>First Claim for Relief</u>**

23            **(Violation of Section 1 of the Sherman Act)**

24       **(Count One – All Plaintiff States - Injunction)**

25      177.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

26  allegation set forth in the preceding paragraphs of this Complaint.

27      178.    Beginning at least on or around 1998 and continuing through at least June 30,

28  2002, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1   into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially

2   raise, fix, maintain, and/or stabilize prices for DRAM in the United States, in violation of Section

3   1 of the Sherman Act, 15 U.S.C. § 1.

4       179.    In formulating and carrying out the alleged agreement, understanding, and

5   conspiracy, the Defendants and their co-conspirators did those things that they combined and

6   conspired to do, including but not limited to the acts, practices, and course of conduct set forth

7   above, and the following, among others:

8           a. To fix, raise, maintain and stabilize the price of DRAM;

9           b. To allocate markets for DRAM among themselves;

10          c. To submit rigged bids for the award and performance of certain DRAM

11              contracts; and

12          d. To allocate the production of DRAM.

13      180.    The combination and conspiracy alleged herein has had the following effects,

14  among others:

15          a. Price competition in the sale of DRAM has been restrained, suppressed, and/or

16              eliminated throughout the United States;

17          b.  Prices for DRAM sold by Defendants and their co-conspirators have been

18              fixed, raised, maintained and stabilized at artificially high, non-competitive

19              levels throughout the United States; and

20          c.  Those who purchased DRAM directly or indirectly from Defendants and their

21              co-conspirators have been deprived of the benefits of free and open

22              competition.

23      181.    Plaintiffs who purchased significant volumes of DRAM and DRAM Containing

24  Products have been injured, and will continue to be injured, in their business and property by

25  having paid more for DRAM purchased directly and indirectly from the Defendants and their co-

26  conspirators than they would have paid and will pay in the absence of the combination and

27  conspiracy.  This includes paying more for DRAM Containing Products as a result of higher

28  prices paid for DRAM by the OEMs of those products, and by the potential future deprivation of

34

competition arising from the failure of Defendants to discontinue the wrongful conduct until Federal Grand Jury Subpoenas were issued, and from the repeated attempts of Defendants to further stabilize the aforementioned price fixing conspiracy by limiting or curtailing supply or market share.

182.    As a result of each of the illegal contracts, combinations, and conspiracies alleged above, consumers in the States represented by Plaintiffs have sustained injury to their property and will continue to be injured in their property by having paid more for DRAM purchased directly and indirectly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy. This includes paying more for DRAM Containing Products as a result of higher prices paid for DRAM by the OEMs of those products, and by the potential future deprivation of competition arising from the failure of Defendants to discontinue the wrongful conduct until Federal Grand Jury Subpoenas were issued, and from the repeated attempts of Defendants to further stabilize the aforementioned price fixing conspiracy by limiting or curtailing supply or market share.

183.    Plaintiffs are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein, as well as enjoining the Defendants from engaging in similar conduct in the future.

**(Count Two – Plaintiff States of California, Florida, Pennsylvania, Virginia and Wisconsin as Direct Purchasers by Assignment Against Defendants)**

184.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.    DRAM Resellers have assigned to the Assignment Clause States, their State Agencies, or their Political Subdivisions their rights under federal law as direct purchasers of DRAM from Defendants that relate to the DRAM and DRAM Containing Products sold to the State Agencies and Political Subdivisions, and that arise out of Defendants' activities alleged above, including the right to recover damages flowing from Defendants' unlawful conduct.

186.    Customers for DRAM and DRAM Containing Products from DRAM Resellers included State Agencies and/or Political Subdivisions in the States of California, Florida,

35

1  Pennsylvania, Virginia, and Wisconsin.

2      187.    Defendants are jointly and severally liable for violations of Section 1 of the

3  Sherman Act, 15 U.S.C. § 1, to the Assignment Clause States, their State Agencies and their

4  Political Subdivisions, as assignees of the federal antitrust claims of DRAM Resellers relating to

5  the DRAM and DRAM Containing Products sold to the State Agencies and Political

6  Subdivisions.

7  **(Count Three – Plaintiff States Arkansas, California, Delaware, Hawaii, Idaho, Illinois,
Maryland, Massachusetts, Mississippi, Nevada, New Mexico, Oklahoma, Oregon,**

8  **Pennsylvania, Utah, Washington, Wisconsin as Direct Purchasers From Defendant Micron)**

9      188.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

10  allegation set forth in the preceding paragraphs of this Complaint.

11      189.    Defendant Micron sold and distributed DRAM to customers throughout the

12  United States through its Crucial Technology division.

13      190.    Defendant Micron sold DRAM directly to State Agencies and/or Political

14  Subdivisions in the following states:  Arkansas, California, Delaware, Hawaii, Idaho, Illinois,

15  Maryland, Massachusetts, Mississippi, Nevada, New Mexico, Oklahoma, Oregon, Pennsylvania,

16  , Utah, Washington, and Wisconsin (hereinafter referred to as "Direct Purchasing States").

17      191.    Customers of Micron who purchased DRAM in these Direct Purchasing States

18  paid artificially inflated prices for DRAM because Micron participated in a conspiracy to fix

19  prices for DRAM in violation of Section 1 of the Sherman Act. 15 U.S.C. §1.  As a direct and

20  proximate result of Defendant Micron's acts, such states paid more for DRAM than they

21  otherwise would have paid in the absence of Defendant Micron's unlawful conduct.

22      192.    Plaintiffs allege that the Defendants are jointly and severally liable for the

23  damages arising under state and federal laws from these sales by Micron of DRAM at artificially

24  inflated prices.

25      193.    The Direct Purchasing States all represent themselves and their State Agencies.

26      194.    The Direct Purchasing States of California, Delaware, Idaho, Illinois, Maryland,

27  Massachusetts, Mississippi, Nevada, New Mexico, Oregon and Utah represent their Political

28  Subdivisions.  The Direct Purchasing States of California and New Mexico represent their

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1   Political Subdivisions as part of the specified Class and Idaho represents its Political

2   Subdivisions that have consented to being represented in this action.

3

4                                 **Second Claim for Relief**

5   **(Count Four – Violation of the California Cartwright Act:  States Purchases of DRAM and
                    DRAM Containing Products in Proprietary Capacity)**

6

7          195.    Plaintiff State of California incorporates and realleges, as though fully set forth

8   herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

9          196.    Defendants' contract, combination, trust or conspiracy was substantially carried

10  out and effectuated within the State of California, and Defendants' conduct within California

11  injured State Agencies represented by the Attorney General of California, which purchased

12  DRAM and DRAM Containing Products.  Therefore, this claim for relief under California law is

13  brought in a proprietary capacity for the State Agencies in California under California law

14  because of the nexus of the alleged conspiracy to California.  This claim is in addition to claims

15  under the laws of other states in which said natural persons, State Agencies, and Political

16  Subdivisions reside or are located.

17         197.    Beginning at a time presently unknown to Plaintiffs, but at least on or around

18  1998, and continuing thereafter at least up to and including June 30, 2002, Defendants and their

19  co-conspirators entered into and engaged in a continuing unlawful trust, in restraint of the trade

20  and commerce described above, in violation of Section 16720, California Business and

21  Professional Code.  Each Defendant has acted, in violation of Section 16720, to fix, raise,

22  stabilize and maintain prices of, and allocate markets for DRAM, resulting in prices at higher

23  than competitive levels.

