EDMUND G. BROWN JR.
Attorney General of the State of California
KATHLEEN E. FOOTE – Cal Bar No.  65819
Senior Assistant Attorney General
NICOLE S. GORDON – Cal Bar No. 224138
Deputy Attorney General
SANGEETHA RAGHUNATHAN – Cal Bar No. 229129
Deputy Attorney General
EMILIO E. VARANINI – Cal Bar No. 163952
Deputy Attorney General
   455 Golden Gate Avenue
   San Francisco, California   94102
   Telephone: (415) 703-5555
   Fax: (415) 703-5480
   Email: emilio.varanini@doj.ca.gov

Attorneys for Plaintiffs

Michael I. Spiegel – Cal Bar No. 32651
Wayne M. Liao –     Cal Bar No. 66591
Charles M. Kagay – Cal Bar No. 73377
SPIEGEL LIAO & KAGAY, LLP
388 Market Street, Suite 900
San Francisco, California  94111
Telephone:  (415) 956-5959
Fax: (415) 362-1431
E-Mail: cmk@slksf.com

Attorneys for the State of California

GARY K. KING
Attorney General of the State of New Mexico
DEYONNA YOUNG - NM Bar No. 2980
Assistant Attorney General
111 Lomas Blvd NW, Suite 300
Albuquerque, NM 87102
Telephone: (505) 222-9089
Fax: (505) 222-9086
E-Mail: DYoung@ago.state.us

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE STATE OF CALIFORNIA et al., <br><br> Plaintiffs, <br><br> v. <br><br> INFINEON TECHNOLOGIES AG et al., <br><br> Defendants. | Case No. C 06-4333 PJH <br> Related to MDL. No. 1486 <br><br> Motion for the Certification of California and New Mexico Governmental Entity Classes <br><br> Date: March 12, 2008 <br> Time: 9:00 A.M. <br> Courtroom: 3 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Motion for Certification of Governmental Entity Classes – No. C 06-4333 PJH (MDL-1486)

**Table of Contents**

NOTICE OF MOTION AND MOTION.................................... 1

I.  INTRODUCTION AND SUMMARY OF ARGUMENT.................... 1

II. THIS COURT'S EARLIER CLASS DECISION STRONGLY SUPPORTS
    THIS MOTION.................................................. 2

III. CLASS DEFINITION. ......................................... 3

IV. BACKGROUND. ............................................... 3

    A.  The DRAM Market.......................................... 3

    B.  The DOJ Investigation.................................... 4

    C.  The Instant Litigation. ................................ 4

V.  THE GOVERNMENTAL ENTITY CLASSES SHOULD BE CERTIFIED. ..... 5

    A.  Class Certification Standards........................... 5

    B.  Federal Rule of Civil Procedure 23(a) Requirements. .... 5

        1.  Numerosity.......................................... 6

        2.  Commonality. ....................................... 6

        3.  Typicality. ........................................ 7

        4.  Adequacy of Representation.......................... 8

    C.  Federal Rule of Civil Procedure 23(b) Requirements..... 10

        1.  Predominance....................................... 11

            a.  Antitrust Violation............................ 11

            b.  Impact. ....................................... 12

                (1)  Proof of impact generally............... 12

                (2)  Proof of impact in an indirect-purchaser case. ..... 12

                (3)  Proof of Impact in This Case. ........... 16

                (4)  Purchases of Products Containing Co-
                     conspirators' DRAM. ....................... 18

            c.  Damages. ...................................... 20

        2.  Superiority. ...................................... 22

i

D.    The Classes Should Also Be Certified Because Class Representatives and Class Members Are, to a Substantial Extent, Direct Purchasers.  . . . . 24

VI.    CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

1

**Table of Authorities**

2

**Cases**

3

*A & M Supply Co. v. Microsoft Corp.*, 252 Mich.App. 580, 654 N.W.2d 572 (Mich.
App. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Bellinder v. Microsoft Corp.*, 2001 WL 1397995 (Kan. Dist. Ct. Sept. 7, 2001). . . . 14

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3rd Cir. 1977). . . . . . . . . . . . . . . . . . 12, 16, 22

*Comes v. Microsoft Corp.,* 696 N.W.2d 318 (Iowa 2005). . . . . . . . . . . . . . . . . . . . . . . . 14

*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir. 1995). . . . . . . . . . . 6

*Cox v. Microsoft Corp.*, 809 N.Y.S.2d 480, 2005 WL 3288130 (2005). . . . . . . . . . . . . . 14

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). . . . . 5

*Eisenberg v. Gagnon*, 766 F.2d 770 (3rd Cir. 1985).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394 (N.D. Ill. 1987). . . . . . . . . . . . . . . 10

*Gordon v. Microsoft Corp.*, WL 366432 (Minn. Dist. Ct. 2001), *aff'd* 645 N.W.2d 393
(Minn. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909 (9th Cir. 1964. . . . . . . . . . . . 6

*Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). . . . . . . 5

*Howe v. Microsoft Corp.,* 656 N.W.2d 285 (N.D. 2003).. . . . . . . . . . . . . . . . . . . . . . . . . 14

*Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 15

*In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269 (D.D.C. 1972).. . . . . . . . . . . . . . . . . 9, 13

*In re Auction Houses Antitrust Litigation,* 193 F.R.D. 162 (S.D.N.Y. 2000). . . . . . . . 7, 19

*In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 (D.N.J.
2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-8, 11, 12, 16, 18, 21, 22

*In re Catfish Antitrust Litigation*, 826 F.Supp. 1019 (M.D. Miss. 1993). . . . . . . . . . . . 21

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333 F. Supp.
278 (S.D.N.Y. 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 2006 WL
1530166 (N.D. Cal. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 5-8, 10-12, 22

*In re Fine Paper*, 82 F.R.D. 143 (E.D. Pa. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472 (W.D. Pa. 1999) 91 F.R.D. 472
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 21, 22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

iii

*In re Florida Antitrust Litig.*, 2002 WL 31423620 (Fla. Cir. Ct. 2002). . . . . . . . . . . . . . 14

*In re Foundry Resins Antitrust Litigation*, 242 F.R.D. 393 (S.D. Ohio 2007). . . . . . . . . 12

*In re GMC*, 55 F.3d 768 (3rd Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374 (S.D.N.Y. 1996). . . . . . . . . . . 7, 18

*In re Linerboard Antitrust Litig.*, 203 F.R.D. 197 (E.D. Pa.2001). . . . . . . . . . 9, 13, 21, 22

*In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3rd Cir. 2002). . . . . . . . . . . . . . . . 16

*In re Microsoft I-V Cases,* 135 Cal.App.4th 706 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re N.M. Indirect Purchasers Microsoft Corp.* 140 N.M. 879, 149 P.3d 976 (N.M.
      Ct. App. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re New Motor Vehicles Canadian Export Antitrust Litigation,* 235 F.R.D. 127
      (D. Me. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Playmobil Antitrust Litig.*, 35 F.Supp.2d 231 (E.D.N.Y. 1998). . . . . . . . . . . . . . . 5, 7

*In re Polypropylene Carpet Antitrust Litigation*, 178 F.R.D. 603 (N.D. Ga. 1997). . . . . 12

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D.  Minn. 1995). . . . . . . . . . . . . . . . . . . . 21

*In re Potash Antitrust Litigation,* 159 F.R.D. 682 (D. Minn. 1995). . . . . . . . . . . . . . . . . 12

*In re Relafen Antitrust Litigation,* 221 F.R.D. 260 (D. Mass. 2004). . . . . . . . . . . . . . . . . 15

*In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. 346 (N.D. Cal. 2005). . . . . . . . . . 6-9, 21

*In re South Dakota Microsoft Antitrust Litigation*, 657 N.W.2d 668 (S. D. 2003) . . . . . 14

*In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322 (E.D. Pa. 1976). . . . . . . . . . . . . . . 13, 19

