UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STATE OF CALIFORNIA, et al.,

    Plaintiffs,

    v.

INFINEON TECHNOLOGIES AG, et al.,

    Defendants.
_____/

No. C 06-4333 PJH

**ORDER DENYING MOTION TO VOID JUDGMENT SHARING AGREEMENT**

Plaintiff States' motion to void certain defendants' judgment sharing agreement came on for hearing before this court on November 14, 2007. Plaintiff States, various individual States and their government entities acting through their Attorneys General (collectively "plaintiff States"), appeared through their respective counsel, Kathleen E. Foote, Emilio E. Varanini, and Charles M. Kagay. Defendants, the Infineon Technologies entities, Micron Technology, the Hynix Semiconductor entities, the NEC entities, and the Elpida Memory entities (collectively "defendants") appeared through their counsel, Joel S. Sanders, Harrison J. Frahn, Julian Brew, Robert B. Pringle, and Michael F. Tubach. Having read all the papers submitted, including the judgment sharing agreement, provided to the court at the hearing for its *in camera* review,[1] and carefully considered the relevant legal authority, the court hereby DENIES plaintiff States' motion to void the judgment sharing agreement, for the reasons stated at the hearing, and as follows.

## BACKGROUND

On July 14, 2006, plaintiff States filed the underlying action against numerous defendants engaged in the manufacture and sale of dynamic random access memory

---

[1] The copy of the judgment sharing agreement reviewed *in camera* will be filed under seal by separate order filed concurrently herewith, for purposes of appellate review.

("DRAM"), including the above-named defendants. As set forth in the current iteration of the plaintiff States' complaint, plaintiff States generally allege that all defendants participated in an unlawful horizontal price-fixing conspiracy in the U.S. market for DRAM. See generally Third Amended Complaint ("TAC"). This action is related to a separate antitrust MDL action, pending on this court's docket since 2002, alleging a similar price-fixing conspiracy against similar or the same defendants.

As a result of the ongoing litigation before the court, the above-named defendants entered into a judgment sharing agreement ("JSA") with each other. The JSA creates a contractual right of contribution among the signatory defendants, and allocates among these defendants the responsibility for the damages portion of any judgment, based on specified percentages related to their market shares (i.e., "Sharing Percentage"). See Declaration of Joel S. Sanders ISO Opposition to Mot. to Void JSA ("Sanders Decl."), ¶¶ 2, 5.

The JSA also governs settlements between the signatory defendants and plaintiff States.[2] It expressly allows signatory defendants to settle with the plaintiff States on any terms, at any time. In order for a signatory defendant's individual settlement to extinguish all continuing obligations under the JSA, however, a settling signatory defendant must first (a) negotiate and obtain a proportionally equal settlement offer (i.e., an offer consistent with the defendants' negotiated Sharing Percentages) for all other signatory defendants; and (b) after one or more of the other signatory defendants have declined this settlement offer, obtain an agreement from plaintiff States to exclude the settling signatory defendant's Sharing Percentage from any judgment that plaintiff States seek to enforce against the other signatory defendants. See Sanders Decl., ¶ 6; see also Declaration of Nicole Gordon ISO Mot. to Void JSA ("Gordon Decl."), ¶ 4.

---

[2] In point of fact, the JSA contemplates settlements with other plaintiff groups, in addition to the plaintiff States, as a result of claims brought in other, related actions. However, since the instant motion is brought by the plaintiff States alone, the court refers to the JSA's provisions with respect to these plaintiffs, specifically.

2

These settlement provisions are the subject of the instant motion. Plaintiff States seek to void the JSA, on grounds that the above provisions violate public policy.

**DISCUSSION**

The plaintiff States' overriding argument is that the JSA impermissibly discourages settlement by restraining a signatory defendant's ability to settle individually with plaintiff States. They assert that, by doing so, the JSA contravenes public policy, and should be voided.

