1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   KATHLEEN E. FOOTE – Cal. Bar No. 65819
    Senior Assistant Attorney General
3   NICOLE S. GORDON – Cal. Bar No. 224138
    Deputy Attorney General
4   SANGEETHA M. RAGHUNATHAN – Cal. Bar No. 229129
    Deputy Attorney General
5   EMILIO E. VARANINI – Cal. Bar No. 163952
    Deputy Attorney General
6     455 Golden Gate Avenue
      San Francisco, California   94102
7     Telephone: (415) 703-5555
      Fax: (415) 703-5480
8     E-Mail: emilio.varanini@doj.ca.gov

9   Attorneys for Plaintiffs

10  Michael I. Spiegel – Cal. Bar No. 32651
    Wayne M. Liao – Cal. Bar No. 66591
11  Charles M. Kagay – Cal. Bar No. 73377
    SPIEGEL LIAO & KAGAY, LLP
12    388 Market Street, Suite 900
      San Francisco, California  94111
13    Telephone:  (415) 956-5959
      Fax: (415) 362-1431
14    E-Mail: cmk@slksf.com

15  Attorneys for the State of California

16  GARY K. KING
    Attorney General of the State of New Mexico
17  DEYONNA YOUNG - NM Bar No. 2980
    Assistant Attorney General
18    111 Lomas Blvd NW, Suite 300
      Albuquerque, NM 87102
19    Telephone: (505) 222-9089
      Fax: (505) 222-9086
20    E-Mail: DYoung@nmag.gov

21              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF CALIFORNIA
22

23  THE STATE OF CALIFORNIA et al.,          Case No. C 06-4333 PJH
                                             Related to MDL. No. 1486
24                          Plaintiffs,
                                             Reply in Support of Motion for the
25  v.                                       Certification of California and New Mexico
                                             Governmental Entity Classes
26  INFINEON TECHNOLOGIES AG et al.,
                                             Date: April 9, 2008
27                          Defendants.      Time: 9:00 A.M.
                                             Courtroom: 3
28

**Table of Contents**

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   THE GOVERNMENTAL ENTITY CLASSES SHOULD BE CERTIFIED. . . . . . . . . . 1

      A.    Federal Rule of Civil Procedure 23(a) Requirements. . . . . . . . . . . . . . . . . . . . 1

            1.    Numerosity and Commonality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            2.    Typicality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

            3.    Adequacy of Representation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Federal Rule of Civil Procedure 23(b) Requirements. . . . . . . . . . . . . . . . . . . . 4

            1.    Predominance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                  a.    Antitrust Violation and Proof of the Amount of Damages. . . . . . . 4

                  b.    Impact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

                        (1)    Proof of Impact in an Indirect-Purchaser Case. . . . . . . . . 4

                        (2)    Proof of Impact in This Case. . . . . . . . . . . . . . . . . . . . . . 7

                              (a)    The Suggestion of Zero Pass-On Sales Does
                                     Not Defeat Class Certification. . . . . . . . . . . . . . . . 7

                              (b)    The Supposed Diversity of Products and
                                     Purchasers Does Not Defeat Class
                                     Certification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            2.    Superiority. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    This Class Action Is Manageable. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    The Classes Should Also Be Certified Because Class Representatives and
            Class Members Are, to a Substantial Extent, Direct Purchasers. . . . . . . . . . . . 13

      E.    Standing Issues Do Not Defeat the Satisfaction of the Predominance
            Criterion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**Table of Authorities**

**Cases**

*A & M Supply Co. v. Microsoft Corp.*, 654 N.W.2d 572 (Mich Ct. App. 2002). . . . . . . . . . . . . 5, 6

*Ashley v. Archer Daniels Midland Co.*, 1998 WL 35167783 (Ala. Cir. Ct. 1998). . . . . . . . . . . . . 6

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983). . . . 13

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Borden, Inc. v. Universal Indus. Corp.*, 88 F.R.D. 708 (N.D. Miss. 1981). . . . . . . . . . . . . . . . . . 5

*Bruno v. Superior Court*, 127 Cal.App.3d 120 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*City of St. Paul v. FMC Corp.*, 1990-2 Trade Cas. (CCH) ¶ 69,283, 1990 WL 259683 (D. Minn. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Derzon v. Appleton Papers*, 1998 WL 1031504 (Wis. Cir. Ct. 1998). . . . . . . . . . . . . . . . . . . . . . 6

*Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Execu-Tech Business Sys., Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19 (Fla. Ct. App. 1999)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fischenich v. Abbott Labs.*, No. MC-94-6868 (Minn. Dist. Ct., Hennepin Co., May 26, 1995)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fish v. Microsoft Corp.*, Case No. 00-031126-NZ (Mich. Cir. Ct., Wayne Co., Apr. 8, 2004)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Godden v. Marigold Foods, Inc.*, No. C8-97-932 (Minn. Dist. Ct., Ramsey Co., Mar. 20, 2000)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Harbin v. Johnson & Johnson Vision Prods.*, No. CV 94-2872 (Ala. Cir. Ct., Mobile Co., Sept. 12, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Ampicillin Antitrust Litigation*, 55 F.R.D. 269 (D.C. Cir. 1972). . . . . . . . . . . . . . . . . . . . . 3

*In re Arizona Dairy Products Litigation*, 1975 WL 908 1 (D. Ariz. 1975). . . . . . . . . . . . . . . . . . 3

*In re Brand Name Prescription Drugs Antitrust Litig. (Price v. American Home Prods.)*, 1994 WL 663590 (N.D. Ill. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Bulk [Extruded] Graphite Prod. Antitrust Litig.*, 2006 WL 891362 (D.N.J. 2006). . . . . . . . 1

