**REDACTED**

EDMUND G. BROWN, JR.
Attorney General of the State of California
JAMES HUMES
Chief Deputy Attorney General
JANET GAARD
Assistant Chief Attorney General
KATHLEEN E. FOOTE, SB#65819
Senior Assistant Attorney General
NICOLE GORDON, SB #224138
Deputy Attorney General
SANGEETHA RAGHUNATAN, SB #229129
Deputy Attorney General
EMILIO VARANINI, SB #163952
Deputy Attorney General
State Bar No. 163952
    455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-3664
    Telephone: (415) 703-5908
    Fax: (415) 703-5480
    Email: Emilio.varanini@doj.ca.gov
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION, <br><br> STATE OF CALIFORNIA, et al., <br><br>                       Plaintiffs, <br><br> vs. <br><br> This Document Relates to: <br><br> INFINEON TECHNOLOGIES AG, et al., <br><br>                       Defendants. | EXPERT REPLY REPORT OF DR. KENNETH FLAMM IN SUPPORT OF MOTIONS FOR THE CERTIFICATION OF GOVERNMENTAL ENTITY CLASSES |

**Table of Contents**

I. Overall Organization ........................................................................................................ 3

II. Overall Observations ....................................................................................................... 3

III. Questions Addressed ....................................................................................................... 3

IV. The Structure of This Report .......................................................................................... 5

V. Common Data and Methods That Can Be Used to Demonstrate the Impact on, and to Measure Damages to the States of California and New Mexico and their Political Subdivisions ...................................................................................................................... 6

VI. Greater Than 100% Pass-through ................................................................................. 13

VII. The Demonstrative Example of a Reduced Form Pricing Equation is Meaningful .... 16

VIII. Zero Pass-Through Is Highly Unlikely in Any Real-World Market for Equipment Containing DRAM ......................................................................................................... 18

IX. The "Small Share" of DRAM in Product Costs is Actually Quite Significant ............ 32

X. The Suggested Product Groups Are Not Too Broad or Diverse for Meaningful Analysis ..... 34

XI. Diversity Among State and Local Government Entities Is Not an Obstacle to Use of Common Data and Methods to Determine Injury or Measure Damages ................... 40

XII. Diversity Among Contract Mechanisms is Not An Obstacle to Use of Common Data and Methods to Establish Injury or Measure Damages ............................................. 47

XIII. Conclusion ..................................................................................................................... 51

My name is Kenneth Flamm. My qualifications are described in my previous report filed with the Court in this matter.

I.  Overall Organization

This Reply Report will respond to questions and issues raised in Margaret Guerin-Calvert's Declaration in Support of Opposition to Motion for Certification of Classes and in Defendants' Opposition to the Motion for Class Certification. I will also identify a number of other conceptual errors, errors of fact, and misstatements in these two documents.

II.  Overall Observations

I have been studying the computer and semiconductor industries for approximately 25 years. I have published five books and numerous scholarly articles analyzing the economics of theses specific industries, and I have consulted for numerous firms competing in these industries. I have also served as a senior procurement official in the U.S. Department of Defense. I am familiar with principles and practices in government procurement, and I have written and published on the subjects of government computer procurement and Defense Department procurement policies.

As before, the opinions I express in this Reply Report and in my prior report are based on this knowledge and experience, as well as my general background as a trained expert in economics and econometrics. In this Report, I will review my analysis of the questions I was originally asked to examine in light of the arguments brought forth to rebut my analysis on each question, when such an argument was provided.

III.  Questions Addressed

In my original report, I examined two questions. The first question was

1. Is there a common set of facts and common method of analysis to determine if injury has been suffered by the states of California and New Mexico and their political subdivisions as the result of price-fixing by the defendants in this case?

My answer to this question was "yes" and remains "yes". In my previous Report, I pointed out that this question could be logically divided into two sub-questions, both of which I answered in my previous Report. The first sub-question is:

    a. Are there common facts and methods which can be used to establish direct impact of a price-fixing conspiracy on DRAM prices?

The Court already in effect answered this questioned in the affirmative when it certified the direct purchaser class. I also answered this sub-question in the affirmative, and my answer is unchanged. Ms. Guerin-Calvert did not challenge this in her Declaration.

The second sub-question to the first question is:

    b. Are there common facts and methods which can be used to analyze the pass-through of increased DRAM prices, resulting from a successful price-fixing conspiracy, to indirect purchasers of DRAM-using computer equipment?

I answered this sub-question in the affirmative, and my answer is unchanged. I will examine her argument in detail below.