24         198.    The aforesaid violations of Section 16720, California Business and Professions

25  Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

26  the Defendants and their co-conspirators, the substantial terms of which were to fix, raise,

27  maintain and stabilize the prices of, and to allocate markets for, DRAM.

28         199.    For the purpose of forming and effectuating the unlawful trust, the Defendants and

                                              37

1 their co-conspirators have done those things which they combined and conspired to do including,

2 but in no way limited to, the acts, practices and course of conduct set forth above and the

3 following:

   a. to fix, raise, maintain and stabilize the price of DRAM;

   b. to allocate markets for DRAM amongst themselves;

   c. to submit rigged bids for the award and performance of certain DRAM

    contracts; and

   d. to allocate amongst themselves the production of DRAM.

   200. The combination and conspiracy alleged herein has had, *inter alia*, the following

effects:

   a. price competition in the sale of DRAM has been restrained, suppressed and/or

    eliminated in the State of California and throughout the United States;

   b. prices for DRAM sold by Defendants and their co-conspirators have been

    fixed, raised, maintained and stabilized at artificially high, non-competitive

    levels in the State of California and throughout the United States; and

   c. those who purchased DRAM from Defendants and their co-conspirators have

    been deprived of the benefit of free and open competition.

   201. State Agencies, Political Subdivisions, and natural persons in California and in

other states paid artificially inflated prices for DRAM and DRAM Containing Products.

   202. As a direct and proximate result of Defendants' unlawful conduct, natural persons

and State Agencies represented by the Attorney General of California have been injured in their

business and property in that they paid more for DRAM and DRAM Containing Products than

they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of

Defendants' violation of Section 16720 of the California Business and Professions Code, the

State of California, acting in a proprietary capacity, seeks treble damages and the costs of suit,

including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and

Professions Code.

*///*

38

**(Count Five – A Violation of the California Cartwright Act – Class Action for Government Purchasers)**

203.    Plaintiff State of California and class representatives City and County of San Francisco, California, County of Santa Clara, California, Los Angeles Unified School District, California, incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

204.    Defendants' contract, combination, trust or conspiracy was substantially carried out and effectuated within the State of California, and Defendants' conduct within California injured State Agencies and Political Subdivisions throughout the United States.  The State of California and class representatives City and County of San Francisco, California, County of Santa Clara, California, Los Angeles Unified School District, California, bring this action as class representatives of State Agencies.  These claims are in addition to claims under the laws of other states in which said natural persons, State Agencies, and Political Subdivisions reside or are located.

205.    Beginning at a time presently unknown to Plaintiffs, but at least on or around 1998, and continuing thereafter at least up to and including June 30, 2002, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professional Code.  Each Defendant has acted, in violation of Section 16720, to fix, raise, stabilize and maintain prices of, and allocate markets for DRAM, resulting in prices at higher than competitive levels.

206.    The aforesaid violations of Section 16720, California Business and Professions Code consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for, DRAM.

207.    For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do including, but in no way limited to, the acts, practices and course of conduct set forth above and the

39

1 | following:

2 |     a. to fix, raise, maintain and stabilize the price of DRAM;

3 |     b. to allocate markets for DRAM amongst themselves;

4 |     c. to submit rigged bids for the award and performance of certain DRAM

5 |         contracts; and

6 |     d. to allocate amongst themselves the production of DRAM.

7 |     208.    The combination and conspiracy alleged herein has had, *inter alia*, the following

8 | effects:

9 |     a. price competition in the sale of DRAM has been restrained, suppressed and/or

10 |        eliminated in the State of California and throughout the United States;

11 |    b. prices for DRAM sold by Defendants and their co-conspirators have been

12 |        fixed, raised, maintained and stabilized at artificially high, non-competitive

13 |        levels in the State of California and throughout the United States; and

14 |    c. those who purchased DRAM from Defendants and their co-conspirators have

15 |        been deprived of the benefit of free and open competition.

16 |    209.    State Agencies and Political Subdivisions, in California and in other states paid

17 | artificially inflated prices for DRAM and DRAM Containing Products.

18 |    210.    As a direct and proximate result of Defendants' unlawful conduct, natural

19 | persons, State Agencies, and/or Political Subdivisions have been injured in their business and

20 | property in that they paid more for DRAM and DRAM Containing Products than they otherwise

21 | would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendants'

22 | violation of Section 16720 of the California Business and Professions Code, the Class

23 | represented by the State of California, acting in a class capacity, seeks treble damages and the

24 | costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California

25 | Business and Professions Code.

26 |

27 |    **(Count Six – Violation of the California Cartwright Act *Parens Patriae* on Behalf of
        Natural Persons)**

28 |

1     211.   Plaintiff State of California incorporates and realleges, as though fully set forth

2  herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

3     212.   Defendants' contract, combination, trust or conspiracy was substantially carried

4  out and effectuated within the State of California, and Defendants' conduct within California

5  injured natural persons throughout the United States.  Therefore, this claim for relief under

6  California law is brought in a *parens patriae* capacity on behalf of all natural persons in

7  California.  This claim is in addition to claims under the laws of other states in which said natural

8  persons, State Agencies, and Political Subdivisions reside or are located.

9     213.   Beginning at a time presently unknown to Plaintiffs, but at least on or around

10  1998, and continuing thereafter at least up to and including June 30, 2002, Defendants and their

11  co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade

12  and commerce described above in violation of Section 16720, California Business and

13  Professional Code.  Each Defendant has acted, in violation of Section 16720, to fix, raise,

14  stabilize and maintain prices of, and allocate markets for DRAM, resulting in prices at higher

15  than competitive levels.

16     214.   The aforesaid violations of Section 16720, California Business and Professions

17  Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

18  the Defendants and their co-conspirators, the substantial terms of which were to fix, raise,

19  maintain and stabilize the prices of, and to allocate markets for, DRAM.

20     215.   For the purpose of forming and effectuating the unlawful trust, the Defendants and

21  their co-conspirators have done those things which they combined and conspired to do including,

22  but in no way limited to, the acts, practices and course of conduct set forth above and the

23  following:

24     a. to fix, raise, maintain and stabilize the price of DRAM;

25     b. to allocate markets for DRAM amongst themselves;

26     c. to submit rigged bids for the award and performance of certain DRAM

27       contracts; and

28     d. to allocate amongst themselves the production of DRAM.

216. The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

    a. price competition in the sale of DRAM has been restrained, suppressed and/or eliminated in the State of California and throughout the United States;

    b. prices for DRAM sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California and throughout the United States; and

    c. those who purchased DRAM from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

217. State Agencies, Political Subdivisions, and natural persons in California and in other states paid artificially inflated prices for DRAM and DRAM Containing Products.

218. As a direct and proximate result of Defendants' unlawful conduct, natural persons, State Agencies, and/or Political Subdivisions have been injured in their business and property in that they paid more for DRAM and DRAM Containing Products than they otherwise would have paid in the absence of Defendants' unlawful conduct. As a result of Defendants' violation of Section 16720 of the California Business and Professions Code, the State of California acting in a *parens patriae*, capacity seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

### Third Claim for Relief – Violation of State Law

### (Count Seven – Arizona)

219. Arizona realleges and incorporates all of the allegations above from paragraphs 1 through 194.

220. Plaintiff State of Arizona represents itself, its State Agencies, and pursuant to A.R. S. § 41-192(A)(5) its Political Subdivisions, its municipalities and its school districts.