*In re Terazosin Hydrochloride Antitrust Litigation,* 203 F.R.D. 551 (S.D. Fla. 2001)
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Vitamins Antitrust Litig.*, 209 F.R.D. 251 (D.C.  Cir. 2002). . . . . . . . . . . . . . . 5, 8, 11

*In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231 (D. Del. 2002). . . . . . . . . . 19

*Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241 (C.D. Cal. 2006). . . . . . . . . . . . . . . . . . 6

*Jordan v. Los Angeles County*, 669 F.2d 1311 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . 6

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244
      F.3d 1152 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

iv

*Local Joint Exec. Body of Culinary /Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*McCarthy v. Kleindienst*, 741 F.2d 1406 (D.C. Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . 5

*Melnick v. Microsoft Corp.*, 2001 WL 1012261 (Me. Super. 2001). . . . . . . . . . . . . . . . 14

*Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D. Minn. 1968). . . . . . . . . . . . 6, 9

*Moore v. Hughes Helicopters, Inc.* 708 F.2d 475 (9th Cir. 1983). . . . . . . . . . . . . . . . . . . 5

*Morgan v. Laborers Pension Trust Fund for Northern California*, 81 F.R.D. 669 (N.D. Cal. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642 (1969). . . . . . . . . . . . . . . . . . . . . . . 13

*Philadelphia Elec. Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D. Pa. 1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Presidio Golf Club v. National Linen Supply Corp.*, 1976-2 Trade Cases ¶ 61,221 (N.D. Cal. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Romero v. Philip Morris Incorporated*, 137 N.M. 229, 109 P.3d 768 (N.M. Ct. App. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 21

*Rosack v. Volvo of America Corp.*, 131 Cal.App.3d 741 (1982) 741 (1982). . . . . . . 19, 21

*State of Alabama v. Chevron U.S.A., Inc.*, 1980 WL 1808 (M.D. Ala. 1980). . . . . . . . . . 10

*State of Illinois v. Associated Milk Producers, Inc.*, 351 F. Supp. 436 (N.D. Ill. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State of Illinois v. Harper & Row Publishers, Inc.*, 301 F. Supp. 484 (N.D. Ill. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38 (S.D.N.Y. 1990). . . . . . 6

*Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15 (1984). . . . . . . . . . . . . . . . . . 15

*United States v. Microsoft Corp.* 253 F.3d 34 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . 13

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir. 2003). . . . 19

**Statutes**

15 U.S.C. § 15 *et seq...* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

California Business and Professions Code § 16700 *et seq...* . . . . . . . . . . . . . . . . . . . . . . 24

California Business and Professions Code § 16750(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

California Business and Professions Code § 16750(c). . . . . . . . . . . . . . . . . . . . . . . . . . . 23

v

California Government Code § 4552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

New Mexico Statutes Annotated § 57-1-3.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

New Mexico Statutes Annotated § 57-1-3.B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Rules**

Federal Rule of Civil Procedure 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 13

Federal Rule of Civil Procedure 23(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

Federal Rule of Civil Procedure 23(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

Federal Rule of Civil Procedure 23(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5-7

Federal Rule of Civil Procedure 23(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rule of Civil Procedure 23(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Federal Rule of Civil Procedure 23(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rule of Civil Procedure 23(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Federal Rule of Civil Procedure 23(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 11, 22

**Miscellaneous**

Conte, Alba, and Herbert B. Newberg, 1 Newberg on Class Actions (4th ed. 2002).. . 6, 9

Newberg, Herbert B., and Alba Conte, 4 Newberg on Class Actions (3d ed. Supp.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Page, William H., Class Certification in the Microsoft Indirect Purchaser Litigation, J. Comp. L. & Econ. (6/2005) 303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT, on March 12, 2008, at 9:00 A.M., or as soon thereafter as the matter may be heard, in Courtroom 3 of the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, California 94102, the State of California, the City and County of San Francisco, the County of Santa Clara, and the Los Angeles Unified School District will move this Court pursuant to Federal Rule of Civil Procedure 23 for an order certifying a class of governmental entities within the State of California, and the State of New Mexico and the County of Sandoval move this Court for an order certifying a class of governmental entities within the State of New Mexico. These plaintiffs (collectively, "Class Representatives") also move the Court for an order appointing attorneys who represent them as class counsel.

This motion is based upon this Notice of Motion and accompanying Memorandum of Points and Authorities, the complete files and records in this action, oral argument of counsel, and such other and further matters as this Court may consider.

**I.    INTRODUCTION AND SUMMARY OF ARGUMENT**

As is generally true when State Attorneys General seek to represent government entities within their states, the present case is particularly amenable to class treatment. The Class Representatives are all government entities, like the class members, and they purchased DRAM in the same ways that the class members did. Class Representatives and class members alike were all victimized by the same price-fixing scheme, they all suffered the same harm as the result of that scheme, and they all incurred damages in the same ways.

All of the substantial issues of law and fact that will have to be proven for the class member entities are already before this Court in the cases of the Class Representative entities, and all are amenable to the same proof. In particular, the impact of defendants' fixing the price of the DRAM on these entities that bought equipment containing DRAM is demonstrated by a wealth of economics literature and basic economic principles, and any

1

further empirical demonstration that might be required will simultaneously demonstrate impact for the representatives and the class. Similarly, the same damage calculations that will be made for the representatives will also serve to measure the damages for the class.

Additionally, unlike a private class representative, the Attorneys General of California and New Mexico are legally empowered to and will represent the absent entities as named parties, either in federal court or in parallel state court actions, if classes cannot be certified. However, the efficiencies of the class device makes class certification the superior route.

## II.    THIS COURT'S EARLIER CLASS DECISION STRONGLY SUPPORTS THIS MOTION

In these related actions, this Court has already certified a class of private direct purchasers. *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 2006 WL 1530166 (N.D. Cal. 2006) ("*DRAM Class Decision*"). Most of the issues raised by the present class motion were addressed in that decision, and for the most part the moving States will defer to that decision on those issues rather than raise them anew.

There appear to be just three significant differences between the class certification sought here and the class certification granted in the *DRAM Class Decision*:

1) The present class representatives and class are governmental, not private, entities;

2) The present class representatives are proceeding under California and New Mexico, as well as federal, antitrust laws;

3) The present class representatives and class largely bought DRAM indirectly.

The first two differences strengthen the case for class certification. The classes that these plaintiffs seek to certify are smaller, more homogeneous, more cohesive, and much less widely dispersed than the class certified in the private direct action. Moreover, the California and New Mexico antitrust laws are particularly receptive and amenable to class certification.

The third difference, the fact that plaintiffs and their classes bought the price-fixed product indirectly, requires closer scrutiny. Indirect purchases raise some different issues on class certification than do direct purchases. But, even so, this case is no exception to the rule that classes of indirect purchasers in antitrust cases can be and routinely are certified. For

2

most class action criteria, indirect purchasers are no different from direct purchasers.  Even on the questions of proving impact and damages, common methods of proof are available and can readily be employed.

### III.    CLASS DEFINITION

The Class Representatives ask the Court to certify the following classes.

For the State of California: a class of all public entities within the State of California other than the federal government, including the University of California, the State Bar of California, county governments, municipal governments, public school systems (including elementary school districts, high school districts, and community college districts but excluding charter schools), special district governments independent of the county and city governments, and statutorily-established fair associations.

For the State of New Mexico: a class of all public entities within the State of New Mexico other than the federal government, including county governments, municipal governments, public school systems, state-operated colleges and universities, and special district governments.