Preliminarily, neither the court nor the parties before it have been able to discern the existence of any controlling legal authority suggesting that JSAs are generally impermissible, or that they inherently violate public policy. Thus, the issue before the court is simply whether the provisions contained in *defendants*' JSA contravene public policy, or otherwise warrant voidance of the agreement as a whole. While there is a paucity of legal authority directly on point, controlling or otherwise, review of the submitted case law most analogous to the present situation compels the court to answer this question in the negative.[3]

In Cimarron Pipeline Constr., Inc. v. Nat'l Council on Compensation Ins., 1992 WL 350612 (W.D. Okla. 1002), the court considered plaintiffs' challenge to a judgment sharing agreement that, as with defendants' JSA, allocated liability shares among signatory defendants, and furthermore required that settlements between plaintiffs and individual signatory defendants meet specific requirements. See id. at **1-2. The district court denied plaintiffs' motion to invalidate the agreement, noting that the Supreme Court has specifically recognized that although a legal *right* to contribution has not been created by Congress, "contribution among antitrust defendants may further certain favorable policy goals." Id. at *2. To that end, the district court concluded that absent "a clear and specific prohibition against the right of contribution," the defendants' agreement requiring

---

[3] To the extent that plaintiff States contend that Ninth Circuit precedent in securities actions should provide persuasive guidance here, the court rejects this argument, finding such cases inapposite, in view of those cases' reliance on statutory contribution rights.

3

contribution would "not be invalidated." See id. at *2.  The court furthermore noted that plaintiff had failed to present evidence "that the [d]efendants' sharing agreement has had a negative impact upon settlement negotiations." Id. at *3.

Another district court reached the same conclusion in In re Brand Name Prescription Drugs Antitrust Litig.. See 1995 WL 221853, *1 (N.D. Ill. 1995).  Relying on several antitrust treatises and sources, the district court concluded that, in the antitrust context, sharing agreements do not necessarily pose a barrier to individual settlements, but rather provide a means of discouraging coerced settlements and serve to ameliorate the "harsh results" of joint and several liability in antitrust cases.  Significantly, the court there noted that judgment sharing agreements among antitrust defendants "commonly provide" – as is the case here – that "if any signatory defendant settles, it must require the plaintiff to reduce any ultimate judgment against the other signatories by the settling defendant's percentage share of liability under the agreement.  Alternatively, the settling defendant remains contractually liable to the other signatories for its share of the judgment." See id. at *3.  The terms of the judgment sharing agreement at issue was also remarkably similar to the JSA now before the court.  It provided that any defendant could settle at any time; however, any settling defendant would remain liable for the payment of any judgment obtained against any of the other defendants based upon the settling defendants' product sales, unless the settling defendant procured a settlement agreement with plaintiff that expressly provided that the settling defendants' settlement would be excluded from any ultimate judgment secured against the non-settling defendants. Id. at *1.

In opposition to these cases, plaintiffs submit In re San Juan Dupont Plaza Hotel Fire Litig., 1989 WL 996278 (D. Puerto Rico 1989).  In re San Juan Dupont did not involve a judgment sharing agreement in the antitrust context.  Nonetheless, the court granted plaintiffs' motion to void a judgment sharing agreement that similarly sought to allocate liability among joint tortfeasor defendants.  The agreement before the In re San Juan Dupont court established a formula by which defendant signatories would pay for eventual

4

judgments, dispensed with any contribution claims that the signatories may have had among themselves, and provided that the *only* method by which the participants could settle their claims was through the judgment sharing agreement's outlined methods. See id. at *2. In granting the plaintiffs' motion to void the agreement, the district court found that there was a "conscious effort by the signatories to impede the ongoing settlement process" in the case. Id. at *1. The court found the provision restricting outside settlements particularly objectionable, as it denoted that the real purpose behind the agreement was "to prevent resolution of plaintiffs' claims using the armor of a defense cooperation" agreement. Id. at *2. Even if this provision were modified to allow for individual settlements, however, the agreement could still not be saved, in view of the court's concerns regarding "the improper underlying motive and potential ill effects of the entire document." Id. at *3. As proof of improper motive, the court pointed to separate provisions in the agreement obligating all signatories to decline all admissions of liability and aid to the plaintiffs, and prohibiting signatories from providing witnesses, assistance, or other support to plaintiffs. Id.