*In re Cardizem CD Antitrust Litig.*, 90 F.Supp.2d 819 (E.D. Mich.1999). . . . . . . . . . . . . . . . . 14

*In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297 (E.D. Mich. 2001). . . . . . . . . . . . . . . 11

*In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 326 (E.D. Mich. 2001). . . . . . . . . . . . . . . 14

ii

*In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333 F.Supp. 267 (S.D.N.Y. 1971)............................................................. 3

*In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 1992 WL 220753 (C.D. Cal. 1992).................................................... 3

*In re Dynamic Random Access Memory (Dram) Antitrust Litigation*, 516 F.Supp.2d 1072 (N.D.Cal. 2007)............................................................... 5

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 2006 WL 1530166 (N.D. Cal. 2006)............................................................. 14

*In re Fine Paper Antitrust Litigation*, 82 F.R.D. 143 (E.D. Pa. 1979)...................... 3

*In re Methionine Antitrust Litigation*, 2003 WL 22048232 (N.D. Cal. 2003)................. 5

*In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................................... 8

*In re Plywood Antitrust Litigation*, 1977 WL 1549 (E.D. La. 1977)........................ 3

*In re Potash Antitrust Litig.*, 159 F.R.D. 682 (D. Minn. 1995)........................... 11

*In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672 (S.D. Fla 2004)......... 3

*In re Terazosin Hydrochloride Antitrust Litigation,* 203 F.R.D. 551 (S.D. Fla. 2001)......... 8

*In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231 (D. Del. 2002)................ 8

*Keating v. Philip Morris, Inc.*, 417 N.W.2d 132 (Minn. Ct. App. 1987)................... 6

*Kerr v. Abbott Labs.*, 1997 WL 314419, 1997-1 Trade Cas. (CCH) ¶ 71,776 (Minn. Ct. App. 1987)................................................................... 6

*Ludke v. Philip Morris Companies, Inc.*, 2001 WL 1673791 (Minn. Dist. Ct. 2001).......... 6

*Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D. Minn. 1968)................... 3

*Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983)..................... 8

*Ren v. Philip Morris, Inc.*, 2002 WL 1839983, 2002-2 Trade Cases (CCH) ¶ 73,743 (Mich. Cir. Ct. 2002)............................................................. 6

*Rivers v. Califano*, 86 F.R.D. 41 (S.D.N.Y. 1980)à86 F.R.D. 41........................... 4

*Romero v. Philip Morris Incorporated*, 137 N.M. 229, 109 P.3d 768 (N.M. Ct. App. 2005) ........................................................................... 6

*Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605 (D.S.D. 2004).................... 14

*State of Alabama v. Chevron U.S.A.*, 1980 WL 1808 (M.D. Ala. 1980).................... 3

*State of California v. Levi Strauss & Co.*, 41 Cal.3d 460 (1986)........................... 6

*State of Illinois v. Associated Milk Producers, Inc.*, 351 F.Supp. 436 (N.D. Ill. 1972)

iii

1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

2  *State of Illinois v. Harper & Row Publishers*, 301 F.Supp. 484 (N.D. Ill. 1969). . . . . . . . . . . . . 3

3  *State of Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391 (S.D. Iowa 1968). . . . . . . . . 3

4  *State of New York v. Salem Sanitary Carting Corp.*, 1989 WL 86997 (E.D.N.Y. 1989). . . . . . . 3

5  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . 12

6  *Wilcox v. Archer-Daniels-Midland Co.*, No. 96- 17 82473-CP (Mich. Cir. Ct., Ingham Co.,
       Sept. 29, 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7

8  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969). . . . . . . . . . . . . . . . . . . . 10

   *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180 (9th Cir. 2001). . . . . . . . . . . . . . . . . 12

9

10  **Statutes**

11  California Business and Professions Code § 16750(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

12  California Business and Professions Code § 16750(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13  California Business and Professions Code § 17203. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

14  California Government Code § 4552. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15  New Mexico Statutes Annotated § 57-1-3.A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16  New Mexico Statutes Annotated § 57-1-3.B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17  New Mexico Statutes Annotated § 57-12-10(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18

19  **Rules**

20  Federal Rule of Civil Procedure 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13

21

22

23

24

25

26

27

28

## I.     INTRODUCTION

Defendants concede that most of the Rule 23 criteria for class certification have been satisfied.  They point almost exclusivity to the size and complexity of the action as a ground for denying class certification.  In point of fact, the claims of the Class Representatives and of the class members are so similar that class certification will make little effect on the scope of this action. Common issues predominate, and the case will be manageable after the classes are certified.

Defendants rely prominently on the declaration of their expert, who professes to disagree with just about everything the Class Representatives' expert says.  Decl. of Margaret E. Guerin-Calvert.  Class certification is not supposed to be determined by a battle of experts. *In re Bulk [Extruded] Graphite Prod. Antitrust Litig.,* 2006 WL 891362, *14 (D.N.J. 2006). But, if this battle is necessary, plaintiffs' expert economist, whose credentials and experience in this industry are far broader and deeper, has carefully refuted every point raised.  Expert Reply Report of Dr. Kenneth Flamm (Flamm Reply).  He has shown, for example, that a solid body of published economic literature establishes that DRAM prices are passed through to equipment manufacturers and that the fact and amount of this pass-through can be reliably estimated on a classwide basis using standard and manageable economic tools, notwithstanding the diversity of equipment containing DRAM.  He has presented a real world example showing how the analysis can be performed.  And he has gone beyond defendants' rhetoric about the supposed diversity of the class members, by examining the purchase data and showing that the full range of Class Representatives and class members, large and small, do indeed buy the same equipment through the same channels at the same prices.