The second question I was asked to analyze was:

    2. Is there a common set of facts and a common method of analysis that can be used to measure damages to the states of California and New Mexico and their political subdivisions as the result of price-fixing by the defendants in this case?

As with the first question, my answer was and remains "yes". And, as with the first question, this question can be decomposed into two sub-questions. The first sub-question is:

    a. Are there common facts and methods which can be used to measure the direct impact of a price-fixing conspiracy on DRAM prices?

My answer to this sub-question remains a "yes". Ms. Guerin-Calvert has not questioned my review of the data and methods required to perform this measurement, and this Court implicitly answered this sub-question in the affirmative when it certified the class of direct purchasers in earlier litigation, because this issue is identical to the analogous issue raised in that case.

The second sub-question was:

> b. Are there common facts and methods which can be used to measure the pass-through of DRAM prices increases resulting from a price-fixing conspiracy to DRAM-using computer equipment purchases by the states of California and New Mexico and their political subdivisions?

My answer to this sub-question was "yes" and Ms. Guerin-Calvert has argued against the points I made. After considering these arguments, my answer is still "yes." I will examine and refute Ms. Guerin-Calvert's arguments in detail below.

IV. The Structure of This Report

Insofar as the pass-through of DRAM price increases to computer equipment prices is concerned, the methods and data used to determine impact are largely the same as the methods and data used to measure damages. Therefore, the common data and methods of analysis described in the two questions in my assignment are largely the same. In the remainder of the report, therefore, in responding to Ms. Guerin-Calvert's critiques of my analysis, I will not distinguish between common data and methods used to determine injury, and common data and methods used to measure damages. There are, however, two specific points on which the common methods and data differ across these two questions.

First, impact determination differs from damages estimation in that there is a unique aspect to the impact question, which is addressed in my original report at pages 37 to 40. The issue is how one might, if necessary, confine recovery to class members injured specifically because they bought equipment containing DRAM manufactured by conspirators. In my previous Report, I pointed out that, from an economic perspective, all DRAM users would be harmed by a successful price-fixing conspiracy, due to the commodity nature of DRAM products produced by

DRAM makers.[1] Ms. Guerin-Calvert did not challenge this conclusion. I also provided in my earlier Report a method for establishing, with any desired degree of certainty, that a class member had purchased one or more pieces of computer equipment containing conspirator-manufactured DRAM. Ms. Guerin-Calvert has not challenged this methodology, although she does for some reason state that I did not address the issue (end of paragraph 112, p. 37).

Second, damages estimation differs from impact determination in that there is an additional methodology that might be used in estimating damages to class members that might not be appropriate for demonstration of injury. This is the calibrated simulation model, discussed at pages 41 to 42 of my previous Report. Ms. Guerin-Calvert has not challenged this methodology in any way.

The balance of this Reply Report will analyze challenges to specific elements of my analysis: the common data and methods that can be used both to demonstrate pass-through of injury to the states and their political subdivisions as the result of the pass-through of DRAM price increases caused by the alleged price-fixing conspiracy, and to measure the damages suffered by these entities because of this pass-through.

V. Common Data and Methods That Can Be Used to Demonstrate the Impact on, and to Measure Damages to the States of California and New Mexico and their Political Subdivisions

I begin by reiterating an important point. In my earlier Report, I examined whether common data and methods were available to prove impact on and calculate damages on a classwide basis; I did not actually perform this analysis. This Reply Report will be directed to the same questions as before.

1. Established Effect of DRAM Prices on Computer Equipment Prices

I pointed out in my earlier Report that there is a substantial, existing body of published scholarly empirical research establishing that DRAM and other semiconductor prices have a

---

[1] See Tab 1 for sworn testimony by four of the defendants that there is a single price in global markets for like DRAM products. A conspiracy that successfully raised price for any one group of producers' DRAM products would raise prices for all such products.

6

substantial impact on computer equipment prices. My point in citing this literature was to demonstrate that the evidentiary burden of proving impact would be substantially lessened because there is considerable evidence of this fact already existing.