221. Defendants' acts violate Arizona's Uniform State Antitrust Act, A.R.S. § 44-1401-16 and Plaintiff is entitled to injunctive relief and reasonable attorneys' fees under

42

1    Arizona's Uniform State Antitrust Act, A.R.S. § 44-1408.

2    **(Count Eight – Arkansas)**

3       222.    Arkansas realleges and incorporates all of the allegations above from paragraphs 1

4    through 194.

5       223.    Plaintiff State of Arkansas represents itself, its State Agencies, and its natural

6    persons.

7       224.    Defendants' acts violate, and Plaintiff is entitled to relief under, the Arkansas

8    Deceptive Trade Practices Act, Ark. Code Ann. §4-88-101 *et seq.*

9    **(Count Nine – Arkansas)**

10       225.    Arkansas realleges and incorporates all of the allegations above from paragraphs 1

11    through 194.

12       226.    Plaintiff State of Arkansas represents itself, its State Agencies, and its natural

13    persons.

14       227.    Defendants' acts violate, and Plaintiff is entitled to relief under, the Arkansas

15    Unfair Practices Act, Ark. Code Ann. § 4-75-301 *et seq.*

16    **(Count Ten – California – Cartwright Act)**

17       228.    California realleges and incorporates all of the allegations above from paragraphs

18    1 through 194.

19       229.    Plaintiff State of California represents itself, its State Agencies, its natural

20    persons, and a class of its Political Subdivisions, who were indirect purchasers of DRAM or

21    DRAM Containing Products or are assignees of antitrust claims from other indirect purchasers of

22    DRAM or DRAM Containing Products.

23       230.    Defendants' acts violate, and Plaintiff is entitled to relief under, the Cartwright

24    Act, California Business & Professions Code sections 16720 *et seq.*

25    **(Count Eleven– California – California Business & Professions Code)**

26       231.    California realleges and incorporates all of the allegations above from paragraphs

27    1 through 194.

28       232.    Plaintiff State of California represents itself, its State Agencies, its natural

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1   persons, and a class of California Political Subdivisions, who were indirect purchasers of DRAM

2   or DRAM Containing Products.

3        233.   Defendants' acts violate the Unfair Competition Law, California Business &

4   Professions Code sections 17200 *et seq.*, and Plaintiff is entitled to relief including civil penalties

5   to the maximum extent permitted by law pursuant to California Business & Professions Code

6   section 17206 *et seq.*

7   **(Count Twelve– Colorado)**

8        234.   Colorado realleges and incorporates all of the allegations above from paragraphs 1

9   through 194.

10        235.   Plaintiff State of Colorado represents itself and its State Agencies.

11        236.   Defendants' acts violate, and Plaintiff is entitled to relief under, the Colorado

12   Antitrust Act of 1992, §§ 6-4-101, *et seq.*, Colo. Rev. Stat.

13   **(Count Thirteen– Florida – Florida Antitrust Act)**

14        237.   Florida realleges and incorporates all of the allegations above from paragraphs 1

15   through 194.

16        238.   The State of Florida, its departments, agencies and units of government purchased

17   DRAM or DRAM Containing Products from Defendants pursuant to contracts containing

18   assignment clauses. The State of Florida, Office of the Attorney General, asserts claims for

19   damages and penalties under the Florida Antitrust Act on behalf of such entities, pursuant to §

20   542.27(2), Florida Statutes.

21        239.   As described in paragraphs 92 through 170 above, Defendants combined and

22   conspired to fix prices in the market for DRAM, in restraint of trade and commerce.

23        240.   Defendants' acts violate § 542.18, Florida Statutes, and the State of Florida is

24   entitled to relief, including damages, under §542.22, Florida Statutes, for all direct purchases

25   made pursuant to contracts containing assignment clauses.

26        241.   The State of Florida is entitled to a civil penalty of up to the maximum amount

27   permitted by § 542.21, Florida Statutes, for each violation of § 542.18, Florida Statutes.

28        242.   The State of Florida is entitled to recover its costs and attorneys' fees pursuant to

1 | § 542.22(2), Florida Statutes.

2 | 243.  The State of Florida requests that the Court order such additional relief as it may

3 | deem just and proper.

4 | **(Count Fourteen– Florida – Deceptive & Unfair Practices Act)**

5 | 244.  Florida realleges and incorporates all of the allegations above from paragraphs 1

6 | through 194.

7 | 245.  Certain Florida governmental entities and individuals residing in Florida

8 | purchased DRAM or DRAM Containing Products from Defendants. The State of Florida, Office

9 | of the Attorney General, asserts claims for damages under the Florida Deceptive and Unfair

10 | Trade Practices Act on behalf of such entities and individuals, pursuant to § 501.207(1)(c),

11 | Florida Statutes.

12 | 246.  As described in paragraphs 92 through 170 above, Defendants' unfair methods of

13 | competition and unconscionable acts and practices in the conduct of trade and commerce offend

14 | established public policy and are immoral, unethical, oppressive, unscrupulous or substantially

15 | injurious to governmental entities and individuals resident in the State of Florida. Thus,

16 | Defendants' unfair methods of competition and unconscionable acts and practices in the conduct

17 | of trade and commerce violate § 501.204, Florida Statutes.

18 | 247.  The sale of DRAM or DRAM Containing Products involves the conduct of "trade

19 | or commerce" within the meaning of § 501.203(8), Florida Statutes.

20 | 248.  The Attorney General of Florida has reviewed this matter and determined that an

21 | enforcement action serves the public interest.

22 | 249.  The State of Florida is entitled to relief, including damages, under § 501.207,

23 | Florida Statutes, for all direct and indirect purchases from Defendants.

24 | 250.  The State of Florida is entitled to a civil penalty of up to the maximum amount

25 | permitted by §§ 501.2075 or 501.2077, Florida Statutes, as applicable, for each violation of §

26 | 501.204, Florida Statutes.

27 | 251.  The State of Florida is entitled to recover its costs and attorneys' fees pursuant to

28 | § 501.2105, Florida Statutes.

45

1    252.    The State of Florida requests that the Court order such additional relief as it may

2    deem just and proper.

3                              **(Count Fifteen– Idaho)**

4    253.    Idaho realleges and incorporates all of the allegations above from paragraphs 1

5    through 194.

6    254.    Plaintiff State of Idaho brings this action on behalf of itself, its State Agencies,

7    those Political Subdivisions that have consented to being represented in this action and its

8    persons (as defined by Idaho Code Section 48-103(2)).

9    255.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce

10   had the purpose and effect of suppressing competition in the sale of DRAM or DRAM

11   Containing Products in the State of Idaho and elsewhere, and had a substantial and adverse

12   impact on prices for DRAM and DRAM Containing Products in Idaho.  Defendants' acts have

13   caused substantial injury and damage to the State of Idaho, its State Agencies, those Political

14   Subdivisions that have consented to being represented in this action and its persons.

15   256.    Plaintiff is entitled to relief under the Idaho Competition Act, Idaho Code

16   Sections 48-101 *et seq.,* including restitution, injunctive relief, civil penalties and reasonable

17   costs and attorneys' fees.  For purposes of application of Idaho Code Section 48-108(2)(a) of the

18   Competition Act, Defendants' actions are per se violations of Idaho Code Section 48-104 of the

19   Competition Act.

20                             **(Count Sixteen– Illinois)**

21   257.    Illinois realleges and incorporates all of the allegations above from paragraphs 1

22   through 194.