### IV.    BACKGROUND

The Class Representatives adopt verbatim the following background discussion from the *DRAM Class Decision* at *1-*2:

> The instant multidistrict litigation stems from allegations of a price-fixing conspiracy in the market for dynamic random access memory (DRAM).
>
> **A.    The DRAM Market**
>
> DRAM is an electronic microchip that is used to store digital information and provide high-speed storage and retrieval of data.  It is commonly used in a wide assortment of electronic devices, including personal computers, printers, digital cameras, and wireless telephones.  DRAM is primarily sold in two forms, component and module, both of which come in different densities, speeds, and frequencies (e.g., 16, 64, 128, or 256 Mb).
>
> The DRAM manufacturing market is primarily occupied by a handful of leading manufacturers-namely, the defendants in the instant actions.[FN1] For the years 2000-2002 – during the relevant class period at issue – defendants' market share, for example, exceeded 70%.
>
> Defendants sell the DRAM they manufacture directly to various types of

3

customers, including both large scale and small scale customers, through a variety of sales channels.  The price they charge for DRAM depends on the particular sales channel through which DRAM is sold and/or the type of customer to whom DRAM is sold.  Generally, defendants have identified four major sales channels and/or customer groups through which and to whom DRAM is sold: (1) equipment manufacturer customers – including the major PC and server manufacturers ("PC and Server OEMs") – who purchase DRAM from defendants under long-term contracts, pursuant to which the pricing for DRAM is negotiated; (2) franchise distributors that sell various electronic components to their customers, who purchase DRAM from defendants under long-term distribution contracts, pursuant to which pricing is initially based on established "book prices"; (3) smaller-volume customers who purchase DRAM from defendants via negotiated one-time transactions known as "spot" sales, in which price is negotiated individually through email or telephone contacts; and (4) customers who purchase DRAM through defendant Micron's Crucial Technology, Inc. ("Crucial") division, which offers online DRAM sales at prices set via price lists that differentiate between customers according to customer classification-e.g., consumer, business, reseller, or government/educational.

All defendants therefore use two general pricing methods in making direct DRAM sales to customers, contract pricing and spot pricing, while defendant Micron additionally engages in direct sales to customers through its Crucial division.

## B.    The DOJ Investigation

In or around 2002, the Antitrust Division of the Department of Justice ("DOJ") began investigating several defendants' alleged participation in a global price-fixing conspiracy to fix prices for the sale of DRAM.  As a result of the DOJ investigation, certain defendants have pled guilty to criminal conspiracy violations of federal antitrust law.  Since 2003, for example, at least three defendants and/or their agents have pled guilty to antitrust conspiracy charges, and agreed to pay hefty criminal fines.  (Footnote omitted)

## C.    The Instant Litigation

The Class Representatives, along with other States, charge defendants with essentially the same antitrust law violations as the private director purchaser action, as quoted above.

The Class Representatives sue under the federal Sherman Act and also under the California and New Mexico antitrust laws.  These state laws reject the direct purchaser rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) and specifically allow suits by indirect purchasers.  Cal. Bus. & Prof. Code § 16750(a); N. M. Stat. Ann. § 57-1-3.A.

The Class Representatives assert their own claims against defendants and also allege a class of state agencies and political subdivisions that are similarly situated ("the governmental entity classes").  These plaintiffs allege that they and the class members they seek to represent are purchasers of DRAM for which the price was elevated by defendants'

4

---

violations of the antitrust laws.

## V.    THE GOVERNMENTAL ENTITY CLASSES SHOULD BE CERTIFIED

All of the FRCP 23 criteria for class certification are satisfied here.

### A.    Class Certification Standards

The Class Representatives adopt verbatim the discussion of class certification standards from the *DRAM Class Decision* at \*2-\*3:

In order for a class action to be certified, plaintiffs must prove that they meet the requirements of Federal Rule of Civil Procedure ("FRCP") 23(a) and (b). Under FRCP 23(a), plaintiffs must satisfy four prerequisites. First, the class must be so numerous that joinder of all members individually is "impracticable." *See* Fed.R.Civ.P. 23(a)(1). Second, there must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). Third, the claims or defenses of the class representative must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). And fourth, the person representing the class must be able fairly and adequately to protect the interests of all members of the class. Fed.R.Civ.P. 23(a)(4). In addition to demonstrating these requirements, plaintiffs must also satisfy one of the requirements of FRCP 23(b). In this case, this requires proof that questions of law or fact common to the class predominate over questions affecting the individual members, and on balance, that a class action is superior to other methods available for adjudicating the controversy at issue. See Fed.R.Civ.P. 23(b)(3).

The court does not make a preliminary inquiry into the merits of plaintiffs' claims in determining whether to certify a class. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). It will, however, scrutinize plaintiffs' legal causes of action to determine whether they are suitable for resolution on a class wide basis. *See, e.g., Moore v. Hughes Helicopters, Inc.* 708 F.2d 475, 478 (9th Cir. 1983). In doing so, the court must accept the substantive allegations contained in plaintiffs' complaints as true, but will consider matters beyond the pleadings in order to ascertain whether the asserted claims or defenses are susceptible of resolution on a class wide basis. *See McCarthy v. Kleindienst,* 741 F.2d 1406, 1419 n. 8 (D.C. Cir. 1984).

Moreover, in antitrust actions such as this one, it has long been recognized that class actions play an important role in the private enforcement of antitrust laws. *See Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Accordingly, when courts are in doubt as to whether certification is warranted, courts tend to favor class certification. *See, e.g., In re Vitamins Antitrust Litig.,* 209 F.R.D. 251, 258 (D.C. Cir. 2002); *In re Playmobil Antitrust Litig.,* 35 F.Supp.2d 231, 238 (E.D.N.Y. 1998).

### B.    Federal Rule of Civil Procedure 23(a) Requirements

### 1.    Numerosity

The Class Representatives adopt verbatim the following part of the discussion of numerosity from the *DRAM Class Decision* at *3:

> FRCP 23(a)(1) requires that a class be so numerous that joinder of all members is impracticable.  In order to satisfy this requirement, plaintiffs need not state the "exact" number of potential class members, nor is there any specific magic number that is required.  *See In re Rubber Chem. Antitrust Litig.,* 232 F.R.D. 346, 350-51 (N.D. Cal. 2005); *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362, *5 (D.N.J. 2006).  The fact that a class is geographically dispersed, or class members difficult to identify, supports class certification.  *See In re Rubber Chem. Antitrust Litig.,* 232 F.R.D. at 350-51.
>
> "Impracticable", as it is used in FRCP 23(a)(1), does not mean impossible, and a "showing of strong litigational hardship or inconvenience should be sufficient."  Conte and Newberg, *1 Newberg on Class Actions* (4th ed. 2002) (*1 Newberg*), p. 230; accord, *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913-14 (9th Cir. 1964); *Town of New Castle v. Yonkers Contracting Co.*, 131 F.R.D. 38, 41 (S.D.N.Y. 1990).  The courts generally find impracticability where the class includes 40 members or more.  See, e.g., *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds in* 459 U.S. 810 (1982);  *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995);  *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 247 (C.D. Cal. 2006).

The proposed classes in this action vastly exceeds the threshold number.  They include all of California and new Mexico's local governments, whose numbers exceed 4000 and 800, respectively.  See Class Representatives' Request for Judicial Notice, Exhibit A.  These numbers easily justify the certification of governmental entity classes.  See, *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 565-566 (D. Minn. 1968) (numerosity requirement satisfied where state represented class of approximately 700 governmental entities).

The court should find that these classes satisfy the numerosity requirement.

### 2.    Commonality

The Class Representatives adopt verbatim the following part of the discussion of commonality from the *DRAM Class Decision* at *3-*4:

> FRCP 23(a)(2) requires that there exist "questions of law or fact common to

6

the class." Where an antitrust conspiracy has been alleged, courts have consistently held that "the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." *See In re Rubber Chem. Antitrust Litig.,* 232 F.R.D. at 351; *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *5.

So here. The existence, scope, and efficacy of the conspiracy to fix or stabilize prices of DRAM sold in the United States are common questions that all plaintiffs must address.

Like the private direct purchaser class representative, the governmental entity class representatives allege, on behalf of themselves and the class members, the same conspiracy. Accordingly, the court should find that they have satisfied the commonality requirement of FRCP 23(a)(2).