In sum, even those cases that recognize the court's role in evaluating and monitoring the use of judgment sharing agreements have upheld the general permissibility of such agreements, holding such agreements improper only where: (1) they contain provisions that impose absolute prohibitions on a signatory defendant's right to settle with plaintiffs individually; and/or (2) they contain provisions demonstrating an improper motive to prevent resolution of litigated claims; and/or (3) the evidence otherwise demonstrates that defendants' judgment sharing agreement has had an adverse impact upon settlement negotiations.

Here, plaintiffs have failed to demonstrate that any of these criteria have been satisfied. First, defendants' JSA does not prohibit individual settlements by signatory defendants. To the contrary, it expressly allows for them. The agreement simply provides that, in order for an individually settling defendant to extinguish all contribution obligations

under the agreement, an attempt must first be made to secure a joint settlement agreement for all signatory defendants, and barring that, the settling defendant must include terms in its individual settlement that reduce the non-settling defendants' judgment by the settling defendant's Sharing Percentage.  In this respect, the latter element is similar to the defense sharing agreements previously upheld by both the Cimarron and In re Brand Name courts, and the former element – requiring an attempt to secure a joint settlement agreement with all signatory defendants – promotes, rather than discourages, settlement.  Second, defendants' JSA contains no provisions that evidence an improper motive to prevent resolution of plaintiff States' claims – e.g., by preventing admissions of liability or cooperation with plaintiffs – as was the case in In re San Juan Dupont.  Finally, plaintiff States have failed to introduce any evidence that defendants' JSA has had an adverse impact on settlement negotiations thus far.  There is no evidence demonstrating that signatory defendants have either refused, or been unwilling to discuss or negotiate settlement with plaintiff States because of their obligations pursuant to the JSA.  Nor is there any reason to believe at this juncture, when viewed in the factual context of the underlying litigation as a whole – i.e., two settlements have already been negotiated with other defendants, and two other entity defendants are not signatories to the JSA – that such will be the case in future.

      Moreover, while plaintiff States are certainly correct that defendants' JSA, by creating a contractual right of contribution amongst the signatory defendants, lessens the sting of joint and several liability, the court in no way finds this to be evidence of an improper motive.  Defendants' agreement does nothing to limit defendants' exposure to joint and several liability in litigation before the court, or to otherwise prevent plaintiff States from seeking a judgment against one or all signatory defendants (or non-signatory defendants, for that matter), in accordance with the principles of joint and several liability.  Indeed, in view of the acknowledged realities of joint and several liability in antitrust cases, defendants' judgment sharing agreement may be viewed as rational and efficient behavior.

In short, absent some established law making the provisions of defendants' JSA illegal, or proof that settlement has in fact been deterred, the court can discern no basis for invalidating defendants' agreement.[4]

## CONCLUSION

For all the foregoing reasons, plaintiff States' motion is DENIED. For the reasons stated at the hearing, the court also STRIKES plaintiff States' addendum filed in support of their motion, for noncompliance with the local rules. Both parties' evidentiary objections are OVERRULED.

**IT IS SO ORDERED.**

Dated: November 29, 2007

PHYLLIS J. HAMILTON
United States District Judge

---

[4] To the extent that the plaintiff States have also argued that the JSA violates public policy by arbitrarily allocating civil penalties, the court rejects this argument, for the reasons stated at the hearing. Defendants' alternative objections to plaintiff States' motion, based on standing and ripeness grounds, are also OVERRULED.