## II.     THE GOVERNMENTAL ENTITY CLASSES SHOULD BE CERTIFIED

All of the FRCP 23 criteria for class certification are satisfied here.

### A.     Federal Rule of Civil Procedure 23(a) Requirements

#### 1.     Numerosity and Commonality

Defendants do not dispute that the numerosity and commonality requirements are satisfied.

#### 2.     Typicality

Defendants dispute typicality by misidentifying the Class Representatives and their purchasing methods.  They ignore Class Representatives California and New Mexico, each

1

composed of a wide spectrum of agencies that purchase in the same ways as the class members.

Defendants' false premise is that the Class Representatives are large monolithic organizations that buy DRAM-containing products in one way, while the class members are a motley collection of smaller purchasers that buy in an endless variety of different ways.  Opposition at 4.  They base this assertion on a pair of tables purporting to show the range of sizes of governmental entities, and on larger lists of entities and agencies.  Guerin-Calvert Report at 7-8 ¶ 14, Appendices 38-65.

The tables and lists mix, without differentiation, Class Representatives and represented class members, both covering the same full range of sizes.  For example, the listed California state agencies include Highway Patrol Districts with 10 to 16 offices, Superior Courts ranging in size from 5 to 433 judges, and the Department of Transportation with a budget of $14 billion – all of which will be present in this action regardless of whether the class is certified.  *Id.* at 7.

From their expert's spurious comparisons, defendants make arguments like the following:

> The range for the size of public colleges and universities is . . . dramatic, from 700 students at Lassen College to more than 38,000 at UCLA. . . .  Lassen College and UCLA would purchase different volumes of products containing DRAM, and thus may receive different pricing and other terms.

Opp. at 15.  However, Lassen College, a member of the California Community College System, is an agency of Class Representative the State of California and likely purchases the same volumes as the smaller class member school districts.  UCLA, with 38,000 students, is a part of class member University of California, but its purchases are unlikely to be much different from those of the California State University at Long Beach, a California state agency with about 35,000 students. http://www.calstate.edu/PA/info/enroll.shtml.  In other words, defendants have demonstrated only that the Class Representatives cover the same size spectrum as the absent class members.

Equally fallacious is defendants' premise that "[t]he large size of [the Class Representatives] affords them procurement options that are not available to small government entities."  Opp. at 3. In fact, all governmental agencies and entities, the smallest to the largest, buy products in the same way – probably far more so than comparable private entities.  Above a threshold amount, they must purchase by competitive bid or off a competitively-bid contract; otherwise, they have the further option of buying by single-source contract or at retail. Smith Decl. at ¶¶ 6-8; Vinyard Decl. at ¶¶ 5-6.

2

All governmental entities, Class Representatives and class members alike, large and small, had access to the same set of purchasing options.  They could purchase directly, or they could and often did purchase off contracts let by the States or other local entities.  Smith Decl. at ¶¶ 9-10; Vinyard Decl. at ¶¶ 7-8.  Defendants make a special point of the fact that "the City and County of San Francisco has developed its own 'Computer Store' . . . ."  Opp. at 3.  This purchasing method is actually *not* unique to San Francisco; the State of California ran a similar Computer Store from which all California class members could purchase.  Keskeys Decl. at ¶ 10.

The evidence demonstrates the universality of purchase options.  Plaintiffs' expert summarizes purchase data showing the full range of state agencies and class members presented in defendants' lists of "diverse" governmental purchasers, from the largest to the smallest, purchasing computer equipment off the same contracts.  Flamm Reply at 41-44.

The Class Representatives' claims here are typical of the claims of the classes.

### 3.    Adequacy of Representation

Defendants do not dispute plaintiffs' counsels' qualifications or the adequacy of any of the Class Representatives, except for New Mexico's County of Sandoval.

The controversy over Sandoval's adequacy is of little moment, because the State of New Mexico is also a class representative for the same entities.  Motion at 1.  Local government class actions are frequently certified when the state itself is the only representative.[1]

The fact that the County of Sandoval does not have purchase records does not make it an

---

[1]*In re Terazosin Hydrochloride Antitrust Litigation*, 220 F.R.D. 672, 693 n. 36  (S.D. Fla 2004); *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 1992 WL 220753, *6-*7  (C.D. Cal. 1992); *State of New York v. Salem Sanitary Carting Corp.*, 1989 WL 86997, *2 (E.D.N.Y. 1989); *State of Alabama v. Chevron U.S.A.*, 1980 WL 1808, *1-*2 (M.D. Ala. 1980); *In re Fine Paper Antitrust Litigation*, 82 F.R.D. 143, 145-146, 156 (E.D. Pa. 1979); *In re Plywood Antitrust Litigation*, 1977 WL 1549, *2 (E.D. La. 1977); *In re Arizona Dairy Products Litigation*, 1975 WL 908, *1 (D. Ariz. 1975); *In re Ampicillin Antitrust Litigation*, 55 F.R.D. 269, 274 (D.C. Cir. 1972); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 333 F.Supp. 267, 269, 272-73 (S.D.N.Y. 1971);  *State of Illinois v. Harper & Row Publishers*, 301 F.Supp. 484, 486, 492 (N.D. Ill. 1969); *State of Iowa v. Union Asphalt & Roadoils, Inc.*, 281 F.Supp. 391, 400-03 (S.D. Iowa 1968), *aff'd*, 409 F.2d 1239 (8th Cir. 1969); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559, 563-564 n.3, 573 (D. Minn. 1968); see also *State of Illinois v. Associated Milk Producers, Inc.*, 351 F.Supp. 436, 438, 400 (N.D. Ill. 1972).