Ms. Guerin-Calvert responds by asserting that changes in DRAM prices over the alleged price-fixing conspiracy period were "slight."[2] She presents no evidence to support her view, and she does not address the extraordinary behavior of DRAM prices over the alleged conspiracy period (e.g., a 100% price increase in the first quarter of 2002, the largest in the recorded history of this industry) documented in my Report. In contrast, top executives at the DRAM producers who are defendants in this matter have acknowledged in sworn public testimony that DRAM is a commodity whose price **normally declines** 20 to 30 or more percent per year.[3]

Turning to the literature I cite, even Ms. Guerin-Calvert acknowledges "all of this support for correlation between semiconductor prices and computer prices."[4] Nevertheless, she erroneously attempts to minimize its importance and questions its relevance. She argues that the possible effects of price-fixing, in slowing DRAM price declines below normal rates, or even in increasing DRAM prices, somehow defy the empirically well-established correlation between semiconductor input (e.g., DRAM) prices and computer prices, asserting that this correlation "does not in any way demonstrate the impact of an alleged DRAM price-fixing conspiracy on individual purchases of DRAM-using equipment by individual government entities." (p. 39, par. 124)

---

[2] "no evidence" to suggest the ability to measure the extent to which *slight changes* in DRAM prices were reflected…" Guerin-Calvert Report, p. 38, par. 118, emphasis added.

[3] Steve Appleton, CEO of Micron Technology, testifying before the U. S. International Trade Commission on June 23, 2003: "Well, the price decline, first of all to clarify, with respect to initially the ability to reduce its costs over time, which in normal markets would correlate with price decline because you would have some margin that would be built in over time, the industry's ability to come down the learning curve, if you will, really hasn't changed in 20 years. It's still the 20 to 30 percent, and that historically has been the price decline with the exception of very, you know, artificial market dynamics that make it move more than that." Farhad Tabrizi of Hynix, testifying on June 23, 2002: "On an average, we can reduce the cost or price by about 40 percent per year." USITC Hearing of June 23, 2002, at page 255, lines 14-16. Michael Sadler of Micron: "one can normally expect a price declined [sic] related to cost improvements on the order of 20 percent per year roughly". USITC Hearing of November 22, 2002, at page 25, lines 14-16.

[4] Guerin-Calvert Report, p. 39, par. 124.

Ms. Guerin-Calvert's dismissive and unfounded assertion that this body of published studies has no relevance to pass-through is clearly erroneous. The articles I cited on pages 9 to 13 of my Report specifically discuss the role of semiconductor price changes in explaining computer price changes. Although none of these articles concludes that *all* of the changes over time in computer prices are explained by changes in the prices of semiconductor inputs (as I note in my report, DRAM and microprocessor costs equally split about 2/3 of the value of semiconductor inputs), *all* these studies *do* conclude that the semiconductor prices have played a very significant role in explaining computer price movements. The productivity studies that Ms. Guerin-Calvert cites as irrelevant (par. 122-123, p. 39) actually do measure how much of the change in computer prices is attributable to changes in the prices of semiconductors and other inputs used in computers. Those studies measure productivity by first deducting the separate contributions of semiconductor and other input price changes to changes in computer prices, and by then ascribing the remainder to productivity improvement within the computer industry.

As this description suggests, this type of analysis requires that the portion of the change in computer prices attributable to semiconductor price changes be estimated. All of these studies conclude that semiconductor price changes account for a very substantial share of changes in computer prices (40 to 60 percent, per Aizcorbe, Flamm and Khurshid's very detailed 2007 study).[5] These studies clearly speak to the issue of DRAM cost pass-through.

None of these studies actually calculate a pass-through rate. However, reduced form pass-through equations, similar to those I identified in my previous Report as usable in this case, actually were estimated in at least one of the studies I cited (Van Reenan's 2004 study of computer servers, which finds that "Higher input costs also have a significantly positive impact on own prices").[6]

---

[5] Guerin-Calvert States Report, p. 38, par. 120. Ms. Guerin-Calvert's Report states: "this study makes no attempt to control for other factors." The statement is incorrect. The analysis did control for the effects of the other factors, but did not make any attempt to disentangle them. That is, the study estimated the effects of all other factors (other than changes in semiconductor prices) in a single term, and made no attempt to decompose this aggregate further into component parts. The methodology did correctly account for the separate impacts of semiconductor prices and the combined effects of all other factors affecting semiconductor prices. This paper was published and has been widely cited.

[6] "[O]wn price" refers to server price.

Ms. Guerin-Calvert's description of this literature is inaccurate. She characterizes work by Aizcorbe, Oliner, and Sichel in the following way: "The paper by Aizcorbe, Oliner, and Sichel (2006) only deals with semiconductors and has no analysis of pass-through downstream."[7] In fact, Aizcorbe, Oliner, and Sichel say the following in their paper: "These swings in semiconductor prices have had a noticeable effect on the prices of computing equipment, which use semiconductors as a key input. Figure 2 displays the price index for computers and peripheral equipment in the National Income and Product Accounts along with the aggregate index of semiconductor prices." (Aizcorbe, Oliner, and Sichel, p. 7). Their graph is reproduced below.



Figure taken from Aizcorbe, Oliner, and Sichel, 2006.