23   258.    Plaintiff State of Illinois represents itself, its State Agencies and its Political

24   Subdivisions who purchased DRAM or DRAM Containing Products directly or indirectly.

25   259.    Defendants' acts violate the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.,*

26   including without limitation 740 ILCS 10/3(1) and (2). Plaintiff is entitled to damages, civil

27   penalties, equitable relief, costs and attorneys' fees.

28                             **(Count Seventeen– Iowa)**

46

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

260. Iowa realleges and incorporates all of the allegations above from paragraphs 1 through 194.

261. Plaintiff State of Iowa brings this action to recover for injuries sustained by the state because of purchases of the affected items of commerce made by Iowa state governmental branches, departments, agencies, and offices.

262. Defendants' actions violate the Iowa Competition Act, Iowa Code section 553 *et seq.*, for which Plaintiff seeks civil penalties, injunctive relief and monetary damages.

**(Count Eighteen– Louisiana – Louisiana Unfair Trade Practices and Consumer Protection Law)**

263. Louisiana realleges and incorporates all of the allegations above from paragraphs 1 through 194.

264. Plaintiff State of Louisiana represents itself, its State Agencies, its Political Subdivisions, and all citizens, whether natural or juridical.

265. Defendants' acts violate the Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401, *et seq.* and Plaintiff is entitled to treble damages, injunctive relief and reasonable attorneys' fees and costs.

**(Count Nineteen - Maine)**

266. Maine realleges and incorporates all of the allegations above from paragraphs 1 through 194.

267. Plaintiff State of Maine represents itself, its State Agencies and, as *parens patriae*, persons who purchased DRAM or DRAM Containing Products indirectly.

268. Defendants' acts violate, and Plaintiff is entitled to relief under, 10 M.R.S.A. § 1101, *et seq.*

**(Count Twenty– Maryland)**

269. Maryland realleges and incorporates all of the allegations above from paragraphs 1 through 194.

270. The aforementioned practices by Defendants were, and are in violation of the Maryland Antitrust Act, Md Com. Law Code Ann. § 11-201 *et seq.*

47

271. During the relevant period DRAM memory chips were in the regular, continuous and substantial flow of intrastate commerce in Maryland. Computers containing DRAM memory chips were shipped by OEMs to locations in Maryland, sold from stores in Maryland and purchased by Maryland governmental entities, businesses and consumers.

272. During the relevant period, State of Maryland governmental entities, including the member institutions of the University System of Maryland, purchased in excess of $100 million worth of DRAM-containing computers and other electronic equipment manufactured by OEMs such as Compaq, Apple, Gateway, Hewlett Packard, IBM, Acer, Unisys and Dell. In addition, Maryland political subdivisions including Baltimore City, and each County government, as well as residents and businesses within the State of Maryland, purchased millions of dollars of DRAM-containing computers and other electronic equipment.

273. Defendant Micron, through its Crucial subsidiary, sold DRAM computer chips directly to the University of Maryland and other Maryland governmental entities. These price-fixed DRAM computer chips were also sold directly to computer manufacturers in Maryland and incorporated in computers built and sold in the State. As a result of the conspiracy, direct purchasers of DRAM computer chips in Maryland paid higher prices than they otherwise would have in a competitive market.

274. As a result of the conspiracy, OEMs that purchased DRAM from Defendants were overcharged. Those overcharges were passed on to OEM customers in Maryland. The State of Maryland, Maryland political subdivisions, Maryland residents and businesses paid higher prices for DRAM-containing computers and equipment than they otherwise would have in a competitive market.

275. Plaintiff State of Maryland brings this action against Defendants pursuant to Md. Com. Law Code Ann. § 11-209, on behalf of the State, its state agencies, and its political subdivisions for: (a) three times the amount of damages sustained by the State and political subdivisions; (b) civil penalties; (c) all available equitable remedies, including injunctive relief; and (d) reimbursement of reasonable attorneys fees, expert fees and costs.

**(Count Twenty-One– Massachusetts)**

48

276.    Massachusetts realleges and incorporates all of the allegations above from paragraphs 1 through 194.

277.    Plaintiff Commonwealth of Massachusetts represents itself, its State Agencies and Political Subdivisions, and its natural persons and businesses that purchased DRAM or DRAM Containing Products.

278.    Defendants' acts violate, and Plaintiff is entitled to relief under, the Massachusetts Consumer Protection Act, G.L. c. 93A, sec. 2, *et seq.*

**(Count Twenty-Two– Michigan – Michigan Antitrust Law)**

279.    Michigan realleges and incorporates all of the allegations above from paragraphs 1 through 194.

280.    Plaintiff State of Michigan, by and through the Attorney General, pursuant to Mich. Comp. Laws § 14.28 and the common law of Michigan, brings this action on behalf of itself, its State Agencies (which pursuant to paragraph 12 excludes those entities treated as autonomous under Michigan Law) and its natural persons who purchased DRAM or DRAM Containing Products.

281.    Defendants' acts violate, and Plaintiff is entitled to relief, including civil penalties, under the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.771 *et seq.* and the common law of Michigan.

**(Count Twenty-Three– Michigan – Michigan Consumer Protection Act)**

282.    Michigan realleges and incorporates all of the allegations above from paragraphs 1 through 194.

283.    Plaintiff State of Michigan, by and through the Attorney General, pursuant to Mich. Comp. Laws § 14.28 and the common law of Michigan, brings this action on behalf of itself, its State Agencies (which pursuant to paragraph 12 excludes those entities treated as autonomous under Michigan Law), and its natural persons who purchased DRAM or DRAM Containing Products.

284.    Defendants' acts violate, and Plaintiff is entitled to relief, including civil penalties, under the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. § 445.901 *et*

49

1    *seq.* and the common law of Michigan.

2    **(Count Twenty-Four– Minnesota)**

3        285.    Minnesota realleges and incorporates all of the allegations above from paragraphs

4    1 through 194.

5        286.    Plaintiff State of Minnesota brings this action on behalf of itself, its state

6    executive branch agencies, its colleges and universities that are part of the Minnesota State

7    Colleges and Universities system, and, as *parens patriae,* on behalf of its consumers.

8        287.    Defendants' acts violate, and Plaintiff is entitled to relief, including damages, civil

9    penalties, injunctive relief, costs, attorneys' fees, and other relief as the Court deems just under

10   the Minnesota Antitrust Law of 1971, Minn. Stat. §§ 325D.49-.66, Minn. Stat. Ch. 8, and the

11   common law of Minnesota.

12   **(Count Twenty-Five– Mississippi Antitrust Act)**

13       288.    Mississippi realleges and incorporates all of the allegations above from

14   paragraphs 1 through 194.

15       289.    The aforementioned practices by Defendants were, and are, in violation of the

16   Mississippi Antitrust Act, Miss. Code Ann. § 75-21-1 *et seq.* as they directly impacted the

17   intrastate commerce of the State of Mississippi.   Defendants' combination of activities to

18   suppress competition by fixing the price of DRAM sold in the United States resulted in wholly

19   intrastate conduct as DRAM and DRAM-containing products were imported into the Mississippi

20   and sold within the state of Mississippi.