### 3.    Typicality

The Class Representatives adopt verbatim the following part of the discussion of typicality from the *DRAM Class Decision* at *4:

FRCP 23(a)(3) also requires that the claims of the named plaintiffs be typical of those of the class. This does not require that the claims of the representative party be identical to the claims of class members. *See, e.g., In re Playmobil Antitrust Litig.,* 35 F.Supp.2d at 242. Rather, typicality results if the representative plaintiffs' claims "arise[ ] from the same event, practice or course of conduct that gives rise to the claims of the absent class members and if their claims are based on the same legal or remedial theory." *See In re Auction Houses Antitrust Litig.,* 193 F.R.D. 162, 164 (S.D.N.Y. 2000). In evaluating typicality, the court should consider whether the named plaintiffs' "individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *See In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *5. In cases involving an alleged price-fixing conspiracy, the representative plaintiff's claim is usually considered typical even though the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class. *See, e.g., In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 479 (W.D. Pa. 1999); *In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374 (S.D.N.Y. 1996).

In this case – as in the private direct purchaser action – the claims of the class representatives and class members arise from the same course of conduct and are based on the same legal or remedial theory. Moreover, the class representative and class members did in fact have common purchasing procedures, did in fact often purchase in similar quantities and at the same or similar prices, and did in fact purchase similar mixes of products.

7

Unlike private purchasers, all public purchasers – Class Representatives and class members alike – must conform to fairly narrow legal requirements in making their purchases, particularly purchases for large value. They make large value purchases by competitive bid or off competitively-established master contracts; they have more flexibility in making smaller purchases but are required to make all purchases in a manner designed to maximize the value obtained for the money spent. See, generally, Declarations of Hugh Smith, David Keskeys, Duane Johnson, Jenti Vandertuig, Naomi Kelly, Michael Vinyard, and Cassandra Herrera. The typicality of the Class Representatives is heightened by the fact that they and the class members can and do buy the same goods off the same master contracts. *Id.*

The moving class representatives also adopt verbatim the following part of the discussion of typicality from the *DRAM Class Decision* at *5-*6:

> Moreover, there is substantial legal authority holding in favor of a finding of typicality in price fixing conspiracy cases, even where differences exist between plaintiffs and absent class members with respect to pricing, products, and/or methods of purchasing products. *See, e.g., In re Vitamins Antitrust Litig.,* 209 F.R.D. at 260-61; *In re Rubber Chem. Antitrust Litig.,* 232 F.R.D. at 351; *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *6. These cases recognize that, in conspiracy cases, plaintiffs' claims are typical of the class because proof of their section 1 claim will depend on proof of violation *by defendants,* and not on the individual positioning of the plaintiff. *See In re Vitamins Antitrust Litig.,* 209 F.R.D. at 260.
>
> . . .
>
> So here. The named plaintiffs' claims and the claims of absent class members *both* depend on allegations that they purchased DRAM from defendants at a price that was artificially inflated as a result of the alleged price-fixing conspiracy. As such, the claims are typical of each other, despite the differences in types of DRAM, customer categories (*i.e., Crucial v. non-Crucial customer* ), and sales channels.

(Emphasis in original.)

The Class Representatives' claims here are typical of the claims of the entire proposed classes. The court should find the typicality requirement satisfied.

### 4.    Adequacy of Representation

The moving class representatives adopt verbatim the following part of the discussion of FRCP 23 requirements from the *DRAM Class Decision* at *6:

8

FRCP 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. First, the adequacy requirement mandates that no conflicts of interest exist between the named plaintiffs and the absent class members. *See, e.g., In re Rubber Chem. Antitrust Litig.,* 232 F.R.D. at 351, *citing Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir.2001). Second, the adequacy requirement seeks to ensure that plaintiffs are represented by "counsel of sufficient diligence and competence to fully litigate the claims." *See id.; see also In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 207 (E.D. Pa.2001).

Both requirements are met here.

A conflict of interest sufficient to defeat adequacy of representation must be a fundamental one going to the specific issues in controversy. *1 Newberg*, p. 435. The courts consider whether there is a sharing of interests between the named representatives and absent class members, an absence of antagonism, and an unlikelihood that the suit is collusive. *Local Joint Exec. Body of Culinary /Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). In class action cases where the named representative is a state suing on behalf of its political subdivisions and the state has been injured in the same manner as the putative class members, the courts have had little difficulty finding that these factors are present and that the state adequately represents the putative class. *In re Ampicillin Antitrust Litigation*, 55 F.R.D. 269, 274 (D.C. Cir. 1972) ("States may certainly represent their lesser governmental entities"); *State of Illinois v. Harper & Row Publishers, Inc.*, 301 F. Supp. 484, 495 (N.D. Ill. 1969) (named representatives (state and local governments) that shared identical positions with class members (public libraries, school districts and boards of education) on crucial issues in antitrust case adequately protected class members' interests); *Minnesota v. United States Steel Corp.*, 44 F.R.D. at 567-568 (states adequately represented their classes of governmental entities in price fixing class action).

Here, both the class representatives and the class members were allegedly injured by the same price fixing conspiracy – they all paid more because of the conspiracy – and they all seek the same monetary relief for overcharges paid. Since the interests of the Plaintiff States and the putative class members are coextensive, their claims are neither antagonistic nor in conflict. *In re Rubber Chemicals Antitrust Litigation*, 232 F.R.D. at 351.

9

The other aspect of the adequacy of representation test is whether plaintiffs' counsel are qualified, experienced and generally able to conduct the litigation. *Morgan v. Laborers Pension Trust Fund for Northern California*, 81 F.R.D. 669, 679 (N.D. Cal. 1979). Generally the courts do not challenge the qualifications, competence, or effectiveness of a state attorney general to represent the state on behalf of its political subdivisions or residents. See, e.g., *State of Alabama v. Chevron U.S.A., Inc.*, 1980 WL 1808, *2 (M.D. Ala. 1980) (state attorney general was proper representative to protect interests of class of public entities in price fixing action); *State of Illinois v. Associated Milk Producers, Inc.*, 351 F. Supp. 436, 440 (N.D. Ill. 1972) ("[T]he State through its Attorney General is the proper and best representative of the political subdivisions organized under the authority of the State"); see also, *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333 F. Supp. 278, 280-281 (S.D.N.Y. 1971) (state attorney general provided class of retail consumers "experienced counsel possessing sufficient resources and professional assistance to meet the obligations inevitably placed on a representative party under Rule 23").

In fact, the attorneys for the class representatives are amply qualified to conduct this litigation on behalf of the putative class. Their respective resumes demonstrate that they have extensive experience in antitrust litigation, and in serving as class counsel for states representing classes of local governments. See Declarations of Emilio Varanini, Charles Kagay, and Deyonna Young. "Where . . . attorneys have been found adequate in the past, it is persuasive evidence that they will be adequate again." *Gomez v. Illinois State Bd. of Educ.*, 117 F.R.D. 394, 401 (N.D. Ill. 1987)

## C.    Federal Rule of Civil Procedure 23(b) Requirements

The moving class representatives adopt verbatim the following part of the discussion of FRCP 23 requirements from the *DRAM Class Decision* at *6:

> In addition to the requirements for class certification set forth in FRCP 23(a), the court must determine whether the requirements of FRCP 23(b) have been satisfied-here, whether (1) "questions of law or fact common to the members of the class predominate" and (2) whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." *See* Fed.R.Civ.P.

10

23(b)(3).

## 1.    Predominance

The moving class representatives adopt verbatim the following part of the discussion

of predominance from the *DRAM Class Decision* at *6-*7:

> Predominance requires "that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." *See, e.g., In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *9.   Generally speaking, the test for predominance is met "when there exists generalized evidence which proves or disproves an [issue or element] on a simultaneous, class-wide basis, since such proof obviates the need to examine each class members' individual position." *See In re Vitamins Antitrust Litig.,* 209 F.R.D. at 262.  In undertaking the predominance analysis, courts must identify the issues involved in the case and determine which are subject to "generalized proof," and which must be the subject of individualized proof.