1   inadequate class representative. It can still prove liability, impact, and damages, for itself and for

2   all class members, even if its ability to claim damages might be constrained by the state of its

3   records. Nothing suggests that class representation can or should turn on document retention.

4       However, if for some reason the Court determined that County of Sandoval was not an

5   adequate class representative and that an additional representative was needed, the Court can and

6   should certify the class and allow another of New Mexico's governmental entities to intervene as a

7   class representative. *Rivers v. Califano*, 86 F.R.D. 41, 46 (S.D.N.Y. 1980) (where named plaintiffs

8   did not have claim, class certification appropriate upon intervention of plaintiffs with valid claims).

9       **B.    Federal Rule of Civil Procedure 23(b) Requirements**

10          **1.    Predominance**

11              **a.    Antitrust Violation and Proof of the Amount of Damages**

12      Defendants apparently do not dispute that common issues predominate as to the element of

13  antitrust violation and make no argument directed to proof of the amount of damages.

14              **b.    Impact**

15                  **(1)    Proof of Impact in an Indirect-Purchaser Case**

16      Defendants make several ineffectual arguments to distinguish the numerous *Microsoft* cases

17  certifying component indirect purchaser classes. In the *Microsoft* cases, the courts certified classes

18  of purchasers who bought the product whose price was raised by the antitrust offense (Windows)

19  only through their purchasers containing Windows as a component.

20      First, defendants assert that the courts showed "striking differences in their approach" to class

21  certification (Opp. at 16) – suggesting only that there are multiple grounds for certifying such

22  classes. Next, they point to spurious distinctions, such as that there was a single seller of Windows

23  (not surprising in monopolization cases); that there were relatively few competitive intermediate

24  levels (because Windows was distributed as a computer component, just like DRAM in this case);

25  and that each class member made relatively few purchases (which would seem to make impact

26  *harder* to prove). Opp. at 17. Finally, defendants posit that the decisions granting certification

27  resulted from a "snowball" effect (Opp. at 17) – in other words, that these cases are precedential.

28      Defendants' narrow view of the *Microsoft* cases contradicts this Court's earlier observation:

4

1    "[T]hese [*Microsoft*] class certification decisions . . . may undoubtedly be relevant at the class

2    certification stage . . . ." *In re Dynamic Random Access Memory (Dram) Antitrust Litigation*, 516

3    F.Supp.2d 1072, 1091 (N.D.Cal. 2007).

4            In response to the *Microsoft* cases, defendants offer the Court comfort in numbers by string-

5    citing a profusion of decisions, mostly unpublished, denying indirect purchaser classes. Opp. at 7-8

6    n. 4, 20 n. 8. Defendants do not discuss the reasons for class denial in those decisions.

7            Particularly instructive is defendants' citation to *In re Methionine Antitrust Litigation*, 2003

8    WL 22048232 (N.D. Cal. 2003). In that case, Judge Breyer of this court had certified an indirect

9    purchaser class where the price-fixed product (a feed additive) was a component of the product the

10   class members bought (animal feed). In certifying the class, the court had rejected the very

11   arguments defendants make here – that multiple regression analysis is insufficiently accurate, that

12   sufficient data were not available, and that the additive was a minuscule part of the product the class

13   members bought. *Id.* at *2-*3. Defendants cite the case because the court ultimately decertified the

14   class, but it did so only because plaintiffs' expert never carried out the proposed analysis, not

15   because certification was improper in the first instance. *Id.* at *4.

16           Some of defendants' authorities give no reason for denial, or affirm denial without

17   examination, or decry inadequacies in the expert's analysis without identifying them.[2]

18           Many of defendants' authorities turn on state substantive law limitations not applicable to

19   California or New Mexico. In Michigan and Alabama cases, the states' antitrust laws required

20   precise proof of individualized damages, necessitating a separate trial for each class member.[3] The

21

22       [2]These include *Harbin v. Johnson & Johnson Vision Prods.*, No. CV 94-2872 (Ala. Cir. Ct.,
     Mobile Co., Sept. 12, 1995); *In re Brand Name Prescription Drugs Antitrust Litig. (Price v.*
23   *American Home Prods.)*, 1994 WL 663590 (N.D. Ill. 1994); *City of St. Paul v. FMC Corp.*, 1990-2
     Trade Cas. (CCH) ¶ 69,283, 1990 WL 259683 (D. Minn. 1990); *Borden, Inc. v. Universal Indus.*
24   *Corp.*, 88 F.R.D. 708 (N.D. Miss. 1981) (suit for class of 1,000,000 indirect purchasers of refined
25   sugar).

26       [3]*Fish v. Microsoft Corp.*, Case No. 00-031126-NZ (Mich. Cir. Ct., Wayne Co., Apr. 8, 2004) at
     17 ("distribut[ion of] class-wide damages to the members of the class on an average or generalized
27   basis . . . is legally impermissible in Michigan"); *A & M Supply Co. v. Microsoft Corp.*, 654 N.W.2d
     572, 599 (Mich Ct. App. 2002) ("generalization is inherently incompatible with proving actual
28                                                                                  (continued...)