---

[7] Guerin-Calvert Report, p. 39, par. 123.

9

1 | The correlation between semiconductor prices and computer prices is evident in the above graph. The correlation is not perfect because the cost of other components (e.g., disk drives) and other factors shifting computer demand would also be expected to change price. However, the above graph, which was created by government economists, does show the relationship between semiconductor prices and computer prices at the overall level of the U.S. macro economy. Similar correlations are very evident in detailed data that have been produced in this case. For example, data from CDW, a vendor since 1999 to the state of California and its political subdivisions through CMAS contracts, shows ▮▮▮ CDW ▮▮▮ based on Gartner data that I calculated in my Report. This suggests that a full analysis taking into account other factors on both the supply and demand sides is likely to conclude that pass-through from DRAM prices to computer prices is both identifiable and significant.

**REDACTED**

*Lagged MA means three-quarter moving average, lagged one quarter..*

| | |
|---|---|
| 1 | Indeed, we know that the reduced form pass-through equation I estimated in my Report |
| 2 | showed that DRAM prices were a statistically significant and quantitatively important |
| 3 | determinant of desktop PC and workstation prices, as measured in the U.S. producer price |
| 4 | statistics, after accounting for other supply and demand factors affecting computer prices. If the |
| 5 | same reduced-form pass-through equation is estimated using the entirely different CDW ▮▮▮ |
| 6 | ▮▮▮ shown in the graph above, as well as the other explanatory variables used in the pass- |
| 7 | through equation displayed in Appendix C of my Report, virtually identical results are produced. |
| 8 | The coefficient for DRAM price is again highly significant statistically, and remarkably close to |
| 9 | the value estimated in my original report, indicating that significant pass-through from DRAM |
| 10 | prices to computer prices is a statistically verifiable interpretation of the behavior depicted in the |
| 11 | above figure. |

2. Methods to Analyze Pass-Through

The methods used by economists to measure pass-through to consumers are well established, well documented, and well understood, and they are part of three voluminous bodies of economic literature cited in my previous Report. The three methods are: separate estimation of demand and supply relationships as part of a structural model; estimation of a reduced form relation; and careful and detailed case study.

Ms. Guerin-Calvert challenges only one of these three methods-- the reduced form method.[8] She mounts this challenge by quoting a passage from the **ABA Section of Antitrust Law, Econometrics (2005).** However, the quotation she presents is very much out of context. The entire passage actually supports my contention that the reduced form method can appropriately be used to make the type of assessment I have proposed. I reproduce below the quotation Ms. Guerin-Calvert gave. I have added, in italics, the text that immediately follows the material that Ms. Guerin-Calvert quoted:

---

[8] Guerin-Calvert Report, par. 133, pp. 41-42.

The reduced-form pricing equation assumes that a conspiracy has the same effect on every purchaser and focuses on an average effect, which may hide variation across class members. If one is attempting to test whether there is impact on all class members of a proposed class, however, that assumption is not valid, as it assumes the very proposition that is being tested. *As a result, somewhat more complex models that do not make such an assumption must be used to test for class-wide impact.*

*One approach is to divide the proposed class into categories and use a model that allows the value of the dummy variable to be different for different categories. This would be appropriate if members of the proposed class can be grouped using some observable structural characteristic that is believed to affect the price they will pay. For example, customers in one area may have seen smaller price increases than customers elsewhere because there was a small firm in the area that did not participate in the conspiracy.*

*Assuming that one can support this type of structure, the first reduced-form regression model could be changed to include a dummy variable that has a value of one during the time period of the conspiracy only if a customer is in the area that is believed to have had a smaller price effect. The model would produce one estimate of the effects of the conspiracy for customers not in the affected area and another for customers in the affected area. The hypothesis that customers in the affected area had a smaller price increase can be tested by the value of the dummy variable for customers in the affected area. If that coefficient is negative and significantly different from zero, then the results will support the view that those customers suffered a smaller price increase.*[9]

Thus, the ABA book from which Ms. Guerin-Calvert quoted does not say that a reduced-form pricing equation is inadequate or invalid in testing for impact. It instead says that, if there is reason to believe that there are systematic differences in impact experienced by class members

---

[9] ABA Section of Antitrust Law, *Econometrics* (2005), p. 222-223.

as the result of a conspiracy's effect on prices, then the reduced form pricing equation should be specified in a manner that allows for such systematic variation in impact to be tested. Thus, this source actually validates the use of a properly specified reduced-form pricing equation.