21       290.    Defendant Micron sold directly to State governmental entities including

22   Mississippi Supreme Court, University of Southern Mississippi, University of Mississippi,

23   Mississippi State University, Delta State University, Alcorn State University, and the Mississippi

24   State Hospital.  Defendant Micron also sold directly to local government entities including

25   community colleges (e.g., Hinds County Community College) and the school districts of

26   Gulfport, Jackson County, Stone County, Van Cleeve, and Picayune.  These transactions with

27   state and local government would have necessarily involved transactions, or portions thereof,

28   which took place wholly within the State of Mississippi.

291.    During the relevant period, the sale, purchases and/or other trade activities concerning DRAM and DRAM- containing products, or portions thereof, took place wholly within the State of Mississippi. Not only was DRAM sent to computer manufacturers located in Mississippi, such as Howard Industries, but OEMs shipped computers containing DRAM memory chips to locations in Mississippi to be sold from retail locations in Mississippi and purchased by Mississippi consumers, educational institutions, local government entities, and state government agencies.   These transactions were accomplished in whole and/or in part by transactions which were wholly intrastate.

292.    During the relevant period, a group of Mississippi State government agencies (excluding all institutes of higher learning and other independent agencies) purchased at least $107,451,403 worth of DRAM-containing computers and other electronic equipment manufactured by OEMs such as Acer, Compaq c/o Hewlett Packard Co., Dell Inc, Gateway Inc., Hewlett Packard Co., International Business Machines Co. (IBM), Sun Microsystems of CA, Toshiba America, Inc., Micron and Howard Computers, a local Mississippi OEM.  Furthermore, Mississippi public schools (K-12) purchased at least $118,303,272 worth of DRAM-containing computers and other electronic equipment manufactured by OEMs.  Finally, other local government entities, residents and businesses within the State of Maryland purchased millions of dollars of DRAM-containing computers and other electronic equipment.

293.    As a foreseeable result of Defendants' conspiracy, OEMs that purchased DRAM from Defendants were overcharged.  Those overcharges were passed on to Mississippi consumers and businesses, local governments, State government and Mississippi schools.  Thus, the State of Mississippi and a large percentage of Mississippians and Mississippi entities - including local schools and higher education institutions - paid higher prices in Mississippi for DRAM-containing computers and equipment than they otherwise would have in a competitive market.

294.    Plaintiff State of Mississippi brings this action against Defendants pursuant to Miss. Code Ann. §75- 21-1 *et seq.* and Miss. Code Ann. §75- 24-1 *et seq.* on behalf of the State, its state agencies, and its political subdivisions for: (a) damages sustained by the State, local

51

1  government and consumers; (b) civil penalties; (c) all available equitable remedies, including

2  injunctive relief; and (d) reimbursement of reasonable attorneys fees, expert fees and costs.

3  Plaintiff State of Mississippi represents itself, its State Agencies, its Political Subdivisions, its

4  businesses, and its natural persons.

5             **(Count Twenty-Six– Mississippi Consumer Protection Act)**

6       295.    Mississippi realleges and incorporates all of the allegations above from

7  paragraphs 1 through 194.

8       296.    Plaintiff State of Mississippi represents itself, its State Agencies, its Political

9  Subdivisions, its businesses, and its natural persons.

10       297.    Defendants' acts violate, and Plaintiff is entitled to relief under, its Consumer

11  Protection Act found at Miss. Code Ann. § 75-24-1, *et seq.* (1972, as amended), which provides

12  for damages, civil penalties and appropriate injunctive relief.

13    **(Count Twenty-Seven– Nebraska – Nebraska Unlawful Restraint on Trade Act)**

14       298.    Nebraska realleges and incorporates all of the allegations above from paragraphs 1

15  through 194.

16       299.    Plaintiff State of Nebraska brings this action on behalf of itself, its State Agencies,

17  its Political Subdivisions, and, as *parens patriae,* the citizens of Nebraska.

18       300.    Defendants' acts violate, and Plaintiff is entitled to relief under, its Unlawful

19  Restraint on Trade Act, Neb. Rev. Stat. §§ 59-801 *et seq.* (Reissue 2004).

20           **(Count Twenty-Eight– Nebraska – Nebraska Consumer Protection Act)**

21       301.    Nebraska realleges and incorporates all of the allegations above from paragraphs 1

22  through 194.

23       302.    Plaintiff State of Nebraska brings this action on behalf of itself, its State Agencies,

24  its Political Subdivisions, and, as *parens patriae,* the citizens of Nebraska.

25       303.    Defendants' acts violate, and Plaintiff is entitled to relief under, its Consumer

26  Protection Act, Neb. Rev. Stat. §§ 59-101 *et seq.* (Reissue 2004).

27    **(Count Twenty-Nine– Nebraska – Nebraska Uniform Deceptive Trade Practices Act)**

28       304.    Nebraska realleges and incorporates all of the allegations above from paragraphs 1

1 | through 194.

2 |       305.    Plaintiff State of Nebraska brings this action on behalf of itself, its State Agencies,

3 | its Political Subdivisions, and, as *parens patriae*, the citizens of Nebraska.

4 |       306.    Defendants' acts violate, and Plaintiff is entitled to relief under, its Uniform

5 | Deceptive Trade Practices Act, Rev. Stat. §§ 87-301 *et seq.* (Reissue 1999 and Cum Supp. 2004).

6 |                                  **(Count Thirty– Nevada)**

7 |       307.    Nevada realleges and incorporates all of the allegations above from paragraphs 1

8 | through 194.

9 |       308.    Plaintiff State of Nevada represents itself, its State Agencies, its Political

10 | Subdivisions, and its natural persons.

11 |       309.    Defendants' acts violate the Nevada Unfair Trade Practice Act, Nev. Rev. Stat. §

12 | 598A.010 *et seq.*, including Nev. Rev. Stat. § 598A.060(1)(a). Plaintiff is entitled to recover

13 | treble damages and reasonable attorneys' fees and costs under Nev. Rev. Stat. § 598A.160 and

14 | Nev. Rev. Stat. § 598A.200, injunctive relief under Nev. Rev. Stat. § 598A.070, and civil

15 | penalties in an amount not to exceed 5 percent of the gross income realized by the sale of DRAM

16 | by the Defendants in the State of Nevada in each year in which the prohibited activities occurred

17 | pursuant to Nev. Rev. Stat. § 598A.170.

18 |            **(Count Thirty-One– New Mexico – New Mexico Antitrust Act)**

19 |       310.    New Mexico realleges and incorporates all of the allegations above from

20 | paragraphs 1 through 194.

21 |       311.    Plaintiff State of New Mexico represents itself, its State Agencies, the County of

22 | Sandoval, New Mexico, and, with the County of Sandoval, New Mexico serving as class

23 | representative, a class of all New Mexico Political Subdivisions similarly situated as alleged

24 | above. The Attorney General represents the State of New Mexico and its State Agencies as a

25 | part of his inherent authority vested in him by the Legislature of the State of New Mexico.

26 | Further, he represents the County of Sandoval by agreement and under his authority to initiate

27 | litigation when in his judgment the public interest of the State requires such action. § 8-5-2,

28 | N.M.S.A. 1978.

1      312.    Defendants' acts violate, and Plaintiff is entitled to relief under, the New Mexico

2  Antitrust Act, Section 57-1-1 *et seq.*, N.M.S.A.1978. The State of New Mexico in its proprietary

3  role and its Political Subdivisions are entitled to treble damages and attorney's fees for

4  overcharges by, and unjust enrichment for, the Defendants. The State of New Mexico as

5  sovereign is entitled to civil penalties of $250,000 against each Defendant.