> There are three key elements of plaintiffs' section 1 claim for which plaintiffs must establish the predominance of common issues: (1) whether there was a conspiracy to fix prices in violation of the antitrust laws; (2) the fact of plaintiff's antitrust injury, or "impact" of defendants' unlawful activity; and (3) the amount of damages sustained as a result of the antitrust violations. *See In re Vitamins Antitrust Litig.,* 209 F.R.D. at 257.

As discussed below, the moving class representatives can establish predominance for

all three elements.

## a.    Antitrust Violation

The moving class representatives adopt verbatim the following part of the discussion

of the predominance of the issue of antitrust violation from the *DRAM Class Decision* *7:

> Common issues predominate in proving an antitrust violation "when the focus is on the defendants' conduct and not on the conduct of the individual class members." *See, e.g., In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *9; *In re Flat Glass Antitrust Litig.,* 191 F.R.D. at 484.  Courts have frequently found this standard satisfied, however, in cases alleging price-fixing conspiracies.  *See In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *9 (whether a conspiracy exists is a common question that predominates over other issues in the case and "has the effect of satisfying the first prerequisite of FRCP 23(b)(3)").  This is because proof of an alleged conspiracy and defendants' acts in furtherance of such conspiracy require common proof of defendants' conduct.

> So here.   Plaintiffs allege that defendants fixed, raised, stabilized, and maintained at artificially high levels the prices they charged for DRAM sold in the United States. . . .  To prove these violations, all class members must establish that the defendants engaged in the conspiracy to fix prices in violation of section 1 of the Sherman Act.  This requires proof common to all plaintiffs.

11

1    This action alleges the same price-fixing conspiracy as the privates' direct action.

2    Accordingly, the Court should find that common issues predominate as to the element of

3    antitrust violation.

4    **b.    Impact**

5    **(1)    Proof of impact generally**

6    The moving class representatives adopt verbatim the following part of the discussion

7    of the predominance of the issue of impact under federal law from the *DRAM Class Decision*

8    at *7:

> Antitrust "impact" – also referred to as antitrust injury – is the "fact of
> damage" that results from a violation of the antitrust laws. *See, e.g., In re Bulk*
> *[Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362 at *10. Proof of impact
> may be made on a common basis "so long as the common proof adequately
> demonstrates some damage to each individual" member of the class. *See id.; see also*
> *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3rd Cir. 1977). In other words,
> plaintiffs must establish, with generalized proof, that all members of the class suffered
> damage as a result of defendants' alleged price-fixing conspiracy.

13    As this passage makes clear, the question on the issue of impact is not whether

14    plaintiff can show the amount by which each class member was injured, or that they were all

15    injured in the same amount; rather, the question is whether plaintiff can show on a classwide

16    basis that the class members generally suffered some injury. *In re Potash Antitrust*

17    *Litigation,* 159 F.R.D. 682, 694-96 (D. Minn. 1995). Moreover, at the class certification

18    stage, "Plaintiffs must show that antitrust impact *can be proven* with common evidence on

19    a classwide basis; Plaintiffs need not show antitrust impact *in fact occurred* on a classwide

20    basis." *In re Polypropylene Carpet Antitrust Litigation,* 178 F.R.D. 603, 618 (N.D. Ga.

21    1997) (emphasis in original).

22    **(2)    Proof of impact in an indirect-purchaser case**

23    In price-fixing cases, proving class-wide impact is generally a simple matter. *In re*

24    *Foundry Resins Antitrust Litigation,* 242 F.R.D. 393, 409 (S.D. Ohio 2007). Even where

25    plaintiffs and class members suffer injury through pass-on of a price-fixing overcharge,

26    courts often find that impact is susceptible of class-wide proof:

27

12

> "[S]atisfaction of the impact requirement can be met by evidence that the alleged conspiracy resulted in overcharges that were 'passed-on,' at least in part, to all claimants."  *In re Sugar Indus.* [*Antitrust Litig.*], 73 F.R.D. [322], 346 [[(E.D. Pa. 1976)] (citing *Perkins v. Standard Oil Co. of Cal.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); *In re Ampicillin Antitrust Litig.*, 55 F.R.D. 269 (D.D.C. 1972); *Philadelphia Elec. Co. v. Anaconda American Brass Co.*, 43 F.R.D. 452 (E.D. Pa. 1968)).

*In re Linerboard Antitrust Litig.,* 203 F.R.D. at 212.

This case, of course, addresses price-fixing of a product (DRAM) that is part of a larger product that the indirect purchaser plaintiff and class members purchased (e.g., computers, printers, or servers).  Fewer authorities address this type of claim, but they do show that class-wide impact can be shown in this type of case in appropriate circumstances.

The most prominent group of such cases, and the group most pertinent to the present litigation, concern antitrust class actions filed on behalf of indirect purchasers of the Microsoft Windows computer operating system.  Microsoft had been adjudged, in a federal enforcement action, to have illegally maintained a monopoly in personal computer operating systems.  *United States v. Microsoft Corp.* 253 F.3d 34, 68 (D.C. Cir. 2001).  In numerous jurisdictions, plaintiffs filed antitrust class actions on behalf of consumers who had bought Windows indirectly, by buying a personal computer that incorporated Windows as the operating system.

Consequently, a number of courts found themselves facing the question of whether to certify a class of purchasers who had indirectly bought a product incorporated into a personal computer that they bought.  Although these cases were mostly filed in state court, the criteria for class certification were largely the same as those dictated by Federal Rule of Civil Procedure 23.  Each court, in particular, had to consider whether it was possible to prove impact on a class-wide basis.

The courts predominantly determined that impact could indeed be demonstrated on a class-wide basis.  For example, the Supreme Court of South Dakota held:

> The Class Members allege that they were harmed because Microsoft's antitrust violations forced direct purchasers to pay non-competitive prices for Microsoft OSS, and that a portion of the overcharged amount was passed on to them as indirect

13

1    purchasers. As proof of the impact, Plaintiffs intend to use common evidence and
     economic methodologies.

2
          . . .
3

4    We find that the Class Members have met their "threshold showing" of harm to
     end-users/consumers.
5

6    *In re South Dakota Microsoft Antitrust Litigation*, 657 N.W.2d 668, 676, 679 (S. D. 2003)

7    (footnote omitted).

8    This determination was typical of other states, including California:

9          Our decision here is in line with other jurisdictions that have faced the same
     certification issue. Every state, with the exception of Maine and Michigan, that has
10   a repealer statute has granted class certification to indirect purchasers seeking redress
     against Microsoft for antitrust violations. The very same pass-through and overcharge
11   arguments that Microsoft makes here, have been rejected by a large majority of courts
     considering the issue. *In re New Mexico Indirect Purchaser Microsoft Corp. Antitrust
12   Litig.*, No. D-0101-CV-2000-1697 (N.M. Dist. Ct., Santa Fe Co., Sept. 30, 2002); *In
     re Florida Antitrust Litig.*, No. 99-27340 CA 11, 2002 WL 31423620 (Fla. Cir. Ct.,
13   Dade Co., Aug. 26, 2002); *Howe [v. Microsoft Corp.,]* 2003 ND 12, 656 N.W.2d 285
     [(N.D. 2003)]; *Bellinder [v. Microsoft Corp.]*, 2001 WL 1397995, *6 -7 [(Kan. Dist.
14   Ct. Sept. 7, 2001)]; *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct., Dane
     Co., June 28, 2001); *Friedman v. Microsoft Corp.*, CV-2000-000722 (Consol.) (Ariz.
15   Super. Ct., Maricopa Co., Nov. 15, 2000 & July 13, 2001); *Gordon v. Microsoft
     Corp.*, No. 00-5994, 2001 WL 366432 (Minn. Dist. Ct., Mar.30, 2001), *aff'd*, 645
16   N.W.2d 393 (Minn. 2002); *Microsoft I-V Cases*, [NO.JCCP.NO. 4106 (Cal. Super.
     Ct., San Francisco Co., Aug. 29, 2000)].