1   California and New Mexico damages rules are expressly to the contrary.  *Bruno v. Superior Court*,

2   127 Cal.App.3d 120, 132-133 (1981) (rejecting the position that "no damages can be recovered

3   unless they are to be distributed only to those who suffered injury and only in the amount that each

4   person was injured"); *State of California v. Levi Strauss & Co.*, 41 Cal.3d 460, 472 (1986)

5   (approving *Bruno*); *Romero v. Philip Morris Incorporated*, 137 N.M. 229, 250-51, 109 P.3d 768

6   (N.M. Ct. App. 2005) (rejecting defendants' authority *Ren v. Philip Morris, Inc.*); see, *Ashley,* 1998

7   WL 35167783, p. 42 n. 21 (contrasting Alabama and California antitrust law).

8   Interestingly, though, even when some of defendants' authorities denied class certification

9   because of these stringent damages rules, they found that impact – the issue defendants press here –

10  could be demonstrated on a classwide basis.  *A & M Supply Co.,* 654 N.W.2d at 600-01; *Ren v.*

11  *Philip Morris, Inc.*, 2002 WL 1839983 at *11; *Ashley,* 1998 WL 35167783 at p. 39.  Thus, these

12  authorities actually support class certification in this case.

13  The Minnesota authorities on which defendants rely identify similar problems.[4]  Defendants'

14  remaining authorities present other problems not faced here.[5]

15  The authorities strongly indicate that certification would be proper in this case.

16  _____

17  [3](...continued)
    damages"); *Ren v. Philip Morris, Inc.*, 2002 WL 1839983, *17 (Mich. Cir. Ct. 2002) ("The rule
    prevails in Michigan that damages for unfair competition . . . which are uncertain or speculative
18  cannot form the basis for recovery");  *Ashley v. Archer Daniels Midland Co.*, 1998 WL 35167783,
19  p. 42 n. 21 (Ala. Cir. Ct. 1998).

20  [4]*Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 137-38 (Minn. Ct. App. 1987) (proof of
    damages required individual trials); *Kerr v. Abbott Labs.*, 1997 WL 314419, 1997-1 Trade Cas.
21  (CCH) ¶ 71,776 (Minn. Ct. App. 1987) (same); *Ludke v. Philip Morris Companies, Inc.*, 2001 WL
22  1673791, *3 (Minn. Dist. Ct. 2001) (same).

23  [5]*Execu-Tech Business Sys., Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19, 21 (Fla. Ct. App. 1999)
    (court struck expert testimony based on admittedly untrue assumptions); *Godden v. Marigold Foods,*
24  *Inc.*, No. C8-97-932 (Minn. Dist. Ct., Ramsey Co., Mar. 20, 2000) (class consisted of hundreds of
    thousands of individual consumers); *Derzon v. Appleton Papers*, 1998 WL 1031504, *5, *7-*9 (Wis.
25  Cir. Ct. 1998) (class consisted of hundreds of thousands of purchasers with conflicting claims, no
26  expert identified, damages could not be proved under Wisconsin procedure which, unlike federal
    procedure, does not allow bifurcation); *Wilcox v. Archer-Daniels-Midland Co.*, No. 96- 17 82473-CP
27  (Mich. Cir. Ct., Ingham Co., Sept. 29, 1997) (class consisted of 8 million unidentifiable consumers,);
    *Fischenich v. Abbott Labs.*, No. MC-94-6868 (Minn. Dist. Ct., Hennepin Co., May 26, 1995) at p. 6
28  (class consisted of over 1,000,000 retail consumers).

6

1

**(2)    Proof of Impact in This Case**

2    In support of this motion, Class Representatives' expert demonstrated that the accepted

3    economics literature, standard economic analysis, and his own considerable experience

4    overwhelmingly support the conclusions that DRAM prices affect the prices of equipment containing

5    DRAM, that this price effect will be passed through to purchasers of the equipment, and that there

6    are reliable methods for demonstrating these facts using available data. Flamm Report at 9-13, 20-

7    26, and 31-37. He also provided an illustrative example, using readily available data, of how pass-

8    through of DRAM costs to equipment purchasers could be estimated. *Id.* at 44-45. Defendants'

9    expert disputes these conclusions, but her attempted refutation is totally ineffectual. Flamm Reply

10    at 16-18 and Tab 4.

11    Defendants principally argue that there might be class members that suffered no impact (Opp.

12    at 9-10), and that the diversity of products and purchasers will make impact hard to prove (Opp. at

13    14-20). (Defendants use the terms "impact," "fact of damage," and "injury" synonymously. Opp.

14    at 7.) Neither of these arguments is sufficient to avoid class certification.

15    These attacks on the class certification motion should all be familiar to the Court. In the

16    private direct purchaser case, defendants essayed almost identical arguments:

17    Defendants . . . contend that the complexity of the DRAM market, and the diversity of
       DRAM products and prices present therein, makes common proof of impact impossible.
18    Specifically, defendants point to the variations among the different types of DRAM . . ., the
       various customer categories that utilize different types of DRAM for different purposes, and
19    the varying methods of purchasing DRAM . . . . Defendants also utilize the testimony of
       their own expert, Margaret E. Guerin-Calvert, to assert that these differences, when properly
20    taken into account, present a far more differentiated picture of the DRAM market – one in
       which price is not correlated across product and customer class. . . . Defendants claim that
21    this differentiated picture of the market makes it impossible. . . [to] prove through
       generalized evidence that the prices paid by the absent class members were so impacted.
22

23    *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, 2006 WL 1530166, *8 (N.D.

24    Cal. 2006) ("*DRAM Class Decision*"). The Court certified the classes, which is proper "regardless

      whether some members of the class negotiated price individually, or whether – as here – differences

25    among product type, customer class, and method of purchase existed." *Id.* at *9.

26
       **(a)    The Suggestion of Zero Pass-On Sales Does Not
27              Defeat Class Certification**

28    Defendants first argue that class certification should be denied because, they say, "pass-on

7

1  could be zero for substantial portions of the class." Opp. at 8. The law is to the contrary: "Even if

2  it could be shown that some individual class members were not injured, class certification,

3  nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class."