At various points in my initial Report, I propose precisely the sort of more precise reduced-form pricing equation that the ABA book advocates. I noted that it can be appropriate to control for contract volume in analyzing price data, because volume discounts are a well understood economic phenomenon.[10] I also noted that rich data sets exist that would permit investigation of differences in price across purchasing mechanisms if appropriate, though I would not expect *a priori* to detect significant differences.[11]

In addition, Ms. Guerin-Calvert repeatedly says that both demand and supply factors affect pass-through, and she implies that this would make an analysis difficult or impossible. In reality, all three of the methods discussed in my report control for both supply-side and demand-side factors in estimating pass-through of production cost increases to output prices. These same three economic methods are routinely used to estimate the effects of pass-through, in the numerous published economic studies in the three bodies of literature I cite in my original report, while taking into account changes in both supply-side and demand-side factors.

VI.  Greater Than 100% Pass-through

Ms. Guerin-Calvert maintains that pass-through of the cost of DRAM into the prices of equipment containing DRAM cannot exceed 100%. (This phenomenon is called "overshifting.") On this point, she is both inconsistent and incorrect.

Ms. Guerin-Calvert's positions on this topic are presented at Tab 2. In short, they are:

- In her Report to this Court in the fall of 2007, Ms. Guerin-Calvert took the unconditional position that standard economic theory held that pass-through could not exceed a maximum of 100%. Guerin-Calvert Report (Private Indirect

---

[10] See, for example, Flamm report, p. 27, line 18; p. 49, line 9. On the economics of purchasing discounts, Besanko, Dranove, Shanley, and Schaefer describe three situations in which bulk discounts might be offered, then conclude that "if these conditions do not hold, then purchasing economies may be nonexistent." D. Besanko, D. Dranove, M. Shanley, and S. Schaefer, *The Economics of Strategy*, 4th Edition, (Wiley: Hoboken, NJ), 2007, p. 86.

[11] Flamm Report, p. 50.

Purchaser Case) pp. 21-22, par. 57-8. She criticized experts for private plaintiffs for their "bizarre result" that pass-through rates might exceed 100%.[12]

In deposition in the fall of 2007, Ms. Guerin-Calvert further elaborated on this point, stating that  Guerin-Calvert Deposition (Private Indirect Purchaser Case) p. 221, lines 3-6. In her current Report, filed in February 2008, Ms. Guerin-Calvert now reverses her position, conceding that the literature review had identified "some theoretical conditions required for "overshifting." **"One such necessary (but not sufficient) condition is that the downstream firms have market power."** (Guerin-Calvert Report p. 40, par. 127)

- In deposition in March 2008, Ms. Guerin-Calvert (p. Guerin-Calvert Deposition p. 119, lines 10-20)

In fact, it is undisputed, in the economic literature and in widely-accepted economic theory, that overshifting is possible in numerous circumstances. In particular, it is undisputed that overshifting is possible in markets with many suppliers of differentiated products and easy entry and exit, a situation known as "monopolistic competition." Despite Ms. Guerin-Calvert's statements to the contrary, there is no general result in economic theory that pass-through cannot

---

[12] "…a bizarre result that invalidates his [Harris'] entire methodology." Guerin-Calvert Report (Private Indirect Purchaser Case), p. 21, par. 57.
"The Bohn Declaration follows the Harris Declaration in asserting that pass-through rates can—and according to Prof. Bohn would be expected to—exceed 100%. As demonstrated above, that assertion is inconsistent with standard economic theory." Guerin-Calvert, Indirect Purchaser Report, p. 30, par. 75.

exceed 100 percent in markets with the characteristics of "monopolistic competition," as defined above.[13]

Indeed, pass-through in excess of 100% would actually be expected in industries where firms produce differentiated products in competitive conditions, and face economies of scale— that is, where their average cost of producing a product declines with their level of output. In particular, as I note in Tab 3, in competitive industries with differentiated products and relatively easy entry and exit (monopolistic competition), when there are economies of scale, overshifting will be the *rule*, not the exception. Empirical studies by economists have characterized the personal computer industry as an industry which fits this description.

For this reason, it is likely that pass-through is greater than 100%, in the market conditions that prevail for most, if not all, of the types of computer equipment considered in the Plaintiffs' complaint. These points are discussed in detail in Tab 3.

Finally, as I pointed out in my original Report, to the extent that distributors, wholesalers, and retailers selling to government entities or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an additional reason for pass-through to exceed 100 percent. We know that the State Computer Store contracts for computer equipment were structured as cost-plus-markup. We know through declaration that CDW's ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and it is a matter of public record that CDW sold computer equipment through CMAS contracts to California government entities over this period.

---

[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Guerin-Calvert Deposition, March 7, 2008, p. 118, lines 10-20

15