6           **(Count Thirty-Two– New Mexico – New Mexico Unfair Practices Act)**

7      313.    New Mexico realleges and incorporates all of the allegations above from

8  paragraphs 1 through 194.

9      314.    Plaintiff State of New Mexico represents itself, its State Agencies, the County of

10  Sandoval, New Mexico and, with the County of Sandoval, New Mexico serving as class

11  representative, a class of all New Mexico Political Subdivisions similarly situated as alleged

12  above. The Attorney General represents the State of New Mexico, its State Agencies and its

13  natural persons as a part of his inherent authority vested in him by the Legislature of the State of

14  New Mexico. Further, he represents the County of Sandoval by agreement and under his

15  authority to initiate litigation when in his judgment the public interest of the State requires such

16  action. § 8-5-2, N.M.S.A. 1978.

17  Defendants' acts violate, and Plaintiff is entitled to relief under, the New Mexico Unfair

18  Practices Act, Section 57-12-1 *et seq.*, N.M.S.A. 1978. The State of New Mexico in its

19  proprietary role, its Political Subdivisions and its natural persons are entitled to the greater of

20  treble damages or $300.00 for overcharges by, and unjust enrichment for, the Defendants. The

21  State of New Mexico as sovereign is entitled to civil penalties of $5,000 for each violation and

22  its attorney fees.

23                 **(Count Thirty-Three– North Carolina)**

24      315.    North Carolina realleges and incorporates all of the allegations above from

25  paragraphs 1 through 194.

26      316.    Plaintiff State of North Carolina represents itself, and, as *parens patriae,* its State

27  Agencies and Political Subdivisions and persons doing business or residing in the State.

28      317.    Defendants' acts as described above had the purpose and effect of suppressing

54

1   competition in the sale of DRAM in the State of North Carolina and elsewhere, and had a

2   substantial adverse impact on prices for DRAM and DRAM Containing Products in North

3   Carolina.  These acts violate North Carolina's prohibitions on unreasonable restrains of trade in

4   N.C. Gen. Stat. §§ 75-1 and 75-2, monopolization in N.C. Gen Stat. § 75-2.1, and unfair methods

5   of competition and unfair or deceptive acts or practices in N. C. Gen. Stat. § 75-1.1.

6        318.    Defendants' acts have caused substantial damage and injury to the State of North

7   Carolina, State Agencies and Political Subdivisions in North Carolina, and persons doing

8   business or residing in the State of North Carolina.

9        319.    Plaintiff State of North Carolina, for itself and, as *parens patriae,* State Agencies

10  and Political Subdivisions in North Carolina and persons doing business or residing in North

11  Carolina, is entitled to monetary relief for injuries indirectly suffered by reason of the violations

12  alleged above.

13       320.    Plaintiff State of North Carolina, for itself and on behalf of State Agencies and

14  Political Subdivisions in North Carolina, is entitled to three times the total damage sustained as a

15  result of the conduct described above, plus costs and reasonable attorneys' fees.

16       321.    Plaintiff State of North Carolina, on behalf of persons doing business or residing

17  in the State, is entitled to disgorgement of ill-gotten gains pursuant to N.C. Gen. Stat. § 75-14

18  and restitution pursuant to N.C. Gen. Stat. § 75-15.1.

19       322.    Pursuant to N.C. Gen. Stat § 75-15.2, plaintiff State of North Carolina is entitled

20  to a civil penalty of up to $5,000 for each knowing violation, and in the case of continuing

21  violations is entitled to a civil penalty of up to $5,000 for each week that such violation

22  continued pursuant to N.C. Gen Stat. § 75-8.

23       **(Count Thirty-Four– North Dakota – North Dakota State Antitrust Act)**

24       323.    North Dakota realleges and incorporates all of the allegations above from

25  paragraphs 1 through 194.

26       324.    Plaintiff State of North Dakota represents itself and its State Agencies.

27       325.    Defendants' acts violate, and Plaintiff State of North Dakota on behalf of itself

28  and its State Agencies is entitled to relief under the North Dakota State Antitrust Act, N.D.C.C.

55

1  Sec. 51-08.1-01 *et seq.*

2  **(Count Thirty-Five– North Dakota – North Dakota Consumer Protection Act)**

3       326.    North Dakota realleges and incorporates all of the allegations above from

4  paragraphs 1 through 194.

5       327.    Plaintiff State of North Dakota represents itself, its State Agencies and its natural

6  persons.

7       328.    Defendants' acts violate, and Plaintiff State of North Dakota on behalf of itself, its

8  State Agencies, and its natural persons, is entitled to relief under the North Dakota Consumer

9  Protection Act, N.D.C.C. Sec. 51-15-01, *et seq.*

10  **(Count Thirty-Six– Northern Mariana Islands – CNMI Unfair Business Practices Act)**

11       329.    The Commonwealth of the Northern Mariana Islands ("CNMI") realleges and

12  incorporates all of the allegations above from paragraphs 1 through 194.

13       330.    Plaintiff CNMI represents itself, its Political Subdivisions and public agencies

14  and, as *parens patriae,* persons doing business or residing in the CNMI.

15       331.    The effect of Defendants' acts violated provisions of the CNMI Unfair Business

16  Practices Act, 4 CMC § 5201 *et seq.*

17       332.    The CNMI, its Political Subdivisions and public agencies, have been injured in

18  their property by Defendants' actions, along with residents and businesses of the CNMI.

19       333.    Plaintiff CNMI, for its Political Subdivisions and public agencies, and, as *parens*

20  *patriae,* persons doing business or residing in the CNMI, is entitled to monetary relief for injuries

21  directly or indirectly suffered by the CNMI, its Political Subdivisions and public agencies, and

22  indirectly suffered by said persons by reason of the violations alleged above.

23  **(Count Thirty-Seven– Northern Mariana Islands – CNMI Consumer Protection Act)**

24       334.    The CNMI realleges and incorporates all of the allegations above from paragraphs

25  1 through 194.

26       335.    Plaintiff CNMI represents itself, its Political Subdivisions and public agencies

27  and, as *parens patriae,* persons doing business or residing in the CNMI.

28       336.    The Defendants' acts were unfair methods of competition and unfair or deceptive

1  acts or practices in the conduct of Defendants' sale of DRAM or DRAM Containing Products in

2  the CNMI, in violation of the CNMI's Consumer Protection Act, 4 CMC § 5101 *et seq.*

3      337.    The CNMI, its Political Subdivisions and public agencies, have been injured in

4  their property by Defendants' actions, along with residents and businesses of the CNMI.

5      338.    Plaintiff CNMI, for its Political Subdivisions, public agencies and, as *parens*

6  *patriae,* persons doing business or residing in the CNMI, is entitled to monetary relief for injuries

7  directly or indirectly suffered by the CNMI, its Political Subdivisions and public agencies, and

8  indirectly suffered by said persons by reason of the violations alleged above.

9                          **(Count Thirty-Eight– Oregon)**

10     339.    Oregon Attorney General Hardy Myers (Plaintiff State of Oregon) realleges and

11  incorporates all of the allegations above from paragraphs 1 through 194.