17   *Id.* at 679.

18        Moreover, in actions filed under California and New Mexico law, and under other

19   states' law, classes were certified for indirect purchasers both of Windows and of Microsoft

20   applications software. *In re Microsoft I-V Cases,* 135 Cal.App.4th 706, 711 (2006); *In re

21   N.M. Indirect Purchasers Microsoft Corp.* 140 N.M. 879, 887, 149 P.3d 976, 984 (N.M. Ct.

22   App. 2006); *Cox v. Microsoft Corp.*, 809 N.Y.S.2d 480, 2005 WL 3288130 (2005); *Comes

23   v. Microsoft Corp.,* 696 N.W.2d 318 (Iowa 2005)

24        As the above quotation notes, two state courts elected not to certify a class in indirect

25   purchaser litigation against Microsoft – Maine and Michigan. In both, the courts held that

26   plaintiffs had made almost no showing of impact. *Melnick v. Microsoft Corp.,* 2001 WL

27   1012261, *7-*15 (Me. Super. 2001); *A & M Supply Co. v. Microsoft Corp.*, 252 Mich.App.

580, 638-39, 654 N.W.2d 572 (Mich. App. 2002).

But the crucial difference between the courts that certified classes in the *Microsoft* cases and the two that did not appears to be the nature of the state antitrust law applied. Courts and commentators have noted that the states in which *Microsoft* classes were certified were those in which the state laws were "sanguine" about indirect purchaser claims; the others are characterized as "skeptical." William H. Page, Class Certification in the Microsoft Indirect Purchaser Litigation, J. Comp. L. & Econ. (6/2005) 303, 310; *A & M Supply Co.,* 252 Mich.App. at 634.

The "sanguine" states are those that adopt the view of the dissent in *Illinois Brick*. Page, J. Comp. L. & Econ. (6/2005) at 305; *A & M Supply Co.,* 252 Mich.App. at 596. The *Illinois Brick* dissent would expressly have granted standing to sue for price-fixing to purchasers of products into which the price-fixed product was incorporated. 431 U.S. at 759-7601. The "sanguine" states would include California and New Mexico, whose courts have identified their *Illinois Brick* repealers as legislative embodiments of the *Illinois Brick* dissent. *Union Carbide Corp. v. Superior Court*, 36 Cal.3d 15, 21 (1984); *Romero v. Philip Morris Incorporated*, 137 N.M. at 231-32. Indeed, at least one federal court has noted that "California is viewed as a 'sanguine' state." *In re New Motor Vehicles Canadian Export Antitrust Litigation,* 235 F.R.D. 127, 135 (D. Me. 2006).

The distinction is important here because "[d]ifferences in state certification decisions reflect, at least to some degree, differences in substantive state law." *In re Relafen Antitrust Litigation,* 221 F.R.D. 260, 280 (D. Mass. 2004). Consequently, the sanguine/skeptical distinction must be considered by a federal court addressing whether the proof of classwide impact is sufficient to allow certification; the *Relafen* court granted certification of indirect purchaser classes under state antitrust laws for those states it found not to be in the "skeptical" camp. *Id.* at 282.

1

**(3)    Proof of Impact in This Case**

2      Proof of impact on indirect purchasers is necessarily a two-step process.  First,

3  plaintiffs must prove that the alleged price-fixing raised prices to direct purchasers.  Second,

4  plaintiffs must show that some or all of the elevated price of DRAM was passed on to them.

5      As a general matter, the courts have established two acceptable paths to establishing

6  classwide impact.  The first, known as the *Bogosian* short-cut, allows the moving plaintiff

7  to rely on general principles of economics to establish that impact was classwide.  *In re

8  Linerboard Antitrust Litigation*, 305 F.3d 145, 151 (3rd Cir. 2002); *In re Bulk (Extruded)

9  Graphite Products Antitrust Litigation*, 2006 WL 891362 at *11.  Both of these cases

10  described the short-cut by quoting the following passage from the Third Circuit's decision

11  in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434:

12      If, in this case, a nationwide conspiracy is proven, the result of which was to increase
        prices to a class of plaintiffs beyond the prices which would obtain in a competitive
13      regime, an individual plaintiff could prove fact of damage simply by proving that the
        free market prices would be lower than the prices paid and that he made some
14      purchases at the higher price. If the price structure in the industry is such that
        nationwide the conspiratorially affected prices at the wholesale level fluctuated within
15      a range which, though different in different regions, was higher in all regions than the
        range which would have existed in all regions under competitive conditions, it would
16      be clear that all members of the class suffered some damage, notwithstanding that
        there would be variations among all dealers as to the extent of their damage . . . .
17      Under these circumstances proof on a common basis would be appropriate.

18   561 F.2d at 455.

19      Moving plaintiffs can also go beyond the "*Bogosian* short-cut" and give specific

20  evidence that impact is class-wide.  *In re Linerboard Antitrust Litigation*, 305 F.3d at 153;

21  *In re Bulk (Extruded) Graphite Products Antitrust Litigation*, 2006 WL 891362 at *12.  A

22  showing based on both methods is known as the "belt and suspenders" rationale.  *Id.*  That

23  is the showing that the Class Representatives present here.

24      Applying first the *Bogosian* shortcut, it is possible to show, without elaborate analysis,

25  that the impact of the price-fixing of DRAM by defendants can be shown on a classwide

26  basis.  The Court noted, in certifying classes in the direct purchaser case, that many cases

27  hold that an illegal price-fixing scheme presumptively impacts upon all purchasers of a

16

1   price-fixed product in a conspiratorially affected market.  *DRAM Class Decision* at *7.

2   Plaintiffs' economic expert further explains, in his declaration, how fundamental economic

3   principles and demonstrable market characteristics can be used to show that an overcharge

4   in the price of DRAM due to price-fixing would necessarily be passed on to all purchasers

5   of products of which DRAM was a part.  Because DRAM is largely a commodity product,

6   basic economic principles predict that the effects of a price-fixing conspiracy would be felt

7   marketwide.  Flamm Report at 27-28.  Moreover, a substantial body of economic research

8   indicates that any elevation in the price of a commodity like DRAM would to some extent

9   necessarily be passed on to all purchasers of product for which DRAM is an input.  Flamm

10  Report 7-9.  The Class Representatives' expert economist concludes: ""The fact of harm

11  would basically be a given, if DRAM prices were shown to have been raised by collusion,

12  although the magnitude of this harm remains an empirical question."  Flamm Report at 24.

13  And, there is a substantial body of economic research that bears this prediction out.  Flamm

14  Report 30-34.  "The existing published economic literature . . . would predict a significant

15  pass through from DRAM prices to computer prices, and should be viewed as supporting a

16  presumption based on widely-accepted economic principles that an increase in the price of

17  DRAM would cause harm to DRAM-using equipment consumers."  Flamm Report 34.

18      The foregoing is sufficient to provide the requisite "*Bogosian* short-cut" proof of

19  impact.  If more is needed, the Class Representatives can also present more specific evidence

20  that impact is class-wide.

21      Again, the Court addressed the first step, impact on the direct purchasers of DRAM,

22  in the decision granting class certification in the direct purchaser action. The Court noted that

23  plaintiffs had presented a seemingly realistic methodology for showing classwide impact to

24  direct purchasers.  *DRAM Class Decision* at *8.  The moving class representatives could

25  easily rely on the same methodology.  However, Class Representatives go beyond this

26  demonstration. Their expert details several different methods that can be used to demonstrate

27  on a class-wide basis that defendants' conspiracy elevated DRAM prices.  Flamm Report at

17

1    32-34.