4  *In re NASDAQ Market-Makers Antitrust Litigation*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996); accord,

5  *In re Warfarin Sodium Antitrust Litigation*, 212 F.R.D. 231, 252 (D. Del. 2002).

6      Furthermore, plaintiffs need not show impact to a certainty. Like all other elements of

7  plaintiffs' proof, "'fact of damage' . . . requires a showing by a preponderance of the evidence."

8  *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 989 (5th Cir. 1983). According to defendants'

9  own authority, "[i]f the same evidence will suffice for each member to make a *prima facie* showing,

10  then it becomes a common question." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005).

11      Thus, the Class Representatives need not show that each individual class member was

12  impacted; they need only show that common proof can demonstrate class-wide impact to a fair

13  degree of certainty. *In re Terazosin Hydrochloride Antitrust Litigation,* 203 F.R.D. 551, 558 (S.D.

14  Fla. 2001), vacated on other grounds*,* 350 F.3d 1181 (11th Cir. 2003). This is what they have done.

15      Defendants do not actually undertake to demonstrate that numerous class members were not

16  injured. Instead, they try to show that, under certain abstract hypotheses, some individual sales could

17  theoretically have been made without pass-on. However, since most class members undoubtedly

18  bought multiple items containing DRAM, the possibility that there were individual sales with no

19  pass-through does not imply, without more, that many class members suffered *no* impact from all

20  their purchases. Moreover, defendants' hypotheses do not reflect any real-world conditions.

21      First, defendants argue that some class members did not sustain injury because "plaintiffs'

22  expert conceded that there were periods within the alleged conspiracy where prices were competitive

23  and thus no harm was incurred." Opp. at 9. Defendants neglect to mention that they are speaking

24  only of an expert for the indirect private plaintiffs; no expert presented by the Class Representatives

25  (or the States) has ever suggested such a conclusion. Flamm Reply at 20. However, the point is

26  irrelevant. From an economic perspective, prices would be expected to reflect current economic

27  value or opportunity costs, meaning that the price of equipment would reflect the price of the inputs

28  on the day the equipment was sold, not on the day it was built. Flamm Reply at 20. In any event,

8

1   if the conspiracy did have a hiatus, then it had two beginnings and two endings, but there are no

2   additional conceptual difficulties in proving impact.  Flamm Reply at 20-21.

3          Second, defendants argue that there would be no pass-on where "supply elasticity is zero" –

4   i.e., that the supply available is wholly unresponsive to price. Opp. at 9.  The suggestion, however,

5   is untenable; there is no possibility that the supply elasticity of DRAM-containing equipment would

6   be zero in any real-world setting. Flamm Reply at 21-25.

7          Third and fourth, defendants argue that equipment sellers might be unable to pass through

8   DRAM price increases because they base their pricing on forecasts of DRAM prices, or because they

9   have entered into long-term contracts that do not allow them to raise their equipment prices.  Opp.

10  at 9-10.  There are numerous reasons why these scenarios will not prevent the expected pass-through

11  of DRAM costs.  Flamm Reply at 25-26.  The biggest problem is that they ignore the fact that prices

12  of equipment such as PCs were continually, and dramatically, dropping throughout the relevant time

13  period.  *Id.* at 26-28.  Consequently, even if the selling prices for equipment were for some reason

14  capped, an increase in DRAM prices would still impact purchasers by slowing the decline of

15  equipment prices. *Id.* at 27-30.  The graphs and data that defendants' expert present suggest that this

16  is precisely what happened.  *Id.* at 28.

17         This indisputable aspect of the market also exposes the fallacy of defendants' assertion that

18  OEMs were unable to raise computer prices.  Opp. at 10.  The cited testimony does not address

19  whether prices declined more slowly because of high DRAM prices, and therefore says nothing about

20  whether pass-through occurred through a failure to lower prices.  Flamm Reply at 30.

21         Fifth, defendants argue that high transaction costs might prevent pass-through. Opp. at 10.

22  In fact, though, the transaction costs for price changes in this industry were quite small.  Flamm

23  Reply at 30-31.  In any event, this hypothetical simply posits that some DRAM price increases were

24  too small to affect equipment prices – a classwide effect that would be detected in a classwide

25  analysis of pass-through.  *Id.*

26         Sixth, defendants say that the Class Representatives' expert concedes that transitory or short-

27  term DRAM price increases might not be passed through to equipment manufacturers.  Opp. at 10.

28  Because a transitory price increase is, by definition, one that causes no injury, the fact that it would

9

not cause impact is tautological and not surprising. Flamm Reply at 31-32. If a DRAM price increase were short-term but not transitory, then the classwide methods of assessing impact and damages that Class Representatives' expert proposes would be expected to detect whatever effect it had. *Id*.

Finally, defendants argue that some of the DRAM sold during the conspiracy period was manufactured by non-defendants. Opp. at 10-11. They assert that "it would be impossible to determine whether an end-user purchased a computer or module containing DRAM supplied by a defendant or a non-defendant." *Id.* at 11. Defendants ignore completely the detailed discussion of this precise issue in the Motion at page 20 and the initial Flamm Report at pages 37 to 40, which shows that it is possible to set simple criteria that assure, to any degree of certainty desired, that class members were impacted by purchases of equipment containing DRAM sold by conspirators.

>                    **(b)**    **The Supposed Diversity of Products and Purchasers Does Not Defeat Class Certification**

In arguing that diversity defeats class certification, defendants misconstrue what a plaintiff must show to demonstrate antitrust impact. They view impact as a quantitative determination, and they presume that plaintiffs will need to prove that each class member suffered exactly the same impact. They argue, for example, that "the pass-on rate is not 100% for every product – or perhaps any product – at issue here"; that "pass-on rates vary dramatically across as well as within categories of products containing DRAM"; that "the rate of pass-on is dependent on supply and demand conditions in the downstream markets and thus cannot be applied broadly across or within categories." Opp. at 12, 13. Defendants, in other words, argue that class certification should be denied because diversity means that different class members suffered different degrees of impact.