12     340.    Plaintiff State of Oregon represents itself, its State Agencies, and, as *parens*

13  *patriae*, all its Political Subdivisions and natural persons who purchased DRAM or Dram

14  Containing Products.

15     341.    Defendants' acts violate, and Plaintiff State of Oregon on behalf of itself, its State

16  Agencies, and, as parens patria, its Political Subdivisions and natural persons who purchased

17  DRAM or Dram Containing Products is entitled to relief under the Oregon Antitrust Act, ORS

18  646.705, *et seq.*

19     342.    Defendants' acts of conspiracy and unreasonable restraint of trade and commerce

20  had the purpose and effect of suppressing competition in the sale of DRAM or DRAM

21  Containing Products in the State of Oregon and elsewhere, and had a substantial and adverse

22  impact on prices for DRAM or DRAM Containing Products in Oregon.

23     343.    Defendants' acts have caused substantial injury and damage to the State of

24  Oregon, State Agencies in the State, Political Subdivisions in the State, and natural persons in the

25  State.

26     344.    The Defendants' activities are a per se violation of Oregon's antitrust law, ORS

27  646.725. Pursuant to ORS 646.775, the Attorney General possesses authority to seek equitable

28  and monetary relief for injuries sustained by natural persons, State Agencies, or Political

1  Subdivisions.

2       345.    In addition, the Court shall award the State of Oregon three times the total

3  damages sustained and its costs in the action, plus reasonable attorney fees.

4                    **(Count Thirty-Nine– Rhode Island)**

5       346.    Rhode Island realleges and incorporates all of the allegations above from

6  paragraphs 1 through 194.

7       347.    Plaintiff State of Rhode Island represents itself, its State Agencies, Political

8  Subdivisions and Rhode Island consumers.

9       348.    Defendants' acts violate the Rhode Island Antitrust Act, and Plaintiff State of

10 Rhode Island on behalf of itself, its State Agencies, Political Subdivisions and as *parens patriae*

11 on behalf of persons residing in Rhode Island, is entitled to injunctive relief, restitution

12 (including treble damages), civil penalties and reasonable attorneys' fees, costs and statutory

13 interest pursuant to R.I. Gen. Laws § 6-36-1 *et seq.*

14                    **(Count Forty– South Carolina)**

15      349.    South Carolina realleges and incorporates all of the allegations above from

16 paragraphs 1 through 194.

17      350.    Plaintiff State of South Carolina represents itself and its State Agencies who

18 purchased DRAM or DRAM Containing Products.

19      351.    Defendants' acts violate the South Carolina Unfair Trade Practices Act, Sections

20 39-5-10 *et seq.*, and the common law of the State of South Carolina.  Plaintiff State of South

21 Carolina on behalf of itself and its State Agencies who purchased DRAM or DRAM Containing

22 Products is entitled to injunctive relief, restitution, civil penalties, and reasonable attorneys' fees

23 and costs under § 39-5-10 *et seq.*

24          **(Count Forty-One– Tennessee – Tennessee Consumer Protection Act)**

25      352.    Tennessee realleges and incorporates all of the allegations above from paragraphs

26 1 through 194.

27      353.    Plaintiff State of Tennessee represents itself as authorized by Tenn. Code Ann. §

28 8-6-109.

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1    354.    Defendants' acts violate, Tenn. Code Ann. § 47-18-101 *et seq.* (The Tennessee

2  Consumer Protection Act of 1977). Plaintiff State of Tennessee is entitled to injunctive relief,

3  reasonable costs, attorneys' fees and civil penalties under § 47-18-108.

4    **(Count Forty-Two– Tennessee – Tennessee Unfair Trade Practices Act)**

5    355.    Tennessee realleges and incorporates all of the allegations above from paragraphs

6  1 through 194.

7    356.    The aforementioned practices by Defendants were, and are, in violation of the

8  Tennessee Unfair Trade Practices Act ("TTPA"), Tenn. Code Ann. § 47-25-101 *et seq.*, as the

9  Defendant's anticompetitive conduct affected Tennessee trade and commerce to a substantial

10  degree. Defendants' combination of activities to suppress competition by fixing the price of

11  DRAM sold in the United States resulted in intrastate conduct as DRAM and DRAM-containing

12  products were imported into the Tennessee and sold within the state of Tennessee.

13    357.    During the relevant period, the sale, purchases and/or other trade activities

14  concerning DRAM and DRAM- containing products, or portions thereof, took place within the

15  State of Tennessee. DRAM was sent to computer manufacturer(s) located in Tennessee,

16  specifically Dell, Inc., which has a large manufacturing facility outside of Nashville, Tennessee.

17  Other OEM's shipped DRAM-containing products to locations throughout Tennessee to be sold

18  from retail locations in Tennessee and purchased by Tennessee consumers, educational

19  institutions, local government entities, and state government agencies. These transactions were

20  accomplished in whole and/or in part by transactions which were wholly intrastate.

21    358.    During the relevant period, the State of Tennessee (excluding institutions of

22  higher learning and other independent agencies) purchased in excess of $58 million worth of

23  DRAM-containing computers and other electronic equipment manufactured by OEMs such as

24  Compaq c/o Hewlett Packard Co., Dell Inc, Gateway Inc., Hewlett Packard Co., International

25  Business Machines Co. (IBM), Sun Microsystems of CA, Toshiba America, Inc., and Micron. In

26  addition, other Tennessee local government entities, school systems, residents and businesses

27  within the State of Tennessee purchased millions of dollars of DRAM-containing computers and

28  other electronic equipment.

1    359.    As a foreseeable result of Defendants' conspiracy, OEMs that purchased DRAM

2    from Defendants paid artificially raised prices. Those artificially raised prices were passed on to

3    Tennessee consumers and businesses, local governments, State government and Tennessee

4    schools. Thus, the State of Tennessee and a large percentage of Tennesseans and Tennessee

5    entities paid artificially raised prices in Tennessee for DRAM-containing computers and

6    equipment than they otherwise would have in a competitive market. These artificially raised

7    prices, therefore, affected Tennessee trade and commerce to a substantial degree

8    360.    Plaintiff State of Tennessee brings this action against Defendants pursuant to

9    Tenn. Code Ann. §47-25-101 *et seq.*, on behalf of the State, its state agencies, and its political

10    subdivisions for: (a) damages sustained by the State, local government and consumers, including

11    full consideration and/or sums paid; (b) civil penalties; (c) all available equitable remedies,

12    including injunctive relief and the denial to do business in the State; and (d) reimbursement of

13    reasonable attorneys fees, expert fees and costs. Defendants' acts violate Tenn. Code Ann. § 47-

14    25-101, *et seq.* (The Tennessee Unfair Trade Practices Act). Plaintiff State of Tennessee is

15    entitled to recover the full amount paid under § 47-25-106.

16                              **(Count Forty-Three– Utah)**

17    361.    Utah realleges and incorporates all of the allegations above from paragraphs 1

18    through 194.

19    362.    Plaintiff State of Utah represents itself, its State Agencies and Political

20    Subdivisions, and, as *parens patriae,* its natural persons, who purchased DRAM or DRAM

21    Containing Products directly or indirectly.˙

22    363.    Defendants' acts violate, and Plaintiff State of Utah on behalf of itself, its State

23    Agencies, its Political Subdivisions, and, as *parens patriae,* its natural persons, who purchased

24    DRAM or DRAM Containing Products directly or indirectly, is entitled to all relief provided

25    under: (a) the Utah Antitrust Act, Utah Code Ann. §§ 76-10-911 *et seq.*, including, without

26    limitation, damages, injunctive and other equitable relief, civil penalties, costs and reasonable

27    attorneys' fees, as provided in §§ 76-10-918 and 76-10-919 and (b) the common law of Utah,

28    including, without limitation, the common law against restraints of trade, unfair competition and

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1 | unjust enrichment.