2    Class representatives also present a specific demonstration that pass-on to the

3    purchasers of products of which DRAM is a part, in particular governmental purchasers, can

4    be demonstrated on a classwide basis.  In the Flamm Report at 36-37, the Class

5    Representatives' expert details three different methods that can be used to demonstrate on

6    a classwide basis that the elevated prices of DRAM were passed on to the purchasers of

7    products of which DRAM is a part, using accepted methodologies and available evidence.

8    Regarding the adequacy of this showing, the moving class representatives adopt

9    verbatim the following part of the discussion of the predominance of the issue of impact

10   under federal law from the *DRAM Class Decision* at *9:

11   It must be remembered, however, that during the class certification stage, the
     court must simply determine whether plaintiffs have made "a sufficient showing that
12   the evidence they intend to present concerning  and that these common issues will
     predominate . . . ."  *See In re Bulk [Extruded* antitrust impact will be made using
13   generalized proof common to the class] *Graphite Prod. Antitrust Litig.,* 2006 WL
     891362 at *14.  The court cannot weigh in on the merits of plaintiffs' substantive
14   arguments, and must avoid engaging in a battle of expert testimony. *See id.; see also
     In re Diamonds Antitrust Litig.,* 167 F.R.D. at 384 ("we need not consider
15   [defendants' expert affidavit] in detail, as it is for the jury to evaluate conflicting
     evidence and determine the weight to give the experts' conclusions").  Plaintiffs need
16   only advance a plausible methodology to demonstrate that antitrust injury can be
     proven on a class-wide basis.
17
18   The moving class representatives have presented a plausible methodology to

19   demonstrate that antitrust injury can be proven on a class-wide basis here.  They can, like the

20   private direct purchaser plaintiffs, demonstrate that the conspiracy elevated the level of

21   DRAM prices marketwide.  They can demonstrate that this elevation of DRAM prices

22   resulted in higher prices paid by purchasers of products of which DRAM was a part.  They

23   can demonstrate that the class members, like the class representatives, bought these products.

     In short, on the question of impact, common issues predominate over individual issues.
24
25   **(4)    Purchases of Products Containing Co-conspirators'
            DRAM**

26   Defendants and their co-conspirators dominated the market for DRAM.  From 1998

27   to 2002, they accounted for roughly 89% to 93% of the DRAM sold to maker of computer

18

equipment.  Flamm Report 38.  As a result, purchasers of products of which DRAM was a part necessarily were impacted by the conspiracy, regardless of whether the product they bought was one of the vast majority of such products that contained DRAM produced by a co-conspirator. Flamm Report 37.  However, it bears noting that class-wide impact can readily be shown even if attention is limited to the class members that bought products containing DRAM manufactured by co-conspirators.

As a threshold matter, plaintiffs need only show that common proof can demonstrate class-wide impact to "a fair degree of certainty," not that each individual class member was impacted:

> The plaintiffs have shown that there is common evidence to prove impact with a fair degree of certainty as to the proposed class members.  They are not required to prove at present that every class member was actually impacted.

*In re Terazosin Hydrochloride Antitrust Litigation,* 203 F.R.D. 551, 558 (S.D. Fla. 2001) (footnote omitted), vacated on other grounds in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir. 2003); see also, *In re Auction Houses Antitrust Litigation,* 193 F.R.D. 162, 167 (S.D.N.Y. 2000).

Thus, it is no barrier to class certification that some class members might ultimately be found not to have suffered injury.  "Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class."  *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996); accord, *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 252 (D. Del. 2002).  California and New Mexico law agree:

> The fact that certain members of the class may not have been injured at all does not defeat class certification. (*In re Sugar Industry Antitrust Litigation*, *supra*, 73 F.R.D. 322, 347; *Presidio Golf Club v. National Linen Supply Corp.*, 1976-2 Trade Cases ¶ 61,221 [(N.D. Cal. 1976)], at p. 70,630.)

*Rosack v. Volvo of America Corp.,* 131 Cal.App.3d 741, 754 (1982); accord, *Romero v. Philip Morris Incorporated*, 137 N.M. 229, 252, 109 P.3d 768 (N.M. Ct. App. 2005) (class

1   certified where plaintiffs offered to prove a "very high percentage" of class members

2   injured).

3          Even if the Court were to hold that purchase of a product containing DRAM

4   manufactured by a conspirator was a prerequisite to recovery in this case, criteria can readily

5   be established to insure that only class members who can demonstrate a high degree of

6   certainty that they bought such a product are allowed to make a claim. Some class members

7   will have physical evidence in the form of a piece of equipment bought in the damages

8   period containing a DRAM chip made by a conspirator. For all other class members, criteria

9   can easily be set to establish that a given class member bought a product containing DRAM

10  made by a conspirator, to whatever level of certainty might be required.

11         Given the very high percentage of all DRAM manufactured by the conspirators, any

12  class member that purchased a piece of equipment containing DRAM had a very substantial

13  probability of purchasing equipment containing a conspirator's DRAM. Flamm Report 38-

14  39.    Not surprisingly, this probability increases steadily as the number of pieces of

15  equipment purchased increases. Flamm Report 39-40. For example, a purchaser that bought

16  three pieces of equipment in the time period would have a 99% chance of having bought

17  DRAM made by a conspirator.   Flamm Report 40. This analysis can easily be adjusted to

18  take into account whatever percentage of the market the conspirators are found to have

19  represented, and whatever probability of having been impacted the Court might require.

20  *Id.*

21         Consequently, even if attention is limited to those class members that bought

22  equipment containing a conspirator's DRAM, there is no impediment to proving impact on

23  a classwide basis.

24                          **c.      Damages**

25         The moving class representatives adopt verbatim the following part of the discussion

26  of the predominance of the issue of damages from the *DRAM Class Decision* at *10:

27                 Courts have held that, at the certification stage of an antitrust class action,

20

plaintiffs have "a limited burden with respect to showing that individual damages issues" do not predominate. *See In re Rubber Chem. Antitrust Litig.*, 232 F.R.D. at 354; *In re Potash Antitrust Litig.*, 159 F.R.D. [682,] 697 [(D. Minn. 1995)]. Plaintiffs need not supply a "precise damage formula," but must simply offer a proposed method for determining damages that is not "so insubstantial as to amount to no method at all." *See id.*

. . .

Furthermore, . . . even if some individual issues may arise in calculating damages, this fact alone does not defeat class certification. *See In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 at *15.

Plaintiffs are not required to show antitrust damages with iron-clad precision. Therefore, at the class certification stage, they are not required to demonstrate their ability to prove individual class members' damages with great specificity:

"[T]he difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the predominating, common issues." *In re Catfish* [*Antitrust Litigation*], 826 F.Supp. [1019,] 1042 [(M.D. Miss. 1993)]. As one commentator noted, "[i]t is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." See 4 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 18.27, at 4S-16 (3d ed. Supp.1998).

*In re Flat Glass Antitrust Litigation*, 191 F.R.D. at 487; accord, *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL at *15; *In re Linerboard Antitrust Litigation*, 203 F.R.D. at 220. California law and New Mexico law are the same. *Rosack v. Volvo of America Corp.*, 131 Cal.App.3d at 754; *Romero v. Philip Morris Incorporated*, 137 N.M. at 255-56.

As with the question of impact, the *Microsoft* indirect purchaser cases illustrate that classwide proof of damages is possible for an indirect purchaser class action in which the price-fixed product was part of a different product, such as a computer. Again, most of the courts addressing the *Microsoft* cases found that all of the criteria for class certification, including common proof of damages, had been satisfied. See citations *supra* at page 14.