To the contrary, the only question in determining impact is *whether*, not *how much*, the class members were injured, and plaintiff's burden "is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 (1969). Defendants' arguments evade the actual question the impact requirement raises:

> To the extent Defendants focus on the quantum of damage suffered in their common impact analysis, however, their focus is misplaced. Common proof of impact is possible without

10

1    common damage amounts.

2    *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297, 309 (E.D. Mich. 2001), quoting *In re*

3    *Potash Antitrust Litig.*, 159 F.R.D. 682, 694 (D. Minn. 1995).  If plaintiffs can show the class

4    members generally suffered some injury, then the impact requirement is satisfied, even if they were

5    impacted in different amounts.

6    　　　Defendants devote much of their attention to the diversity of products that contain DRAM

7    as a supposed barrier to classwide proof of impact.  Opp. at 11-14.  The suggestion is that pass-

8    through cannot be detected or measured because the different products have different configurations,

9    different prices, and different percentages of their cost tied up in DRAM.

10    　　　In fact, though, this type of analysis – determining individual price effects in products with

11    a wide range of components and configurations – is very common in the economic literature, and

12    the methods of performing such analyses are well established and well understood.  Flamm Reply

13    at 33-34 and Tab 12.  In particular, sound principles of economics and statistics show that it is not

14    at all necessary to perform a large number of separate analyses to determine price effects of

15    individual components, even where the product under study has hundreds or thousands of

16    configurations.  *Id.* at 34-35.  In any event, should the need arise, there is no reason why the analyses

17    Class Representatives' expert proposes could not be broken down into smaller groups, in the unlikely

18    event this proves to be necessary.  *Id.* at 35-36.

19    　　　Defendants similarly argue that the diversity of size among class member entities, and the

20    supposed diversity of purchasing methods they use, mean that impact cannot be determined on a

21    classwide basis.  Opp. at 14-16.  These position are totally at odds with the facts.

22    　　　The supposed diversity of purchasing methods available to the governmental entity class

23    members is illusory.  As is discussed above at pages 2 to 3, the governmental entity class members,

24    far more than a comparable set of private purchasers, share a common set of purchase options.

25    　　　The size of an entity, in particular, does not matter, precisely because of the broad set of

26    purchase options both large and small entities enjoy.  Dell Computer and a college student

27    assembling computers in his garage (both potential members of the direct purchaser class) probably

28    buy DRAM through different channels, but Alpine County, Oakland, and the University of California

11

1    at San Francisco all can and do buy precisely the same computer off WSCA, a multistate

2    governmental purchasing contract, at the same price. Flamm Reply at 44-45.

3        More generally, the Class Representatives' expert has examined a profusion of actual

4    purchases made by Class Representatives. As he explains, they show quite dramatically that Class

5    Representatives and class members, from the smallest to the largest, do indeed buy the same

6    equipment through the same channels at the same prices. Flamm Reply at 42-51 and Tab 13.

7    Neither the size of the entity nor the purchasing channel chosen makes a significant difference in the

8    prices paid. *Id*.

9            **2.    Superiority**

10       Defendants ignore the second Rule 23(b) criterion, superiority of the proposed class action

11   to other available methods, except to state without analysis that "Plaintiffs have not shown that

12   [class] treatment is superior to other alternatives." Opp. at 21. To the contrary, a class action is far

13   superior to the available alternative method, individual actions for the absent class members.

14       Individual actions are a viable but not desirable alternative for California and New Mexico

15   governmental entities. Cal. Bus. & Prof. Code § 16750(c); N. M. Stat. Ann. § 57-1-3.B. Individual

16   actions for hundreds or thousands of entities will present enormous procedural inconveniences – the

17   precise inconveniences the class action device was designed to circumvent.

18       **C.    This Class Action Is Manageable**

19       Defendants also urge that the Class Representatives have failed to satisfy a supposed

20   requirement of the Ninth Circuit that they present a realistic trial plan. Opp. at 20. Actually, as the

21   two authorities they cite show, there is no separate "trial plan" requirement; a class trial is feasible

22   if and only if common issues predominate. In *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d

23   1180, 1189 (9th Cir. 2001), certification was inappropriate "[b]ecause [plaintiff] seeks certification

24   of a nationwide class for which the law of forty-eight states potentially applies." In *Valentino v.

25   Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996), certification was inappropriate because "the

26   certification order . . . is . . . silent as to any reason why common issues predominate . . . ."

27       The Class Representatives' "trial plan" is neither complicated nor novel, and it is the same

28   regardless of whether the class is certified. They will 1) prove defendants' liability using evidence

                                              12

specific to defendants, not to individual purchasers; 2) prove impact on virtually all governmental entities, including the Class Representatives' agencies and the very similar class member entities, using one or more of the several methods proposed by the Class Representatives' expert economist; 3) establish a formula for estimating damages on the basis of purchases, again using one or more of the several methods proposed by the Class Representatives' expert economist; and 4) determine damage awards by estimating purchases through claims or through estimates based on the purchase survey Plaintiff States are undertaking. This is the type of plan often accepted for large and complex class actions. *Dukes v. Wal-Mart, Inc.*, 509 F.3d 1168, 1190 (9th Cir. 2007).