2 | **(Count Forty-Four– Vermont)**

3 |      364.    Vermont realleges and incorporates all of the allegations above from paragraphs 1

4 | through 194.

5 |      365.    Plaintiff State of Vermont represents itself, its State Agencies, and all Vermont

6 | consumers, whether or not natural persons who purchased DRAM or DRAM Containing

7 | Products.

8 |      366.    Defendants' acts violate the Vermont Consumer Fraud Act, 9 V.S.A. §2451 *et*

9 | *seq.*, and Vermont common law, and Plaintiff State of Vermont seeks the relief under the

10 | Vermont Consumer Fraud Act on behalf of itself and its State Agencies, and on behalf of all

11 | Vermont consumers, whether or not natural persons, who purchased DRAM or DRAM

12 | Containing Products, including injunctive relief, civil penalties, damages (including treble

13 | damages), and reasonable attorneys' fees and costs as provided in §§ 2458 and 2465.

14 | **(Count Forty-Five– Washington)**

15 |      367.    Washington realleges and incorporates all of the allegations above from

16 | paragraphs 1 through 194.

17 |      368.    Plaintiff State of Washington represents itself, its State Agencies and, as *parens*

18 | *patriae,* all its natural persons who purchased DRAM or DRAM Containing Products.

19 |      369.    Defendants' acts violate Wash. Rev. Code 19.86, including Wash. Rev. Code

20 | 19.86.030 and 040. Plaintiff State of Washington on behalf of itself, its State Agencies and, as

21 | *parens patriae,* all natural persons who purchased DRAM or DRAM Containing Products, is

22 | entitled to recover damages and attorneys' fees under § 19.86.090, injunctive relief and

23 | restitution under § 19.86.080, and civil penalties under § 19.86.140.

24 | **(Count Forty-Six– West Virginia)**

25 |      370.    West Virginia realleges and incorporates all of the allegations above from

26 | paragraphs 1 through 194.

27 |      371.    Plaintiff State of West Virginia represents itself, its State Agencies and Political

28 | Subdivisions, where such agencies and Political Subdivisions have not expressly opted out of

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1    participation in this litigation, and its natural persons, as *parens patriae*.

2         372.    The aforementioned practices by Defendants were in violation of the West

3    Virginia Antitrust Act, W.Va. Code § 47-18-1 *et seq.*

4         373.    The State of West Virginia, its State Agencies, its Political Subdivisions and, as

5    *parens patriae*, its natural persons, who purchased DRAM or DRAM Containing Products, are

6    entitled to injunctive relief and civil penalties under W.Va. Code § 47-18-8 and treble damages,

7    attorneys' fees, filing fees and costs under W.Va. Code § 47-18-9.

8                              **(Count Forty-Seven– Wisconsin)**

9         374.    Wisconsin realleges and incorporates all of the allegations above from paragraphs

10   1 through 194.

11        375.    Plaintiff State of Wisconsin represents itself and its State Agencies.

12        376.    Defendants' acts were violations of the Wisconsin antitrust statute, Wis. Stat. §

13   133.03.  These violations substantially affected the people of Wisconsin and had impacts within

14   the State of Wisconsin.

15        377.    Plaintiff State of Wisconsin, on behalf of itself and its State Agencies, all of

16   whom were indirect purchasers of DRAM or DRAM Containing Products, or are assignees of

17   antitrust claims from other indirect purchasers of DRAM or DRAM Containing Products, is

18   entitled to recover damages under Wis. Stat. § 133.14, an injunction under § 133.16, and treble

19   damages and attorneys' fees under § 133.18.

20

21

22

23

24

25

26

27

28

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

A. The state antitrust law claims alleged in the Second and Third Claims for Relief brought as a part of a class action as asserted in Paragraphs 208-215, 233-238 and 313-318 of this Complaint may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B. That the Defendants' contract, conspiracy or combination alleged herein be adjudged and decreed to be:

1. A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

2. An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of state antitrust laws in the First, Second and Third Claims for Relief herein;

C. That Plaintiffs recover damages, as provided by federal and state antitrust laws under the First, Second, and Third Claims for Relief for conduct occurring during the time period of approximately March 1, 1999, to June 30, 2002, as well as similar conduct by at least some Defendants regarding at least some OEMs prior to that time period, and that a joint and several judgment in favor of Plaintiffs be entered against the Defendants in an amount to be trebled in accordance with such laws where applicable;

D. That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; (2) communication or causing to be communicated to any other person engaged in the sale of DRAM, information concerning bids of competitors; (3) entering into agreements for the sale, transfer, assignment or lease, of DRAM producing assets directly, through joint ventures or otherwise without first

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1   providing Plaintiffs appropriate notice and disclosures; and (4) conducting further sales in the

2   U.S. without instituting compliance programs;

3          E.  That the Plaintiffs be awarded restitution, including disgorgement of profits

4   obtained by Defendants as a result of their acts of unfair competition and acts of unjust

5   enrichment and/or any acts in violation of state antitrust, consumer protection, or other statutes

6   and laws, and the maximum civil penalties allowed by the laws of their respective States;

7          F.  That the Plaintiffs be awarded pre- and post-judgment interest, and that the interest

8   be awarded at the highest legal rate from and after the date of service of the initial complaint in

9   this action;

10          G.  That the Plaintiffs recover their costs of this suit, including reasonable attorneys'

11   fees as provided by law; and

12          H.  That the Plaintiffs have such other, further, and different relief as the case may

13   require and the Court may deem just and proper under the circumstances.

14                          **JURY TRIAL DEMAND**

15          Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a

16   trial by jury for all issues so triable.

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded

1   Dated:  November 7, 2007

2                                         Respectfully submitted,

3

4                                         EDMUND G. BROWN, JR.
                                          Attorney General of the State of California
5                                         ROBERT ANDERSON
                                          Chief Deputy Attorney General
6                                         J. THOMAS GREENE
                                          Chief Assistant Attorney General
7

8
                                           /S/ Kathleen E. Foote
9                                         KATHLEEN E. FOOTE, CA Bar #65819
                                          Senior Assistant Attorney General
10                                        NICOLE GORDON, CA Bar #224138
                                          SANGHEETA M. RAGHUNATAN, CA Bar
11                                        #229129
                                          Deputy Attorney General
12                                        EMILIO E. VARANINI, CA Bar #163952
                                          Deputy Attorney General
13                                        Office of the Attorney General of California
                                          455 Golden Gate Ave., Suite 11000
14                                        San Francisco, CA 94102
                                          (415) 703-5908
15

16

17                                        THOMAS W. CORBETT, JR
                                          Attorney General of the Commonwealth of
18                                        Pennsylvania

19

20
                                           /S/ James A. Donahue, III
21                                        JAMES A. DONAHUE, III, PA Bar #42624
                                          Chief Deputy Attorney General
22                                        Admitted *Pro Hac Vice*
                                          NORMAN W. MARDEN, PA Bar #203423
23                                        Deputy Attorney General
                                          14th Floor, Strawberry Square
24                                        Harrisburg, PA 17120
                                          (717) 787-4530
25

26                                        Attorneys for Plaintiffs

27

28

                                          65
Third Amended Complaint; C 06-4333 PJH; Jury Trial Demanded