Consequently, defendants cannot seriously contend that the need to prove the class members' damages should preclude class certification here:

With respect to the amount of damage, the Court of Appeals has stated that "[b]ecause

21

1    separate proceedings can, if necessary, be held on individualized issues such as
     damages or reliance, such individual questions do not ordinarily preclude the use of
2    the class action device." *In re GMC*, 55 F.3d [768,] 817 [(3rd Cir. 1995)] (citing
     *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3rd Cir. 1985)); accord *In re Fine Paper*, 82
3    F.R.D. [143,] 154 [(E.D. Pa. 1979)] ("it has been commonly recognized that the
     necessity for calculation of damages on an individual basis should not preclude class
4    determination when the common issues which determine liability predominate.");
     *Bogosian*, 561 F.2d at 456. Accordingly, defendants' arguments aside, the need to
5    determine the amount of damage sustained by each plaintiff is an insufficient basis
     for which to decline class certification.

6
*In re Flat Glass Antitrust Litigation*, 191 F.R.D. at 487; accord, *In re Bulk [Extruded]*
7
*Graphite Prod. Antitrust Litig.,* 2006 WL at *15; *In re Linerboard Antitrust Litigation*, 203
8
F.R.D. at 220.
9
     Nevertheless, plaintiffs' expert has illustrated some of the ways that damages can be
10
proved on a classwide basis.  Flamm Report 41-45.
11
     For these reasons, the court should find that individual issues do not predominate with
12
respect to plaintiffs' proof of the damages element of their antitrust conspiracy claim.
13
             **2.    Superiority**
14
     The moving class representatives adopt verbatim the following part of the discussion
15
of superiority from the *DRAM Class Decision* at *10-*11:
16
             FRCP 23(b)(3) permits class certification where "a class action is superior to
17    other available methods for the fair and efficient adjudication of the controversy."
     Traditionally, there have been four factors that the court looks at in evaluating the
18    superiority requirement: the individual interests of members of the class; the extent
     and nature of any litigation concerning the controversy already commenced by or
19    against members of the class; the desirability of concentrating the litigation of the
     claims in the particular forum; and the difficulties likely to be encountered in the
20    management of a class action.  *See* FRCP 23(b).

21           Each of these elements is satisfied here.  As plaintiffs point out, and as already
     discussed, common questions of law and fact unite all plaintiffs with respect to the
22    nature, scope, and impact of the alleged price-fixing conspiracy in question.  As such,
     it would be unnecessarily duplicative, and judicially inefficient, for the court to
23    mandate individual trials as to each class member.  Second, the instant actions have
     already been consolidated for MDL purposes before this court, and the consolidated
24    actions have been proceeding along in smooth fashion for several years.  Indeed,
     given the purpose and function of MDL proceedings, which is to streamline the
25    prosecution of cases involving multiple actions and parties, it is inconceivable that
     allowing a class action to proceed in such circumstances would *not* promote
26    manageability.  Third, and for these same reasons, concentrating the litigation of all
     claims in the instant forum – which has already heard all pretrial proceedings thus
27    far – would further promote manageability and efficiency.  Finally, few difficulties

                                          22

are likely to result from a decision to certify the instant class. Indeed, the only difficulties likely to be encountered in this case would result from not certifying the class, given the incredible expenditure of time and resources that would result – from both the court's and the parties' perspectives – in requiring each class member's action to proceed independently. (Footnote omitted.)

All of these considerations apply with full force here. Class actions in which the California and New Mexico public entities are represented by their Attorneys General are inherently more efficient and manageable than the thousands of individual actions that would be necessary if these public entity claims were to be brought outside the class action context.

Of course, in many small claimant class actions, the alternative of individual actions is merely an abstraction; everyone knows that consumers will not file individual actions for a few dollars in recovery. In this case, in contrast, the burden that individual actions would represent is not a mere theoretical possibility.

For one thing, a lot of the individual claims would merit individual lawsuits. Many local entities have claims of sufficient size to merit an individual action. Some of the local entities – the City and County of San Francisco, the County of Santa Clara, and the Los Angeles Unified School District in California, and the County of Sandoval in New Mexico – are already plaintiffs in this action, prepared to serve as class representatives for the other entities. There are many other entities of comparable size in these two states that might well decide to file individual suits if the classes are not certified.

Moreover, the California and New Mexico Attorneys General are empowered to file individual actions on behalf of California governmental entities that have claims against defendants. The applicable statutes allow the Attorneys General of these two states to file antitrust actions directly on behalf of subordinate public entities. Cal. Bus. & Prof. Code § 16750(c); N. M. Stat. Ann. § 57-1-3.B.

If the Court were to determine that a class action on behalf of California or New Mexico public entities could not be maintained, these Attorney Generals will file consolidated individual actions on behalf of any and all public entities in that state with significant damage claims. The California Attorney General has found it necessary to take

23

this course more than once when a class could not be certified. Thus, in this case individual actions are not just an abstract possibility. But they certainly would be far less efficient than a class action, and therefore an inferior method of proceeding.

Defendants cannot seriously contend that individual actions are a superior means of resolving this litigation. The superiority requirement is easily met in this case.

**D.    The Classes Should Also Be Certified Because Class Representatives and Class Members Are, to a Substantial Extent, Direct Purchasers**

It is also important to recognize that the State of California and its public entities are in fact, for a significant part of their DRAM purchases, direct purchasers. As a preliminary matter, many bought at least some memory modules directly from Micron, a defendant.

Moreover, by operation of law, any vendor submitting a winning bid to a California public entity agrees to assign to that public entity any Sherman Act or Cartwright Act claim it has arising from its purchases of goods of the goods sold pursuant to the bid. Specifically, California Government Code § 4552 provides:

> In submitting a bid to a public purchasing body, the bidder offers and agrees that if the bid is accepted, it will assign to the purchasing body all rights, title, and interest in and to all causes of action it may have under Section 4 of the Clayton Act (15 U.S.C. Sec. 15) or under the Cartwright Act (Chapter 2 (commencing with Section 16700) of Part 2 of Division 7 of the Business and Professions Code), arising from purchases of goods, materials, or services by the bidder for sale to the purchasing body pursuant to the bid. Such assignment shall be made and become effective at the time the purchasing body tenders final payment to the bidder.

California and its local entities bought substantial quantities of DRAM-containing products from vendors that bought DRAM directly from defendants, such as OEM computer makers. With respect to such purchases, California and its public entities stand in exactly the same position as the plaintiffs and class members stood in the private direct action, in which this Court found that class certification was appropriate. For exactly the same reasons, the California class action must be certified.

## VI.    CONCLUSION

The Class Representatives have met their burden of establishing all required elements for class certification, their motion for class certification should be granted.

24

1   Furthermore, given the unquestionable suitability and competence of the Class

2   Representatives' counsel, the court should further grant the request to appoint the California

3   Attorney General's Office, and in particular Emilio Varanini, and Spiegel Liao & Kagay, and

4   in particular Michael Spiegel, Charles Kagay, and Wayne Liao, as class counsel for the

5   California class; and the New Mexico Attorney General's Office, and in particular Deyonna

6   Young, as class counsel for the New Mexico class.

7   Dated:  November 21, 2007

8

9   EDMUND G. BROWN JR.                    GARY K. KING
    Attorney General of the State of         Attorney General of the State of New
    California                               Mexico
10  KATHLEEN E. FOOTE
    Senior Assistant Attorney General        /s/ Deyonna Young
11                                           DEYONNA YOUNG
    /s/ Emilio Varanini                      Assistant Attorney General
12  EMILIO E. VARANINI                       Attorneys for the State of New Mexico
    Deputy Attorney General
13  Attorneys for Plaintiff States           I, Emilio Varanini, attest that concurrence
                                             in the filing of the document has been
14  SPIEGEL LIAO & KAGAY, LLP                obtained from each of the other
                                             signatories.
15  /s/ Charles M. Kagay
    Charles M. Kagay                         /s/ Emilio Varanini
16  Attorneys for the State of California    Emilio Varanini

17

18

19

20

21

22

23

24

25

26

27

25