### D.    The Classes Should Also Be Certified Because Class Representatives and Class Members Are, to a Substantial Extent, Direct Purchasers

Defendants ignore the fact that the State of California and its public entities are, for many DRAM purchases, direct purchasers – mostly because they are assignees of manufacturers who bought DRAM from defendants and sold products containing those DRAM. Cal. Govt. Code § 4552. As with the private direct purchasers, this Court should certify the California class, at the very least, because the California governmental entities are assignees of direct purchase claims.

### E.    Standing Issues Do Not Defeat the Satisfaction of the Predominance Criterion

Defendants also raise, and quickly drop, the issue of standing. Opp. at 6. They note that this Court has elsewhere held that purchasers of DRAM incorporated into other products do not have standing under state antitrust laws, applying *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") to overcome the state legislative directive that plaintiffs may proceed without regard to whether they dealt directly or indirectly with defendant. Cal. Bus. and Prof. Code § 16750(a); N. M. Stat. Ann. § 57-1-3.A. Defendants tell the Court there is no need to address the issue here "because the requirements of Rule 23 preclude class certification." Opp. at 6.

The requirements of Rule 23 do *not* preclude class certification, and this Reply explains at length why this is so. There are other reasons why the Court need not address the *AGC* issue here.

First, regardless of any standing issues, the ultimate disposition of the claims is not an issue at the class certification stage. "The court does not make a preliminary inquiry into the merits of

1    plaintiffs' claims in determining whether to certify a class." *DRAM Class Decision* at *3.

2    Furthermore, standing issues do not affect class certification because the California and New

3    Mexico Class Representatives can and will proceed on unfair competition and unjust enrichment

4    claims, and seek the remedy of restitution, on behalf of themselves and the represented class

5    members. Such claims are, like the antitrust claims, readily amenable to class certification.

6    The States' Third Amended Complaint alleges that defendants violated California and New

7    Mexico's unfair competition statutes, and that the defendants were unjustly enriched. Third

8    Amended Complaint at ¶¶ 160, 171-74, 176(b)(vi)-(vii), 233, 312, 314, Prayer E at p. 64. It

9    therefore asks for the remedy of restitution. Third Amended Complaint at ¶¶ 2, 176, Prayer E at

10   p. 64. Thus, even if these cases did not proceed as class actions on state law antitrust claims, they

11   could just as well proceed as class actions on unfair competition or unjust enrichment claims. The

12   California and New Mexico unfair competition statutes expressly recognize that class actions are an

13   appropriate means of obtaining relief for multiple victims. Cal. Bus. & Prof. Code § 17203;

14   N.M.S.A. § 57-12-10(E).

15   As with the antitrust claims, the commonality criterion is easily satisfied because the primary

16   concern is the legal and factual implications of defendants' actions, which affected the representative

17   and represented class members alike:

18
19   > In looking at claims for unjust enrichment, we must keep in mind that the very nature of such claims requires a focus on the gains of the defendants, not the losses of the plaintiffs. That is a universal thread throughout all common law causes of action for unjust enrichment.

20   *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D. 2004) (finding commonality

21   criterion satisfied).

22   The common issues of law and fact predominate for unjust enrichment claims, because of

23   the very nature of those claims. For example, in *In re Cardizem CD Antitrust Litigation*, 200 F.R.D.

24   326 (E.D. Mich. 2001), the court addressed a class certification motion brought by indirect

25   purchasers pressing state antitrust and unjust enrichment claims. Predictably, defendants strongly

26   urged that individual claims would predominate. *Id.* at 352. The court concluded:

27
28   > [T]he nature of Plaintiffs' restitution claim for unjust enrichment and disgorgement is undivided and integrated, and "the disgorgement remedy would inure to the benefit of the class rather than vindicate any alleged violations of individual rights." *In re Cardizem CD*

14

1    *Antitrust Litig.*, 90 F.Supp.2d 819, 825-26 (E.D. Mich.1999) (internal quotes and citations
     omitted). Plaintiffs' success or failure in proving this unjust enrichment claim will mean
2    success or failure for the class as a whole; not individual class members.

3    . . .

4    Accordingly, this Court finds that common questions predominate over individual ones as
     to Michigan Plaintiffs' undivided and integrated unjust enrichment claim.

5    *Id.*

6    Even more than the antitrust claims, the unjust enrichment claims are amenable to class

7    treatment.

8    **III.    CONCLUSION**

9    All of the criteria of Rule 23 are met here.  In particular, even if the Court were to accept

10   defendants' invitation to referee a battle of the experts, it is apparent that impact can be proved on

11   a classwide basis.  In the markets at issue here, marketwide passing-on of an overcharge can readily

12   be proven.  This is true notwithstanding the supposed diversity of products and of purchasers –

13   diversity that would be present to precisely the same degree even if the classes are not certified,

14   because state agencies buy the same range of products and are just as diverse in size and function

15   as the class members.

16   For all of the reasons stated above, the classes should be certified.

17   Dated:  March 19, 2008

18

19   EDMUND G. BROWN JR.                          GARY K. KING
     Attorney General of the State of California   Attorney General of the State of New Mexico
20   KATHLEEN E. FOOTE
     Senior Assistant Attorney General            /s/ Deyonna Young
21                                                 DEYONNA YOUNG
     /s/ Emilio Varanini                          Assistant Attorney General
22   EMILIO E. VARANINI                           Attorneys for the State of New Mexico
     Deputy Attorney General
23                                                 I, Charles M. Kagay, attest that concurrence
     SPIEGEL LIAO & KAGAY, LLP                     in the filing of the document has been
24                                                 obtained from each of the other signatories.
     /s/ Charles M. Kagay
25   Charles M. Kagay                              /s/ Charles M. Kagay
     Attorneys for the State of California         Charles M. Kagay

26

27

28

15